William J. Heller
**McCARTER & ENGLISH LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

Thomas A. Smart (*pro hac vice*)
Paul Llewellyn (*pro hac vice*)
**KAYE SCHOLER LLP**
425 Park Avenue
New York, NY 10022
(212) 836-8000

*Counsel for Plaintiffs-Counterclaim*
*Defendants The Hershey Company and*
*Hershey Chocolate & Confectionery Corporation*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

THE HERSHEY COMPANY and HERSHEY
CHOCOLATE & CONFECTIONERY CORPORATION,

                  Plaintiffs-Counterclaim Defendants,

       v.

PROMOTION IN MOTION, INC.,

                  Defendant-Counterclaim Plaintiff.

:     07-CV-1601 (SDW) (MCA)

:     **<u>REDACTED</u>**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### PLAINTIFFS' LOCAL RULE 56.1 STATEMENT
### OF UNDISPUTED FACTS IN SUPPORT OF THEIR
### MOTION FOR PARTIAL SUMMARY JUDGMENT ON
### THEIR CLAIM TO CANCEL DEFENDANT'S SWISSKISS
### <u>TRADEMARK REGISTRATION FOR LACK OF *BONA FIDE* USE IN COMMERCE</u>

Pursuant to Local Civil Rule 56.1, plaintiffs-counterclaim defendants The

Hershey Company ("Hershey Company") and Hershey Chocolate & Confectionery Corporation

("Hershey Chocolate") (collectively, "Hershey"), submit this Statement of Undisputed Facts in

31940308.DOCX

support of their motion for partial summary judgment on their claim to cancel defendant

Promotion in Motion, Inc.'s ("PIM") trademark registration for SWISSKISS on the ground that

PIM has not made *bona fide* use of the mark in commerce, as required for registration.

   This Statement is based upon the deposition testimony and exhibits attached to the

Declaration of Thomas A. Smart, dated February 5, 2010 ("Smart Decl.").[1]

**Defendant Promotion In Motion**

  1.

  2.

  3.

  4.

---

[1]  Mr. Michael Rosenberg, President of PIM, appeared as PIM's Rule 30(b)(6) corporate representative during the proceeding between Hershey and PIM before the Trademark Trial and Appeal Board ("TTAB proceeding") and in the current litigation. Accordingly, there are citations in this document to two different Rosenberg deposition transcripts, one dated February 16, 2006, taken in the TTAB proceeding ("Rosenberg 06 Tr."), and one taken in this lawsuit, dated April 30, 2009 ("Rosenberg 09 Tr."). The TTAB proceeding has been stayed in light of Hershey's federal lawsuit against PIM. (Smart Decl. Ex. 39).

5.

6.       PIM has sold continuously for several years a SUISSE chocolate bar product that

PIM purchases from Maestrani, a Swiss manufacturer. (Smart Decl. Ex. 2, Rosenberg 06 Tr. 21-

22; *id.* Ex. 3, Rosenberg 09 Tr. 176-77).

7.       PIM presently advertises over ten products on its website

(www.promotioninmotion.com), including the SUISSE chocolate bar. (Smart Decl. Ex. 22; *id.*

Ex. 3, Rosenberg 09 Tr. 115-16).

**PIM's Application to Register the SWISSKISS Mark**
**and Its Statement of Use in Support Thereof**

8.       On May 8, 2002, PIM filed with the United States Patent & Trademark Office

("PTO") an intent-to-use application to register the mark SWISSKISS for use on "chocolate."

(Smart Decl. Ex. 8; *id.* Ex. 2 Rosenberg 06 Tr. 100-01; *id.* Ex. 3, Rosenberg 09 Tr. 50-51).

9.       The SWISSKISS mark was published for opposition on June 4, 2003. (Smart

Decl. Ex. 10; *id.* Ex. 3, Rosenberg 09 Tr. 51).

10.     On August 27, 2003, PIM amended the description of goods in the SWISSKISS

application from "chocolate" to "chocolate of Swiss origin." (Smart Decl. Ex. 11; *id.* Ex. 2,

Rosenberg 06 Tr. 120-23).

11.     The PTO issued a notice of allowance concerning the SWISSKISS mark on

February 10, 2004. (Smart Decl. Ex. 14; *id.* Ex. 2, Rosenberg 06 Tr. 145).

12.     On June 27, 2004, PIM filed with the PTO a statement of use asserting that the

SWISSKISS mark "was first used by [PIM] at least as early as 06/24/2004, and first used in

commerce at least as early as 06/24/2004, and is now in use in such commerce." (Smart Decl.

Ex. 12; *id.* Ex. 2, Rosenberg 06 Tr. 125).  PIM submitted a specimen showing the mark as used

in commerce consisting of "packaging for the goods."  (*Id.* Ex. 12; *id.* Ex. 2, Rosenberg 06 Tr.

125, 128-29).

       13.

       14.     The specimen submitted with the statement of use consisted of a cardboard header

attached to a clear cellophane bag that contained two chocolate SUISSE bars, which did not bear

the SWISSKISS mark.  The cardboard header bore both the SUISSE and SWISSKISS marks.

(Smart Decl. Exs. 9, 12; *id.* Ex. 2, Rosenberg 06 Tr. 102-03, 125-32).

       15.     The cardboard header PIM submitted as part of the specimen of use is different

from the cardboard header on the product that was actually shipped to Continental.  Specifically,

the cardboard header of the product shipped to Continental bore the SUISSE mark in the top left

corner, while the specimen submitted to the PTO bore the SUISSE mark in the top center of the

cardboard header.  (Smart Decl. Exs. 9, 12; *id.* Ex. 2, Rosenberg 06 Tr. 125-29; *id.* Ex. 3,

Rosenberg 09 Tr. 65-66; *id.* Ex. 6, Walsh Tr. 28-29).

       16.     The mark SWISSKISS for "chocolate of Swiss origin" was registered on Septem-

ber 28, 2004.  (Smart Decl. Ex. 18; *id.* Ex. 3, Rosenberg 09 Tr. 58).

**The Only Shipment of a Product with a SWISSKISS Mark**

       17.

18.

19.     For regular stock inventory, Continental always issues a purchase order.  (Smart

Decl. Ex. 5, Slonim Tr. 46).

20.     According to Aaron Slonim, President of Continental, "if [Adam Gottlieb] did his

work properly, he should have issued the purchase order."  (Smart Decl. Ex. 5, Slonim Tr. 5, 47).

21.

                        The cellophane bag with the two SUISSE bars

shipped to Continental was stapled to a cardboard header that bore the SWISSKISS and SUISSE

marks.  (*Id.* Ex. 9; *id*. Ex. 3, Rosenberg 09 Tr. 62-63).

22.

23.

24.     Thomas Walsh, PIM's Art Director, designed the cardboard header of the bars

shipped to Continental.  (Smart Decl. Ex. 6, Walsh Tr. 6, 25-28).

25.     Mr. Walsh personally stapled the cardboard header to the cellophane bag contain-

ing the two SUISSE chocolate bars.  (Smart Decl. Ex. 6, Walsh Tr. 50).

26.     Mr. Walsh is "not aware" of any other PIM product that "bear[s] one trademark

on the outside and has on the inside a product . . . that [is] wrapped with a different trademark on

it."  (Smart Decl. Ex. 6, Walsh Tr. 59).

27.

        The double backing was added "to prevent" "the chocolate bars [from]

falling."  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 62-63).

28.     Adam Gottlieb, Executive Vice President of Sales and Procurement at Conti-

nental, testified that he "[didn't] recall seeing a product like that before," that it was "different"

from what Continental "buy[s]" from PIM, and that he had never seen a header card with "the

same thing underneath than what is on the thing that is [on top]."  (Smart Decl. Ex. 1, Gottlieb

Tr. 3, 79-80).

29.     Aaron Slonim, President of Continental, testified that the packaging of the bars

shipped to Continental looked "homemade," that it was "not typical of any Promotion In Motion

package that [he had] seen before," and that Continental had never sold anything in packaging

like that before.  (Smart Decl. Ex. 5, Slonim Tr. 5, 37-39).

30.     Jeffrey Scudillo, Vice President of Special Markets at PIM, who coordinated the

June 24, 2004 shipment to Continental, testified that he never had "previously put two bars

together in a . . . clear plastic container and put a header on it" while working at PIM.  (Smart

Decl. Ex. 4, Scudillo Tr. 3, 16; *id*. Ex. 3, Rosenberg 09 Tr. 24-25).

31.

Continental also has its own small retail outlet store in Long Island, where the typical customers are Continental's own employees.  (Smart Decl. Ex. 1, Gottlieb Tr. 54-55, 92-94).

32.     There is no evidence that any of the products in the shipment to Continental was ever sold or shipped to any retailers.  (Smart Decl. Ex. 6, Walsh Tr. 31-32; *id.* Ex. 5, Slonim Tr. 40-42; *id.* Ex. 3, Rosenberg 09 Tr. 103-06; *id.* Ex. 4, Scudillo Tr. 26-27; *id.* Ex. 1, Gottlieb Tr. 84-87).

33.     Mr. Slonim testified that he did not know if any of the SWISSKISS products had been returned to PIM.  (Smart Decl. Ex. 5, Slonim Tr. 42).

34.     There is no evidence that any of the SWISSKISS products was ever sold in Continental's retail outlet store in Long Island.  (Smart Decl. Ex. 1, Gottlieb Tr. 84-85).

35.     There is no evidence that any consumer ever saw the SWISSKISS product that PIM shipped to Continental.  (Smart Decl. Ex. 3 Rosenberg 09 Tr. 105-06; *id.* Ex. 4, Scudillo Tr. 26-27; *id.* Ex. 5, Slonim Tr. 29, 41).

36.     Neither Michael Rosenberg, President and Chief Executive Officer of PIM, nor anyone else at PIM, made any effort to follow up with Continental to obtain any information regarding any reaction to the SWISSKISS product.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 6, 103-06; *id.* Ex. 4, Scudillo Tr. 25-27, 103-04; *id.* Ex. 5, Slonim Tr. 42-44; *id.* Ex. 1, Gottlieb Tr. 86-87).

37.     In prior launches, including for Welch's Reduced Sugar Fruit Snacks and Sour Jacks Sour Apple, PIM made test sales and then sought and received feedback on the products. (Smart Decl. Ex. 3, Rosenberg 09 Tr. 129-31, 136-38).

**Continental Received a Full Credit for the Shipment**

38.     Continental and PIM have engaged in "thousands" of transactions.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 106-07).

39.

40.     Continental ordinarily pays PIM for shipments received within ten days in order to get a discount.  (Smart Decl. Ex. 1, Gottlieb Tr. 70-71).

41.

42.     Continental did not get the discount because it did not pay the invoice within ten days.  (Smart Decl. Ex. 1, Gottlieb Tr. 71).

43.     As of early May 2005, Continental still had not paid the invoice for the June 24, 2004 shipment.  (Smart Decl. Ex. 24; *id.* Ex. 4, Scudillo Tr. 36).

44.     In or about May 2005, Mr. Scudillo of PIM told Mr. Gottlieb of Continental "just pay the bill and I'll get you credit on something else."  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 36-37, 101-02).

45.     Continental paid for the June 24, 2004 shipment of SWISSKISS product on May 13, 2005.  (Smart Decl. Ex. 24; *id.* Ex. 4, Scudillo Tr. 36).

46.     Continental paid for the June 24, 2004 shipment of SWISSKISS product only after it was guaranteed by PIM that it would receive a credit for the full purchase price of the product.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 36-38, 101-02; *id.* Ex. 4, Scudillo Tr. 38-39).

47.     On May 31, 2005, PIM issued Continental a credit for $1,020 (the full amount of the invoice for the June 24, 2004 shipment).  (Smart Decl. Ex. 25; *id.* Ex. 4, Scudillo Tr. 35-38).

48.     Mr. Scudillo could not testify to "any concrete examples of other instances in which [he] gave someone the full value of an order for a product that they never ordered again." (Smart Decl. Ex. 4, Scudillo Tr. 39).

49.     During the TTAB proceeding, Hershey served discovery requests, dated September 13, 2005, on PIM that called for the production of documents "sufficient to identify the total annual retail value of sales of [PIM's] products sold under the SWISSKISS mark" and "documents sufficient to identify [PIM's] total annual sales of all SWISSKISS products sold or sold for resale."  (Smart Decl. Ex. 37 at ¶¶ 12-13).

50.     On November 14, 2005, PIM responded to these discovery requests that it would produce any non-privileged documents in its possession, custody, or control responsive to these requests.  (Smart Decl. Ex. 7 at ¶¶ 12-13; *id.* Ex. 2, Rosenberg 06 Tr. 90).

51.

52.     When PIM opposed Hershey's motion for summary judgment on the issue of non-use in the TTAB proceeding, the briefs and affidavits PIM submitted did not disclose that Continental received full credit for the SWISSKISS product.

53.     The late payment and full credit regarding the invoice for the June 24, 2004 shipment with SWISSKISS product were never disclosed to the TTAB.

54.     In connection with the current litigation, Hershey served discovery requests on PIM, dated October 1, 2007, that called for production of all documents concerning "the offer to sell and sale to [Continental], of products bearing the SWISSKISS mark."  (Smart Decl. Ex. 40 at ¶ 4).

55.     On October 17, 2008, PIM responded to the request concerning the alleged sale to Continental of products bearing the SWISSKISS mark by stating that it had "already produced all non-privileged documents in its possession, custody or control responsive to this request in connection with the TTAB" proceeding.  (Smart Decl. Ex. 41 at ¶ 4).

56.     In the current litigation, on October 2, 2007, Hershey served a subpoena on Continental requesting, *inter alia*, documents concerning "any offer to sell and sale by Promotion in Motion to [Continental] of products bearing the name or mark SWISSKIISS."  (Smart Decl. Ex. 23 ¶ 1; *id.* Ex. 1, Gottlieb Tr. 24-25).

57.     On October 17, 2007, Continental responded to the subpoena by producing "the only document" it was able to locate that referenced SWISSKISS.  The document Continental produced was a copy of the June 24, 2004 invoice stamped "past due," and bearing some hand written notations on it, including "took deduction for 1020.00," "59468 CR," "as per Jeff Scudillo" and "as per Adam."  (Smart Decl. Ex. 21; *id.* Ex. 5, Slonim Tr. 27-28, 50).

58.     On April 30, 2009, Mr. Rosenberg appeared as PIM's 30(b)(6) corporate representative in connection with the current litigation, identified as the individual knowledgeable of matters including any sale of a SWISSKISS product.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 31-32, 35, 39).

59.     At his deposition on April 30, 2009, Mr. Rosenberg testified that he did not know if PIM had any documents that could specifically identify the credit to Continental in connection with the alleged sale of the SWISSKISS product.  (Smart Ex. 3, Rosenberg 09 Tr. 106-07).

60.     On June 8, 2009, PIM sent Hershey a letter confirming that PIM had conducted a thorough search of all pertinent accounting records for any evidence of payments received or credits issued to Continental and that the "only document located" was a computer printout showing payment of the June 24, 2004 shipment on May 13, 2005.  (Smart Decl. Ex. 24; *id.* Ex. 4, Scudillo Tr. 35-36).

61.     The next day, on June 9, 2009, PIM sent Hershey another letter stating that PIM had located a credit to Continental on May 31, 2005 that matched the $1,020 amount in the invoice for the June 24, 2004 shipment to Continental.  PIM produced a copy of a computer printout reflecting the credit to Continental.  (Smart Decl. Ex. 25; *id.* Ex. 4, Scudillo Tr. 36-38).

**PIM Has Made No Decisions Regarding SWISSKISS**

62.

63.

64.

65.

66.     The 50 cases shipped to Continental on June 24, 2004 constituted the entire inventory of products bearing the SWISSKISS mark.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 64-65).

67.     There is no current inventory of any product bearing the SWISSKISS mark. (Smart Decl. Ex. 3, Rosenberg 09 Tr. 64-65; *id.* Ex. 4, Scudillo Tr. 69-71, 105; *id.* Ex. 6, Walsh Tr. 32, 47-50).

68.     PIM continues to sell SUISSE chocolate bars (supplied by Maestrani).  PIM has not made another attempt to sell the SUISSE chocolate bars under the SWISSKISS mark. (Smart Decl. Ex.3, Rosenberg 09 Tr. 169-74, 176; *id*. Ex. 2, Rosenberg 06 Tr. 144)

69.

70.

71.

72.

73.

74.

75.

76.

77.

78.

79.

80.

81.

82.

83.　　PIM produced excerpts from the 2004, 2006, and 2008 Manufacturing

Confectioner's Candy Buyers' Directory that listed SWISSKISS in the directories' brand name

section as one of PIM's marks. (Smart Decl. Ex. 3, Rosenberg 09 Tr. 49-50, 346-47). The

directories do not contain any description of the SWISSKISS product or information regarding

its pricing. The directories are industry publications and are not targeted to consumers. (*Id.*).

On June 11, 2009, PIM also produced a sample shipping carton bearing nine marks, including

SWISSKISS. There is no evidence that PIM ever shipped any samples of the SWISSKISS

product in this or any other sample box. (*Id.* Exs. 30-31; *id.* Ex. 4, Scudillo Tr. 71-73; *id.* Ex. 6,

Walsh Tr. 62).

84.

85.

PIM's marketing department has con-

ducted market research, such as consumer focus groups, for other products.  (*Id.* Ex. 2, Rosen-

berg 06 Tr. 50; *id.* Ex. 3, Rosenberg 09 Tr. 121-22).

86.

87.

88.

89.     PIM created some mock-up packages bearing the SWISSKISS mark, all of which

were created after the June 24, 2004 shipment to Continental.  (Smart Decl. Exs. 20, 26-28, 42;

*id.* Ex.3, Rosenberg 09 Tr. 73-75; *id.* Ex. 4, Scudillo Tr. 48-49, 52-55; *id.* Ex. 6, Walsh Tr. 45-

46, 52, 56-57).

90.     Sometime after the Rule 30(b)(6) deposition in the TTAB proceeding (Feb. 16,

2006), PIM produced a sample package design, which was a green gusseted bag bearing the

SUISSE and SWISSKISS marks.  (Smart Decl. Ex. 20; *id.* Ex. 3, Rosenberg 09 Tr. 72-73).  This

mock-up design was taken to trade shows but was never used at "a commercial level."  (*Id.* Ex.

3, Rosenberg 09 Tr. 73-75).  It was created on January 21, 2005 and last modified on February 25, 2005.  (*Id.* Ex. 42).

91.     On June 18, 2009, six weeks after the Rule 30(b)(6) deposition in this case, PIM produced three additional "mock-up packages" bearing the SWISSKISS mark.

(Smart Decl. Exs. 26-29; *id.* Ex. 4, Scudillo Tr. 45-55, 68-69; *id.* Ex. 6, Walsh Tr. 45-47, 52, 55-58).

92.

Munz is not sold by PIM in the normal course of business.  (*Id.* Ex. 4, Scudillo Tr. 69).  Munz is a product that PIM "had considered to twist wrap in the SwissKiss packaging."  (*Id.* Ex. 3, Rosenberg 09 Tr. 384-85).  The Munz chocolates were added to the mock-up packages because PIM "wanted to see how the pack looks full."  (*Id.* Ex. 6, Walsh Tr. 47).

93.     Each of the mock-up gusseted bags produced in June 2009 was stamped "FPO" (which means "for position only") on the backside because PIM did not "have actual nutrient facts or ingredients" and PIM was only interested in seeing the position of where that information would be located on the package.  (Smart Decl. Ex. 6, Walsh Tr. 38).

94.     Two of these gusseted bags were created in January 2005 and last modified on April 27, 2006.  The third gusseted bag was created and last modified on April 27, 2006.  (Smart Decl. Ex. 42).

95.     None of the mock-up packages was ever made into actual product packages. (Smart Decl. Ex. 6, Walsh Tr. 48-50).

96.     None of the mock-up packages was ever filled with any SWISSKISS chocolate product.  (Smart Decl. Ex. 6, Walsh Tr. 47).

97.     There is no evidence that any individually wrapped piece of bite-sized chocolate bearing the SWISSKISS mark was ever created.  (Smart Decl. Ex. 4, Scudillo Tr. 69-71, 105; *id.* Ex. 6, Walsh Tr. 47).

98.     PIM has no inventory of any of the mock-up packages.  (Smart Decl. Ex. 6, Walsh Tr. 51-52, 55, 58-59; *id.* Ex. 4, Scudillo Tr. 104-05; *id.* Ex. 2, Rosenberg 06 Tr. 205-06).

99.

100.

**PIM's Activities Related to Other New Products Launched by PIM**

101.    In conjunction with the launch of HOT HEADS in February 2005, PIM issued a press release, distributed trade advertisements, and included the product image, product description, and press release on PIM's website (Smart Ex. 32; *id.* Ex. 4, Scudillo Tr. 75-83, 88).

102.    In conjunction with the launch of SPEED STRIPS in May 2006, PIM issued a press release, distributed trade advertisements, and included the product image, product description and press release on PIM's website.  (Smart Decl. Ex. 33; *id.* Ex. 4, Scudillo Tr. 91-93, 97-98).

103.    Following the product launches of HOT HEADS and SPEED STRIPS, PIM sold HOT HEADS and SPEED STRIPS continuously to several different customers.  (Smart Exs. 32-33; *id.* Ex. 4, Scudillo Tr. 84-88, 94-96, 101).

**Hershey's Demand Letters**

104.    On October 14, 2002, Hershey sent PIM a letter concerning its application to register SWISSKISS.  (Smart Decl. Ex. 34).  Hershey received no response from PIM.

105.    On July 15, 2003, Hershey filed with the PTO a request to extend time to file a notice of opposition; Hershey's request was granted on July 29, 2003.  Hershey filed a second request to extend time to file a notice of opposition on August 13, 2003.  The request was granted on August 21, 2003, giving Hershey until October 22, 2003 to oppose registration of the SWISSKISS mark.  (Smart Decl. Exs. 15-17, 35; *id.* Ex. 3, Rosenberg 09 Tr. 52-55).

106.    Hershey did not seek a further extension of time to oppose the SWISSKISS mark and did not file an opposition to the mark, which, as noted above, was registered on September 28, 2004.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 54-55, 58).

107.    On February 14, 2005, Hershey sent PIM a demand letter concerning the SWISSKISS trademark registration.  (Smart Ex. 19; *id.* Ex. 3, Rosenberg 09 Tr. 58-59).

108.    There were no communications between Hershey and PIM between October 2003 and February 14, 2005.  (Smart Decl. Ex. 3, Rosenberg 09 Tr. 59-61).

109.    Hershey instituted a cancelation proceeding at the PTO on April 12, 2005 concerning defendant's SWISSKISS mark.  (Smart Decl. Ex. 36).

Dated:  February 5, 2010

                                                            **McCARTER & ENGLISH LLP**

*Of Counsel*

                                                            By:   S/William J. Heller
                                                                    William J. Heller

Thomas A. Smart (*pro hac vice*)
Paul Llewellyn (*pro hac vice*)                             Four Gateway Center
Richard A. De Sevo                                          100 Mulberry Street
**KAYE SCHOLER LLP**                                        Newark, New Jersey   07102
425 Park Avenue                                             (973) 622-4444
New York, NY  10022
(212) 836-8000                                              *Attorneys for Plaintiffs-Counterclaim*
                                                            *Defendants The Hershey Company and*
                                                            *Hershey Chocolate & Confectionery*
                                                            *Corporation*