<u>**NOT FOR PUBLICATION**</u>                                                                                     <u>**SEALED**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

THE HERSHEY COMPANY and
 HERSHEY CHOCOLATE &
CONFECTIONERY CORPORATION,                          Civil Action No. 07-cv-1601
                                                    (SDW) (MCA)

        Plaintiffs/Counterclaim Defendants,

    v.

PROMOTION IN MOTION, INC.,                          **OPINION**

                                                    October 4, 2010
        Defendant/Counterclaim Plaintiff.

_____

WIGENTON, District Judge

      Before the Court are Plaintiffs', the Hershey Co. and Hershey Chocolate & Confectionery

Corp. (collectively "Hershey"), motions for Partial Summary Judgment pursuant to Fed. R. Civ.

P. 56(c).  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Venue is

proper pursuant to 28 U.S.C. § 1391(b).  This Court, having considered the parties' submissions,

decides this matter without oral argument pursuant to Fed. R. Civ. P. 78.  For the reasons stated

below, this Court **grants** Hershey's Motion for Partial Summary Judgment on Defendant

Promotion in Motion's ("PIM") counterclaim and affirmative defense that the KISSES

trademark is generic and **denies** Hershey's Motion for Partial Summary Judgment to cancel

PIM's SWISSKISS trademark registration.

<u>**BACKGROUND**</u>

     The present action was brought by Hershey against PIM under the Lanham Act, 15

U.S.C. §§ 1114, 1119, and 1125, seeking preliminary and permanent injunctive relief,

cancellation of a registered trademark, profits, damages and other relief relating to PIM's

registration and use of the SWISSKISS mark.  (Pl.'s Comp. ¶ 1.)  PIM cross-claims that the

terms "kiss" and "kisses" are generic and unprotectible trademarks and asks that the Court order

Hershey's KISSES trademark registrations under 15 U.S.C. § 1064(3) on the grounds that these

marks are comprised of the generic terms "kiss" and "kisses" either alone or in conjunction with

other generic or merely descriptive terms.  (Def.'s Answer and Countercl.)  Hershey now moves

for Partial Summary Judgment on: (1) PIM's counterclaim and affirmative defense that the

KISSES trademark is purportedly generic, and (2) Hershey's claim to cancel PIM's SWISSKISS

trademark registration for lack of bona fide use in commerce.

i.     *Genericness of Hershey's KISSES Mark*

      Hershey is a major manufacturer and seller of chocolate and confectionary candy

products, one of the most successful of which is the KISSES brand chocolates.  (Wege Decl. ¶¶

4-6.)  Hershey is the owner of the registered trademark for KISSES, United States Registration

No. 2,416,701, issued on January 2, 2001 for use in connection with "solid chocolate candy, with

and without ingredients such as nuts."  (Duquette Decl. ¶¶ 5-6 & Ex. 1.)  KISSES is on the

principal register of the United States Patent and Trademark Office ("PTO"), and thus this term

is presumptively valid as a trademark.  See 15 U.S.C. § 1057(b).

      During the prosecution of Hershey's 1996 trademark application for KISSES, the PTO

examining attorney initially rejected the registration based on genericness.  However, in April of

2000, the Trademark Trial and Appeal Board ("T.T.A.B.") of the PTO reversed the examining

attorney's decision and held that "'KISSES' is in fact perceived by the relevant consumers not as

the generic name of a type of candy, but rather as the brand name of candy emanating from a

single source" and that "'KISSES' is now a famous trademark which identifies [Hershey's]

chocolate candy." *See In re Holmstead, Inc.*, 2000 TTAB LEXIS 240, at ** 11-12 (T.T.A.B. 2000). The Hershey's family of KISSES products is also the subject of over twenty other federal registrations with the PTO. (Duquette Decl. ¶¶ 5-6 & Ex. 1.) Hershey also owns several other federal registrations relating to the distinctive conical configuration of KISSES chocolate products. (*Id.* ¶ 7 & Ex. 2.)

KISSES chocolates have been continuously sold in the United States since 1907, with the exception of a pause in sales from 1942-1949 due to silver foil rationing during World War II. (Wege Decl. ¶ 6.) The KISSES brand is comprised of solid chocolates of varying flavors and sizes, the best-selling being the bite-sized individually wrapped KISSES milk chocolates molded in the familiar conical shape. (*Id.* ¶¶ 7-9.) Hershey's KISSES products are sold in a variety of retail stores, with estimated sales of over $2.5 billion in the past five years. (*Id.* ¶¶ 10-11.) The KISSES marks have also been widely promoted, with Hershey spending over $100 million on advertising over the past five years in various forms of national media. (*Id.* ¶¶ 10-12.)

Hershey proffered three *Teflon* surveys conducted by three different individuals over the past fourteen years, most recently in July of 2009 by Dr. Gary Ford ("Ford Survey"), all finding that over seventy percent of consumers perceived the term KISSES to be a brand name of a chocolate candy, rather than a common or generic term. Dr. Ford's survey shows that seventy-two percent of the respondents perceived KISSES to be a brand name while over ninety-three percent of the respondents identified M&Ms, and eighty-three percent identified Milk Duds as a brand. In contrast, over seventy-four percent of the respondents identified "chocolate covered peanuts" as generic and a majority also correctly identified "malted milk balls" as a generic term. Two prior surveys conducted by independent market research experts, one in 1996 and another in 2006, yielded results similar to the Ford Survey and were substantively similar in their form of

questioning and definition of terms.  (Smart Genericness Decl. Ex. Z, Ford Dep. ¶¶ 1-2 & Apps. C-D.)

Moreover, the KISSES mark has been recognized in various ways: Harris Interactive, an independent market research company, ranked Hershey's KISSES as the brand with the highest overall brand equity among 1,020 brands in thirty-nine categories in 2007 and the second highest in 2009 (Wege Decl. ¶ 17 & Ex. 7); market research commissioned by Hershey has also shown that there is a ninety-eight to ninety-nine percent aided awareness of the KISSES brand among costumers (*Id*. ¶¶ 18-20 & Exs. 8-9); the 100th anniversary of the KISSES brand was celebrated by the U.S. Postal Service with a commemorative stamp (*Id.* ¶ 15 & Exs. 4-5); and a book about branding calls the KISSES product a "cultural icon" (*Id.* ¶ 16 & Ex. 6).

On the other hand, PIM offered dictionary evidence dating back to the middle of the nineteenth century defining a "kiss" as a small piece of confectionery.  (Def.'s Genericness Supp. R. 56.1 ¶ 47.)  Dr. Ronald R. Butters, PIM's expert who compiled the data, testified that he was not aware of any evidence before 1907 in any dictionary that defined the word "kiss" in relation to a chocolate product or used the word "kiss" to refer to solid chocolates.  (Smart Genericness Decl. Ex. B, Butters Dep. 14-15, 22-23.)  He also stated that "kiss" was sometimes in use as the name of a type of taffy or meringue.  (*Id.* 15-16, 108, 121.)  PIM also offered numerous dictionary definitions from contemporary dictionaries that consistently define "kiss" as a small piece of candy, with varying references from soft candies, with no mention of chocolate, to specific descriptions mirroring Hershey's KISSES' unique trade dress.  (PIM Genericness Supp. R. 56.1 ¶¶ 48-57.)  None of the dictionaries explicitly identifies or disclaims the term as a trademark.  (*Id.*)

4

Included within Dr. Butters' expert report was evidence of third-party uses of the words "kiss" or "kisses" in the sale of candy products, from before 1907 up to contemporaneous uses with Hershey's KISSES today.  (PIM Genericness Supp. R. 56.1 ¶¶ 70-93; Butters Decl. Ex. 1 at 23-87.)  Butters testified that he could not tell whether any evidence of pre -1907 use of "kiss" or "kisses" was in conjunction with solid chocolate products.  (Smart Genericness Decl. Ex. B, Butters Dep. 30-31, 66-67, 155.)  However, Hershey notes that in 1907 there were other small chocolates in the United States not called "kiss" or "kisses," including a small chocolate product made by Hershey called SWEETHEARTS, and a conical shaped chocolate product called Wilber Buds.  (Smart Genericness Decl. ¶¶ 19, 25-26 & Exs. R, X-Y.)  Hershey also used other names to refer to various small chocolate products, such as LIBERTY BELLS, SILVER TOPS, and SILVERPOINTS from 1910-1941.  (Smart Genericness Decl. ¶¶ 20-22, 25 & Exs. S-U, X.)  Various competitors of Hershey also produced and marketed conical chocolates using terms other than kisses in the first half of the twentieth century.  (Smart Genericness Decl. ¶ 24 & Exs. W-X.)  Nonetheless, some third parties have included the term "kisses" as part of their trademarks and used the term in the description of their products.  (PIM Genericness Supp. R. 56.1 ¶¶ 71-82)  For example: "Bartons Almond Kisses" has been sold since 1938, Madeline Chocolate's "Love and Kisses" chocolate candies, Sarris Candies' conically shaped chocolate "Sweet Kiss," and Sunsweet Growers' federally registered "French Kisses" for chocolate covered prunes.  (*Id.* ¶¶ 85-93.)  Allegedly, a number of other candy "kisses" continue to be sold in commerce where Hershey has not initiated enforcement proceedings.  (Chinda Decl. ¶¶ 8-14 & Exs. 12-21.)

Nevertheless, Hershey has initiated enforcement efforts against many other third parties engaged in uses of the words "kiss," "kisses" or similar terms in connection with the sale of

chocolates.  (Duquette Decl. ¶ 11 & Ex. 4.)  Hershey also polices the use of such terms in

connection with non-chocolate products that use the conical shape or that otherwise reference or

make secondary use of KISSES products.  (*Id.* ¶¶ 12-13.)  Additionally, Hershey successfully

prosecuted at least thirty trademark opposition and cancellation proceedings before the T.T.A.B.

concerning marks that infringe or dilute the KISSES trademark.  (*Id.* ¶ 16.)  Since the federal

registration of the KISSES mark, Hershey has commenced multiple lawsuits in the United States

against parties that allegedly infringed or diluted the KISSES trademark, ending in consent

judgments or settlement agreements acknowledging Hershey's exclusive rights and resulting in

cessation of the challenged conduct.  (*Id.* ¶ 15.)  As a result of these enforcement actions, some

parties added a disclaimer regarding "kisses" in their trademark registrations.  (Mandel

Genericness Decl. Ex. 4, Duquette Dep.173-175; *id.* Ex. 53.)  Hershey also disclaimed "kisses"

in a few of its own trademarks.  (*Id.* at 47-53 & Ex. 30.)

Various statements Hershey made during enforcement actions also allegedly show that

Hershey used "kisses" generically.  (PIM Genericness Supp. R. 56.1 ¶ 22, 24-37.)  Moreover,

Pamela Whitnack of the Hershey Community Archives researched and found that "the word

'kiss' had been a common confectionery term used for a variety of candies" before 1907.  The

research was incorporated in an internal Hershey employee newsletter.  (*Id.* ¶ 14.)  Whitnack

testified that the "variety of candies" referred to taffy and meringue and she specifically could

not locate any references to chocolate.  (Mandel Genericness Decl. Ex. 16, Whitnack Dep. 43,

49-50, 52-53.)

Further, Dr. Butters' expert report included evidence of various uses of kisses in several

trade journals and media sources, including: newspapers, magazines, books, and the internet.

(PIM Genericness Supp. R. 56.1 ¶¶ 62-69; Butters Decl. Ex. 1 at 23-87.)  Trade directories have

also used the word "kiss" to describe a generic category of candies, and the term has been

generically used with respect to equipment such as molds marketed for home candy making and

recipes published for making candy and other food items.  (PIM Genericness Supp. R. 56.1 ¶¶

62-67.)  Dr. Butters conducted a study based on searches of internet news databases in 2001 and

2006 allegedly showing the genericness of "kisses".  The study searched for articles containing

"chocolate kisses" but not "kisses chocolate," and excluded articles referencing Hershey.

(Butters Decl. Ex. 1 at 40-78.)

*ii        Bona Fide Commercial Use of PIM's SWISSKISS Mark*

PIM is in the business of manufacturing, importing, distributing and selling candy and

chocolate products.  (Smart Bona Fide Use Decl. Ex 2, Rosenberg 2006 Dep. 14-18, 32-33.)  The

company employs approximately two hundred people at various offices and advertises and

promotes its products in various ways, grossing in excess of $100 million annually.  (*Id.* Ex. 2,

Rosenberg 2006 Dep. 31-33, 40-42, 47-48; Rosenberg Bona Fide Use Decl. ¶ 7.)  PIM's candy

and chocolate products are available for purchase online and by telephone, as well as through

various distributors, wholesalers, and retail outlets.  (*Id.*)  PIM is the owner of the registered

trademark for SWISSKISS, United States Registration No. 2,899,705, issued on September 28,

2004 for "chocolate of Swiss origin."  (Smart Bona Fide Use Decl. Ex. 11 at 3.)

For many years, PIM has imported chocolate from the Swiss manufacturer Maestrani

and sold it under PIM's SUISSE brands.  In 2002, PIM's CEO, Michael Rosenberg, conceived

the SWISSKISS name as a new mark for Swiss chocolate and filed an intent to use trademark

application with the PTO.  The PTO allowed PIM's application in February 2004, giving the

company up to three years to begin use of the mark and file a subsequent statement of use.

(Rosenberg Bona Fide Use Decl. ¶¶ 21-25.)  Beginning in the spring of 2004 PIM entered

discussions with Maestrani concerning products and pricing formats; implemented logos, graphics and artwork to establish a SWISSKISS brand identity; listed SWISSKISS in the 2004 Candy Buyer's Directory; and solicited feedback from customers at trade shows. (*Id.* ¶¶ 29-38 & Exs. B-D).

On June 24, 2004, PIM sold fifty cases of a SWISSKISS branded product worth $1,020 to Continental Concession Supplies, Inc. ("Continental"), a long-time PIM customer ordering millions of dollars in products each year. The SWISSKISS product consisted of a header that bore both the SWISSKISS and SUISSE marks attached to a cellophane bag each containing two SUISSE chocolate bars. (Smart Genericness Decl. Ex. K, Rosenberg 09 Dep. 62-63.) Continental employees testified that the quality of the packaging is consistent with that of other products Continental received from other manufacturers in the past. (Def.'s Bona Fide Use Supp. R. 56.1 ¶ 29.) This was the only sale of a SWISSKISS product. (Smart Genericness Decl. Ex. K, Rosenberg 09 Dep. 62-63.) Continental paid the invoice for this purchase on May 13, 2005. Continental was then issued a credit equal to the value of the invoice on May 30, 2005. (Smart Bona Fide Use Decl. Ex. 1, Gottleib Dep. 70-71; *id.* Ex. 4, Scudillo Dep. 35-36, 38-39; *id.* Ex. 3, Rosenberg 09 Dep. 36-38, 101-02.) Employees from both Continental and PIM testified that receiving a credit for taking on a newly introduced product is a standard practice in the industry to reduce risk exposure of introducing a new product, and that the two companies had similar arrangements with one another in the past. (Rosenberg Bona Fide Use Decl. ¶¶ 39-43; Def.'s Bona Fide Use Supp. R. 56.1 ¶¶ 24-30; Mandel Bona Fide Use Decl. Ex. A, Gottleib Dep. 73-75, 90-91; *id.* Ex. B, Slonim Dep. 48-52.) On April 13, 2005 Hershey filed a cancellation petition with the PTO. Based on its sale of SWISSKISS products to Continental, PIM filed a statement of use for the SWISSKISS mark with the PTO and the T.T.A.B denied

Hershey's petition.  A registration for SWISSKISS was issued thereafter.  (Smart Bona Fide Use Decl. Exs. 12, 18.)

Continental employees testified that they could not recall whether Continental re-sold the SWISSKISS products after receiving PIM's shipment, but they believe that Continental's regular business practice indicates that it should have been sold in the company's outlet store. (Smart Bona Fide Use Decl. Ex. 1, Gotlieb Dep. 84-85; *id.* Ex. 3, Rosenberg 09 Dep. 106; *id.* Ex. 4, Scudillo Dep. 26-27; *id.* Ex. 5, Slonim Dep. 29, 41.)

Mr. Rosenberg testified that under threat of the Hershey litigation[1] and an update in its manufacturing facilities, PIM temporarily suspended development of the SWISSKISS brand. However, since the Continental sale PIM has: continued discussions with Maestrani regarding the present litigation and possible future strategies for the SWISSKISS brand, including a 2004 meeting with Maestrani in Switzerland and a 2006 meeting at a German trade show to discuss SWISSKISS (Rosenberg Bona Fide Use Decl. ¶¶ 64-70 & Ex. A); begun discussions with several potential customers for SWISSKISS (*Id.* ¶ 65); developed a series of packaging formats for SWISSKISS in different flavors and modified the SWISSKISS logo (*Id.* ¶ 34 & Ex. C); showed prototypes of SWISSKISS at various trade shows through 2008 (*Id.* ¶ 71); discussed other packaging formats with customers; listed SWISSKISS in the Candy Buyer's Directory in 2006 and 2008; and added the SWISSKISS logo to the component of brands appearing on its sample shipping cartons still in use today.  (*Id.* ¶¶ 37, 71 & Exs. E, J.)  In 2007, in connection with negotiations to settle this litigation, PIM made additional efforts to promote SWISSKISS that included: Mr. Rosenberg meeting with business associates in the candy industry to pitch ideas about SWISSKISS collaborations or licenses (*Id.* ¶¶ 72-74); searching for other possible

---

[1] Hershey sent two threatening letters to PIM asking that the company cease using its SWISSKISS mark prior to initiating a cancellation proceeding with the PTO on April 12, 2005.  (Smart Bona Fide Use Decl. Ex. 36.)

chocolate suppliers (*Id.* ¶ 75); monitoring the market for trends relating to premium chocolates (*Id.* ¶ 76); holding discussions with additional business collaborators and meeting with Swiss suppliers (*Id.* ¶ 77); and revamping the packaging for SWISSKISS (*Id.* ¶¶ 78-79 & Ex. D).

## LEGAL STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but, rather, must determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

## DISCUSSION

**A.  Whether Hershey's KISSES Mark is Generic**

As one of its counter-claims and affirmative defenses, PIM asserts that Hershey's

KISSES trademark is generic for small pieces of candy and, as such, is incapable of trademark protection.  (Def. Answer and Countercl. ¶ 58.)  Hershey in turn relies on its successful acquisition of the federal trademark registration of the term KISSES on January 2, 2001 and argues that the KISSES mark is not generic.  (Pl.'s Genericness Br. 15.)

A mark registered on the principal register supplies the registrant with "*prima facie evidence* of . . . the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein."  15 U.S.C. §1115(a) (emphasis added).  Federal registration creates a strong presumption that the term is not generic, and the defendant bears a heavy burden to overcome that presumption.  *See id.*; *see also J&J Snack Foods, Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 145-46 (D.N.J. 2001).  The presumption of validity has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is generic and un-protectable.  *See Barnes Group Inc. v. Connell Ltd.*, 793 F. Supp. 1277, 1297 (D. Del. 1992) (citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 299-300, n.9 (3d Cir. 1986)).  Consequently, the presumption created by the federal registration is rendered moot if the defendant can demonstrate that the mark is generic.  *See Interstate Net Bank v. Netbank, Inc.*, 221 F. Supp. 2d 513, 518 (D.N.J. 2002) (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)).  After the rebuttal of the presumption, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  In the Third Circuit, the test for genericness focuses on whether "the primary significance of a term in the minds of the consuming public" is the name of a type of product (i.e., genus) rather than of a source or producer of that product.  *E.T. Browne Drug Co. v. Cococare Prods.*, 538 F.3d 185, 192 (3d Cir.

2008).  This Court holds that the evidence in the record is insufficient to allow a rational fact finder to conclude genericness of the KISS mark.

### a. Genus

In applying the primary significance standard, a fundamental question is to identify the applicable genus of the goods at issue.  *See, e.g.*, 2 McCarthy on Trademarks and Unfair Competition § 12:23 (4th ed.) [hereinafter McCarthy] ("by expanding or contracting the definition of a 'genus' of products, a court can substantially affect the final determination of whether a term is 'generic'"); *A.J. Canfield*, 808 at 299; *Campbell v. Bassani Mfg.*, 368 F.App'x. 133, 134 (Fed. Cir. 2010); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 148 (2d Cir. 1997) (holding "honey brown" is generic for some beers but descriptive for other beers); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976) ("Safari" is generic for hats and jackets, but not for shorts, scarves, and other items).  PIM asserts that the proper genus of goods for which KISSES is purportedly a generic term is, inter alia, "pieces of candy and confectionery, including chocolate candy," (Def.'s Am. Countercls. ¶ 12), "small pieces of candy and confectionery, including chocolate candy," (*Id.* ¶ 13), "a kind of chocolate candy," (*Id.* ¶19), and a "kind or species of candy."  (*Id.* ¶ 21).  On the other hand, Hershey asserts that the relevant genus is solid chocolate.  (Pl.'s Genericness Br. 13.)

The genus of a product is an interchangeable term that refers to the product class or product category.  *A.J. Canfield*, 808 F.2d at 293.  Therefore, the issue is whether a particular term can denote a class of products, not whether that term can be generically used in a selected sub-species within that product class.  *See* McCarthy § 12.23 (defining genus as the broader, more inclusive classification, while species are groupings within a given genus).  Here, this Court finds PIM's contention for a broader scope of the genus for KISSES to be unpersuasive.

PIM's linguistic expert found mid-nineteenth century to early twentieth century dictionary definitions for "kisses" with specific references to meringue, pulled sugar candy, and taffy, and recent dictionary definitions with the additional reference to chocolate—describing something similar to the Hershey's KISSES trade dress.  (Smart Genericness Decl. Ex. B 16-17.)  Such delineation is evidence of distinct sub-classes within the larger class of small candies. Significantly, the PIM expert concedes that a definition of "kiss" as a small confection does not mean every, or even a majority, of small confections can be referred to as a "kiss."  (Smart Bona Fide Use Decl. Ex. 1, Butters Dep. 99-101, 103-07.)  The publications that list a variety of different candies, including the word "kisses," (Def.'s Genericness Br. 10) are similarly unpersuasive where the products advertised belong to only selected categories of small candy. Moreover, Hershey's linguistic expert's testimony that "kisses" was generic for two categories of chocolate flavored confectionery before 1907[2] further supports a finding that "kisses" was used to describe specific types of small candy, some of which have obtained a generic status.  (Mandel Genericness Decl. Ex. 10, Nunberg Dep. 20-21.)  Consequently, this Court finds that any alleged genus coverable by  the term "kisses" cannot extend to the scope of all small candies.

Furthermore, in a genericness analysis the genus' scope should reflect the type of products on which the trademark owner uses its mark.  *In re Veeco Instruments, Inc.*, 2006 TTAB LEXIS 114, at **19-20 (T.T.A.B. 2006).  Because a term may be a generic name of one product but not the generic name of a related product, *see, e.g.*, *Abercrombie*, 537 F.2d at 10; *MasterCard Int'l, Inc. v. American Express Co.*, 14 U.S.P.Q. 2d 1551 (T.T.A.B. 1990) (holding that GOLD CARD is generic for premium level credit card services, but it could be non-generic

---

[2] PIM disputes Dr. Geoffrey Nunberg's definition of the two categories of chocolate flavored confectioneries because the "second group of so-called taffy like candies actually itself embraces at least four concededly distinct categories of taffy, toffee, caramels and pralines."  (Def.'s Genericness Opp. Br. 11.)  The dispute lends support to, rather than distracts from, the existence of more granular classes of candy than "small candy."

for check guarantee services or hotel reservation services); *In re Minnetonka, Inc.*, 3 U.S.P.Q. 2d 1711 (T.T.A.B. 1987) (holding that SOFTSOAP is generic for industrial soap made from potash and used primarily in the textile industry, but not generic for household liquid soap), the genus should be defined narrowly for the purpose of a genericism analysis. *See Veeco*, 2006 TTAB LEXIS 114, at **19-20. Hershey offers evidence that it used the KISSES mark exclusively with conical shaped solid chocolates, with and without such ingredients as nuts, in sizes ranging from bite-sized pieces to larger servings. (Pl.'s Genericness Supp. R. 56.1 ¶¶ 14-15) Hershey's federal registration of the KISSES mark specifically authorizing it for use in connection with "solid chocolate candy, with and without ingredients such as nuts" also supports this narrow construction. S*ee Interstate Net Bank*, 221 F. Supp. 2d at 518 (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985); *Trustees of Columbia Univ. v. Columbia /HCA Healthcare Corp.*, 964 F. Supp. 733, 742 (S.D.N.Y. 1997)) (holding that the presumption of validity for federally registered marks only extends to the scope claimed within the registration) PIM does not offer any contrary evidence as to Hershey's use of the KISSES mark on its products.

Further, PIM's assertion that the differences between chocolate flavored and solid chocolate products are too small for each to claim their own separate genus (Def.'s Genericness Br. 12) is unavailing. Hershey asserts, and PIM fails to dispute, that candy manufacturers and retailers commonly list their chocolate products as a separate category from other confectionery products. Continental, PIM's customer, also testified that, at a minimum, consumers distinguish between chocolate based candy and sugar confections. (Smart Genericness Decl. Ex. D, Gottlieb Dep. 44-46.) Absent contrary evidence, the only conclusion this Court can draw is that candy genera are at least partially based on the type of ingredients within the products. Therefore, this

14

Court evaluates the genericness of Hershey's KISSES mark within the "solid chocolate candy" genus. *See Veeco*, 2006 TTAB LEXIS 114, at **19-20*; see also Enders Razor Co. v. Christy Co.*, 85 F.2d 195 (6th Cir. 1936) (finding that hatchets, saws, knives, and razors are genera of various products, not various species within a single genus of cutting instruments.)

**b.   Genericness**

The presumption of validity in a federally registered mark includes a presumption that the mark is not generic or merely descriptive. *Interstate Net Bank*, 221 F. Supp. 2d at 517-18 (citing 15 U.S.C. § 1115(a); *Liquid Controls*, 802 F.2d at 936); *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 214 (S.D.N.Y. 2001). PIM bears the burden of proof to overcome this presumption by offering sufficient proof that the mark is generic. *See Interstate Net Bank*, 211 F. Supp. 2d at 518. A term is generic if it functions as a name for a class of goods or services. *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1092 (D.N.J. 1997).

While not binding, this Court finds the extensive prosecutorial history of the federally registered KISSES trademark, and the T.T.A.B.'s evidentiary analysis of the mark's non-genericness in particular, helpful to this Court's determination as to whether PIM offered sufficient evidence to overcome the presumption of validity. Here, PIM raises similar arguments and uses similar or identical evidence as that offered by the examiner and rejected by the T.T.A.B. in 2001.

**i. Whether KISSES was Generic When First Used by Hershey in 1907**

To rebut the presumption that the mark is not generic, the proof that the primary significance of the mark is its indication of the nature or class of the product or service, rather than merely the indication of its source, must be from the objective view point of the relevant

consumer.  15 U.S.C. § 1064(3); McCarthy § 12.46.  While courts have held that consumer

surveys are a good way of showing the relevant public's understanding of a given term, *see, e.g.*,

*Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 982-83 (3d Cir. 1993); *Heroes Inc. v.*

*Boomer Esiason Hero's Found.*, 43 U.S.P.Q.2d 1193 (D.D.C. 1997), due to the remoteness of

Hershey's first use of the "kisses" mark for solid chocolate in 1907, the parties instead rely on

expert analysis of dictionary definitions, trade journals, and other media records to demonstrate

relevant consumer understanding.  Specifically, PIM based its proof on Hershey's own research

of the term, various dictionary definitions, and trade journal evidence.  (Def.'s Genericness Opp.

Br. 10-13.)  Here, PIM's evidence fails to raise any issues of material fact and cannot prove that

"kisses" was a generic term at the time of Hershey's first use in 1907.

      Pamela Whitenack's research shows that the term "kiss" is generic for some types of

candies, but she specifically testified this finding, which was cited in a Hershey internal

newsletter, referred to non-chocolate confections such as taffies and caramels, and that she was

unaware of any chocolates called "kisses*"* prior to 1907.  (Mandel Genericness Decl. Ex. 16,

Whitenack Dep. 43, 49-50, 52-53.)  Dr. Butters' findings were based on newspapers, other

printing sources and dictionaries to show the alleged generic usage of "kisses."  (Def.'s

Genericness Opp. Br. 10.)  While dictionary definitions "are not conclusive, [they] . . . are

significant evidence of genericness because they usually reflect the public's perception of a

word's meaning and its contemporary usage."  *Harley-Davison, Inc. v. Grottanelli*, 164 F.3d

806, 810 (2d Cir. 1999).  Here, Dr. Butters found the nineteenth century dictionary definitions of

the word "kiss" as typically being a type of "confectionery," (PIM Supp. R. 56.1 ¶ 47) but he

acknowledged that none referred to chocolate or solid chocolate.  (Smart Genericness Decl. Ex.

B, Butters Dep. 14-16, 22-23, 121.)  Significantly, Dr. Butters stated that "generally speaking, it

seems to be *accepted by everyone*, including candy historians, that . . . *certainly one of the first uses of [KISS] applied to solid chocolate products would have been Hershey's use in 1906*." (*Id.* 66-67) (emphasis added).

Further, PIM's characterization of media references supporting a finding of generic use of the KISSES mark in solid chocolate candy is also unsupported by the record as a whole.  Dr. Butters testified that his findings regarding the word "kiss" before 1907 could not identify any use of the term in reference to a solid chocolate product.  (Smart Genericness Decl. Ex. B 31.) Similarly, the leading trade journal, *Confectioners' Journal*, listed advertisements to other "kisses" products, none of which used chocolate.  The only other similar solid chocolate candy of the time was called "Wilbur Buds."  (Smart Genericness Decl. ¶¶ 19-26 & Exs. R-Y.)  Given the available evidence, this Court will not create an inference that PIM's own expert is unable to draw.  There is no genuine issue of material fact, and no reasonable fact finder could conclude that KISSES was generic in 1907 as applied to solid chocolate candy.

**ii. Whether Hershey's KISSES Mark is Generic Today**

PIM also argues that a reasonable fact finder could find Hershey's KISSES mark generic today.  (Def.'s Genericness Opp. Br. 13.)  To prove the primary significance of a term, "[e]vidence of the public's understanding of the term [] may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications.  *Berner*, 987 F.2d 975, 982 (3d Cir. 1993) (quotation marks and citation omitted).  However, direct consumer evidence, such as consumer surveys and testimony, is preferred.  In particular, "[c]onsumer surveys have become almost *de rigueur* in litigation over genericness.  Judges . . . often expect to receive evidentiary assistance by surveys in resolving generic disputes."  *Id.* at 982-83 (emphasis added).

## 1. Direct Evidence

In addition to the strong presumption of non-genericness created by the federal registration, *Interstate Net Bank*, 211 F. Supp. 2d at 517-18, the key piece of evidence submitted by Hershey in support of non-genericness of its KISSES mark consists of three separately conducted *Teflon* surveys which are substantively identical.  The 1996 survey was submitted with Hershey's original federal trademark registration application while the latter two were conducted after the T.T.A.B. granted Hershey's federal registration of KISSES.  PIM disputes the validity of these surveys based on Hershey's market share, genericness of the term at the time of first use, the inherent bias of *Teflon* surveys and design flaws in the surveys.

The Third Circuit has cautioned against relying on consumer survey evidence that links a term with a specific product rather than a genus of products if the genus at issue only contained a single product.  *See A.J. Canfield*, 808 F.2d at 304.  Furthermore, words used generically in the past cannot be infused with trademark significance through survey evidence.  *See, e.g.*, McCarthy § 12:11; *American Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 822 (4th Cir. 2001) (finding survey of generic term identification with a specific company can only establish de facto secondary meaning for the word).  Here, neither of the articulated exclusionary grounds applies because Hershey's KISSES mark was not generic within the relevant genus at the time of first use, *see supra*, and neither party alleged that there is only a single product in the relevant genus.  Moreover, this Court cannot find any legal support for PIM's assertion that dominant market share of a brand of product categorically renders *Teflon* survey results ineffective.[3]

---

[3] PIM cites to cases, treatises, and Dr. Itamar Simonson's expert testimony to support the position that market share dominance invalidates survey results.  (*See* Def.'s Genericness Opp. Br. 23.)  However, the cases cited by PIM do not show that any court has used market share dominance as a basis to invalidate a properly conducted *Teflon* survey: *Steak N Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 993 (E.D. Mo. 2004) did not test primary significance, *Eastern Air Lines, Inc. v. New York Airlines, Inc.*, 559 F. Supp. 1270, 1275 (S.D.N.Y. 1983) and *America Online*, 243 F.3d at 822 are concerned with marks that were generic prior to conducting the surveys, and *Cerreta*, 195 U.S.P.Q. at 256, did not hold surveys irrelevant.  The passage PIM cited from McCarthy also comes

Turning to the substantive validity of Hershey's surveys, a properly construed *Teflon* survey first runs a participant through a sample list of terms, some of them generic and some specific brand names.  After the participant is shown to grasp the distinction, the survey then asks the participant to categorize a number of terms, including the term at issue.  McCarthy § 12:11 (describing the survey format used in *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502 (E.D.N.Y. 1975)).  The Hershey surveys were conducted through telephone interviews with potential purchasers of chocolate candy.  The difference between generic terms and brand names was explained by the surveyor,[4] and then the reaction of the surveyees to five different terms used in connection with candy was recorded.  In addition to the KISSES mark at issue in the present case, the surveys included two designations that are established trademarks, "M&M" and "Milk Duds," and two designations that are generic, "chocolate covered peanuts" and "malted milk balls."  (*See* Smart Genericness Decl. Ex. Z.)  More than seventy percent of the respondents in each of the three surveys identified KISSES as a brand, while over ninety-three percent of the respondents identified M&Ms, and eighty-three percent identified Milk Duds as a brand.  In contrast, over seventy-four percent of the respondents identified "chocolate covered peanuts" as generic and a majority also correctly identified "malted milk balls" as a generic term. (Smart Genericness Decl. Ex. Z at 16.)  If validly conducted, these figures would show that the applicant's mark was overwhelmingly recognized as a trademark.  *See E. I. Du Pont*, 393 F. Supp. at 526-28 (holding a *Teflon* survey result of sixty-eight percent  respondents identifying a term as a brand proves the term is not generic.).

---

from a paragraph discussing "generic name[s] linked with a leading producer."  *See* McCarthy § 12.11.  Moreover, this Court cannot find any court that has adopted PIM's expert's critique of the *Teflon* format, in this or any other Circuit.  In the absence of legal support, this Court will not endorse a new legal basis to exclude survey results purely based on PIM's expert's suppositions of consumer brand response or his critique of the *Teflon* survey.
[4] "Brand name" is defined in the surveys as "the proprietary name of a particular product that a company uses to identify a product of that type."  (Smart Genericness Decl. Ex. Z at 7.)

Nonetheless, PIM argues that the use of the word "proprietary" for the definition of "brand" and the inclusion of the phrase "product type" in the definitions for both "generic" and "brand" in Hershey's three surveys is confusing and inaccurate, thus rendering the results meaningless.  (Def.'s Genericness Opp. Br. 25.)  The relevant purpose of a consumer survey, and the material issue here, is whether the survey provided evidence of the public's understanding of the term as either generic for a genus or as a brand name.  *E.T. Browne*, 538 F.3d at 192 ("the primary significance test . . . inquires whether the primary significance of a term in the minds of the consuming public is the product or the producer") (citations and quotation marks omitted).  This Court recognizes that there may be a genuine dispute as to whether the term "proprietary" as used to define "brand" asked respondents to reach a legal conclusion as to the ownership of the mark.  There may also be a question as to whether inclusion of the phrase "product type" in both definitions was optimal.  However, there is no evidence that the respondents in the surveys failed to grasp the difference between "brand" and generic" as a result of these alleged issues.  After providing the definitions of the terms "generic" and "brand," tests were used to ensure the respondents' understanding of the terms—those who failed the test were excluded from the survey.  Moreover, the respondents' answers to the control terms covering various degrees of brand identification are also consistent with evidence of a clear understanding of the difference between "generic" and "brand."  Even Dr. Simonson, PIM's expert, conceded that "[t]he overwhelming majority of consumers know[] the difference between a product type and a brand name."  (Smart Genericness Reply Decl. Ex. 6 at 212-13.)  Significantly, the T.T.A.B., a body with acknowledged technical expertise in the area of trademark law and familiarity with surveying techniques and methodologies, reviewed the very same Hershey's KISSES *Teflon* survey from 1996 and concluded that "[the T.T.A.B.] cannot identify any basis upon which to

fault applicant's survey." *In re Holmstead*, 2000 TTAB LEXIS 240, at *9. Therefore, this Court finds that the *Teflon* surveys were validly conducted and are strong probative evidence of consumer perception that KISSES is the brand name of candy originating from a single source. *See Berner*, 987 F.2d at 982-83. The surveys weigh heavily against PIM's duty to overcome the presumption of validity of the federally registered KISSES mark.[5]

### 2. Indirect Evidence

To overcome the presumption of non-genericness, PIM's expert adduced various trade journals, lay publications, and other media references that used the word "kisses." (*See* PIM Genericness Supp. R. 56.1 ¶¶ 62-69) While trade references, media references, and dictionary evidence can be helpful in a genericism analysis, *In re Merrill Lynch*, 828 F.2d 1567, 1570 (Fed. Cir. 1987), the Third Circuit has cautioned against reliance on such indirect evidence because it may not reflect the word's meaning to the relevant consuming population of the mark. *See Berner*, 987 F.2d at 982. PIM cites to numerous trade publications wherein the word "kisses" was allegedly used generically. (Mandel Genericness Decl. Exs. 30-33.) None of the references are definitively linked to solid chocolate candy products prior to 1907, *see supra* (discussion of genericness in 1907), and many of the post-1907 references refer to taffies, caramels or other non-chocolate based products. (*See also* Smart Reply Decl. Ex. 1, Butters Dep. 112-14.) Moreover, evidence that Hershey itself may have used the term "kiss" in materials directed to the trade rather than consumers has little bearing on the primary significance of KISSES to consumers. The lack of evidence showing that the readers of trade journals and the relevant

---

[5] Hershey has submitted additional non-Teflon surveys that also speak to the brand equity of the KISSES mark, including Harris Interaction's finding that KISSES is the brand with the highest overall brand equity among 1,020 brands in thirty-nine categories in 2007 and the second highest in 2009 (Smart Genericness Decl. ¶ 17 & Ex. 7); market research commissioned by Hershey that showed a ninety-eight to ninety-nine percent aided brand name awareness for KISSES among consumers. (*Id.* ¶¶ 18-20 & Exs. 8-9). The Court finds the results of these surveys corroborate the Teflon surveys' findings and are probative.

consuming public share the same understanding of "kisses" weighs against the probative value of

the evidence. *Berner*, 987 F.2d at 982 (finding indirect evidence based on trade journal use of a

mark problematic because it is evidence of understanding by producers, not the relevant

consuming public).

       PIM also points to evidence of dictionary definitions of the word "kiss" as being

dispositive of whether or not the KISSES trademark is generic.  While dictionary evidence can

be useful in some contexts, *see Interstate*, 221 F. Supp. 2d at 524 (quoting *Surgicenters of Am.,*

*Inc. v. Dental Surgeries*, Co., 601 F.2d 2011, 1015 n.11 (9th Cir. 1979) ("[dictionary definitions

are relevant and often persuasive in determining . . . whether a trademark is generic"), the Third

Circuit has cautioned that dictionary evidence is problematic and should be scrutinized closely.

*Berner*, 987 F.2d at 982.  Because dictionaries may show delays between common acceptance of

a word's usage and its lexicographical documentation, dictionaries "may not reflect word

meaning among those persons who purchase the particular products involved." *Id.*  "[T]he

entries can also reflect lexicographical judgment and editing which may distort a word's

meaning or importance." *Id*.  Here, this Court finds the lack of dictionary definitions for

KISSES as a trademark not probative.  The mark's federal registration occurred in 2001 and

there is an admitted delay between trademark registration and dictionary updates, *see id.* at 983,

the dictionaries themselves have disclaimed any judgment as to whether a word is a trademark,

and there is a lack of evidence that any dictionary made a decision not to identify KISSES as a

mark since the registration.  Moreover, the plethora of dictionary entries on "kiss" also indicates

divergent lexicographical judgments on the word.  For example, not mentioning chocolate at all,

Encarta World English Dictionary, North American Edition (Microsoft Corp., 2005): defines

"kiss" as: "3. FOOD small piece of candy: a very small piece of soft candy, sometimes

individually wrapped in foil."  (Butters Decl. Ex. 1 at 6.)  On the other hand, seemingly referring

specifically to the Hershey's KISSES trade dress, Random House Dictionary of the English

Language, (2d edition unabridged 1987): defines "kiss" as: "a small, sometimes conical, bite-size

piece of chocolate, usually individually wrapped."  (*Id.*)  Several other definitions cited by Dr.

Butters show examples of further variations in definitions of the word "kiss."  While dictionary

evidence may be probative in some context, the available evidence clearly shows the lack of any

uniform, generic definition of the word "kisses" to describe small solid chocolate candies.  This

Court finds the dictionary evidence submitted even less probative as it applies to the relevant

public.

As for indirect evidence of consumer understanding through generic uses of "kisses"

online and in other media, the examining attorney at the PTO also offered similar evidence

during the prosecution of the KISSES mark before the T.T.A.B.  In that proceeding, the T.T.A.B.

found "persuasive [Hershey]'s argument that many of the examining attorney's references that

appear to be generic uses of the word are instead references to applicant's product without

appropriate designation of the term as applicant's trademark."  *See In re Holmstead*, 2000 TTAB

LEXIS 240, at **10-11.  Similar inferences exist: while PIM counted non-capitalized uses of

"kiss" as purported evidence of generic usage, the expert who conducted the search

acknowledged that a failure to capitalize "kisses" does not necessarily indicate a belief that the

term is generic.  (Smart Genericness Decl. Ex. B, Butters Dep. 164-65, 184-85). *See Schmidt v.

Quigg*, 609 F. Supp. 227, 229 (E.D. Mich. 1985) (finding evidence of term used in news stories

and restaurant menus did not prove genericism because it was unclear whether the sources used

the term generically or to refer to plaintiff's product).  PIM's expert also acknowledged that his

searches were not exhaustive, and that the search terms he used were more likely to uncover

purported generic uses rather than trademark uses of the word "kiss."  (Smart Genericness Decl. Ex. B, Butters Dep. 202-04) (Dr. Butters only searched for "chocolate kiss" or "chocolate kisses," and did not search for combinations that are more indicative of trademark use such as "kisses chocolate" and excluded all articles containing both "Hershey" and "chocolate kisses").

PIM also introduced various evidence of Hershey's own alleged generic uses of the KISSES mark.  (Mandel Genericness Decl. Ex. 21; PIM Genericness Supp R. 56.1 ¶¶ 43-46.)  If the proponent of a trademark status itself used the term before the public generically, it is strong evidence of genericness.  *800 Spirits v. Liquor by Wire*, 14 F. Supp. 2d 675, 679 (D.N.J. 1998) (citing McCarthy § 12:13).  The focus of the inquiry is on whether the mark owner's generic use was directed toward the relevant consuming population.  *See, e.g.*, *id.*; *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 299 (S.D.N.Y. 2000) (finding the mark generic where plaintiff used the term generically to name a method of exercise and associated equipment sold); *In re Bausch & Lomb, Inc.*, 206 U.S.P.Q. 534, 537-38 (T.T.A.B. 1979) (mark applicant's use of term in its own externally distributed literature was evidence of genericness).  PIM stated that Hershey's "clearest statement of the generic status of the term 'kiss' can be found in a 1983 Hershey consumer relations publication providing what are expressly identified as 'generic descriptions' for Hershey products." (Def.'s Genericness Opp. Br. 14.)  However, this Court finds the document unpersuasive as it was produced for internal consumption and clearly marked "confidential."  There is no indication of any public awareness of this document.  Other evidence includes a piece of corporate correspondence from 1986 and packaging from the early twentieth century in which KISSES was presented in a manner similar to other Hershey marks, but does not comport with Hershey's modern day trademark usage guidelines.  (*See* Def.'s Genericness Opp. Br. 14; Smart Genericness Decl. Exs. S-U, X; Mandel Genericness Decl. Ex. 66 at

KISS209305.)  Hershey's and its competitors' disclaimers of "kisses" also do not "prejudice or affect the applicant's or registrant's rights then existing or thereafter arising in the disclaimed matter."  *See* 15 U.S.C. § 1056(b).  Therefore, even when viewed in a light most favorable to PIM, no rational fact finder could conclude that Hershey's use of KISSES demonstrates public awareness of generic usage.

PIM also points to evidence of third party use of the term "kisses."  (PIM Genericness Supp. R. 56.1 ¶¶ 70-93.)  The use of a term by a competitor not contested by the mark owner can be indirect evidence of genericness.  *See, e.g.*, McCarthy § 12:13; *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 37 (1900); *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 579 (2d Cir. 1963) (holding a mark "became a part of the public domain . . . because of the plaintiff's lack of reasonable diligence in asserting and protecting its trademark rights in the word . . ..")  Conversely, successful enforcement of a mark can be evidence that the mark is strong and not generic.  *See, e.g.*, *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 139 (2d Cir. 1999) ("successful policing of a mark adds to [a mark's] strength"); *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1134 (N.D. Cal. 2009) (successful policing of a mark suggests acceptance of that mark's brand significance).  But a trademark owner is not required to take action against every infringing or *de minimis* use of its mark. *Varian Assoc. v. IMAC Corp.*, 160 U.S.P.Q. 283 (N.D. Ill. 1968) (failure to prosecute *de minimis* uses of a mark is not sufficient to prove acquiescence).  This Court will focus on evidence of alleged use within the relevant genus.  *See supra* Discussion Part A(a).  It is undisputed that there have been various third-party uses of composite terms, including "kiss" and "kisses."  (PIM Genericness Supp. R. 56.1 ¶¶ 85-89, 92-93; Chinda Decl. ¶¶ 8-14 & Exs. 12-21.)  However, Hershey has commenced multiple successful law suits and trademark opposition and cancellation

proceedings before the T.T.A.B. to enforce its rights in the KISSES mark.  (Duquette Decl. ¶ ¶ 11, 15-16 & Ex. 4.)  Hershey also asserts that the remaining uses are either non-chocolate related or *de minimus* uses that do not require enforcement.  PIM failed to address evidence of current use by a third party that is more than *de minimis*.[6]

In contrast, Hershey points to undisputed evidence that competitors use terms other than "kiss" to describe their products.  In light of other evidence of the non-genericness of "kiss," the availability of commonly used alternatives is probative toward a finding that the term is not generic.  *See A.J. Canfield*, 808 F.2d at 306 n.20 (finding that the availability of commonly used alternatives is probative in deciding whether a term is generic); *but compare Novartis Consumer Health, Inc. v. McNeil-PPC, Inc.*, 53 U.S.P.Q. 2d 1406, 1413 (D.N.J. 1999) (after finding that a term is generic, evidence of the availability of other generic designations becomes irrelevant).  This indicates that competitors such as PIM did not need to use the word "kisses" to communicate to consumers the type of product that they sell.  *See E.T. Browne*, 538 F.3d at 198.

While this Court does not find a complete lack of probative value in the indirect evidence offered by PIM, the Court must view the evidence in the context of whether a reasonable fact finder could find that the indirect evidence, without the "almost *de rigueur*" consumer survey showing genericness, *Berner*, 987 F.2d at 982, is capable of overcoming the contrary direct evidence of multiple *Teflon* surveys and the strong presumption of the mark's validity.  In light of the strong presumption in favor of finding Hershey's federally registered mark as valid and protectable, the limited and indirect evidence presented by PIM, and Hershey's multiple *Teflon* surveys offering direct evidence of the primary significance of KISSES as a brand to consumers, this Court concludes that a reasonable fact finder could not find the KISSES mark generic.

---

[6] Necco's significant sales figures for "Mary Jane Peanut Butter Kisses" involves a taffy product.  (PIM Genericness Supp. R. 56.1 ¶¶ 92-93.)

**B.  Whether PIM Made "Bona Fide Commercial Use" of the SWISSKISS Mark**

Hershey moves for partial summary judgment cancelling PIM's SWISSKISS trademark registration on the ground that PIM has not made "bona fide commercial use" of the SWISSKISS mark. [7]  (Pl.'s Bona Fide Use Br. 15.)  PIM disagrees and argues that PIM's sale of SWISSKISS products to Continental constitutes bona fide use in commerce.  (Def.'s Bona Fide Use Opp. Br. 12.)

Under Section 45 of the Lanham Act, trademark rights are authorized where the mark is "used in commerce," 15 U.S.C. § 1051, which is defined as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  The determination of "use" adequate to establish such trademark rights is one to be decided on the facts of each case.  *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 417 (1st Cir. 1951).  However, a mere token or *de minimis* use will not qualify.  *See, e.g.*, *Paramount Pictures Corp. v. White*, 31 U.S.P.Q. 2d 1768, 1772-73 (T.T.A.B. 1994) (finding no *bona fide* use where mark was affixed to a game consisting of three pieces of paper and distributed for the purpose of promoting a musical group); *HydroDynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470 (Fed. Cir. 1987) (shipment of goods marked with trademark for the sole purpose of obtaining distributor's opinion of the mark was not a use in commerce).  To show such use, "[the mark must be] placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto," and "the goods [must be] sold or transported in commerce."  15 U.S.C. § 1127.

---

[7] Hershey pursued a cancellation petition with the PTO in 2005.  However, Hershey contends that at the time its motion for summary judgment in the cancellation petition was denied by the T.T.A.B., the limited discovery did not include evidence relating to the late payment and credit to Continental surrounding the sale.  On March 9, 2007, the T.T.A.B. denied Hershey's motion for summary judgment "based on the evidence presented."  (Smart. Decl. Ex. 38 at 10.)  Hershey contends that had the additional evidence produced in this proceeding been available to the T.T.A.B., the motion may have been granted in its favor and the SWISSKISS mark cancelled.

The Trademark Law Revision Act of 1988 ("TLRA") eliminated "token use" as a basis for registration, *Westrex Corp. v. New Sensor Corp.*, 2007 TTAB LEXIS 57, at **14-15 (T.T.A.B. 2007), but bona fide use of a mark in commerce need not be extensive. *Protech Diamond Tools, Inc. v. Liao*, 2009 U.S. Dist. LEXIS 53382, at *12 (N.D. Cal. 2009). A single sale or shipment may still be sufficient to establish ownership of the trademark after the TLRA if the sale or shipment was followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market in a commercial scale. *See, e.g.*, *Lucent Info. Mgmt. v. Lucent Techs., Inc.*, 186 F.3d 311, 317 (3d Cir. 1999) (citing *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)); *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484-86 (7th Cir. 2007) (quoting *Lucent*, 186 F3d at 315-17) (finding one sale of a van where the trademark was not used in the sale "too obscure an event to alert any significant number of consumers [to the trademark use,]" but concedes possible situations where a single sale could be sufficient to constitute bona fide commercial use); *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006) (quoting *Chance v. Pac-Tel Teletrac*, 242 F.3d 1151, 1158 (9th Cir. 2001)); *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) (quoting *Blue Bell*, 508 F.2d at 1265).

Hershey asserts that PIM's single sale of fifty boxes of SWISSKISS to Continental was not an actual sale because PIM provided a credit to Continental equal in value to the alleged products sold. (Pl.'s Bona Fide Use Reply Br. 3, 6-7.) However, the sufficiency of use should be viewed in light of "the customary practices of a particular industry." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1198 (11th Cir. 2001). Adam Gottlieb, Continental's Executive Vice President of Sales and Procurement, and Aaron Slonim, President of Continental,

stated that in exchange for taking on a new untested product, Continental typically receives additional consideration in the form of either free goods or a credit against other purchases. (*Compare* Mandel Bona Fide Use Decl. Ex. A Gottlieb Dep. 73-75 and *id*. Ex. B Slonim Dep. 48-52, *with* Pl.'s Resp. Supp. R. 56.1 at 16-17.)  Specifically, they stated that "very often when [Continental] bring[s] something new, [Continental] insist[s] on free products or [other] form[s] of compensation for bringing it on," (Mandel Bona Fide Use Decl. Ex. B at 48-49) and usually the compensation is equivalent to the full invoice price.  (*Id.* Ex. A at 73-75, 90-91.)  Moreover, "[PIM wa]s not treated any differently than any other manufacturer."  (*Id.* Ex. B at 50.)  Until the question of whether PIM's credit to Continental constitutes a standard practice in the industry has been resolved, this Court cannot determine whether PIM's sale constitutes an initial sale within the meaning of the required "bona fide use in commerce" of the SWISSKISS mark.

Moreover, this Court finds that PIM has submitted sufficient evidence to establish the existence of a genuine issue of material fact as to whether PIM's actions post-Continental sales demonstrate the requisite continuing effort or intent to use the mark.  "Where no present intent has been found to market the trademarked product, minimal sales have been held insufficient to establish trademark rights."  *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974) (citations omitted).  The Third Circuit, in applying the "continuous commercial utilization" test, stated that the subsequent promotional efforts must be "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."  *Lucent*, 186 F.3d at 315 (quoting *Blue Bell*, 508 F.2d at 1266).

Here, Hershey asserts that PIM's sale of SWISSKISS marked products to Continental was not followed by sufficient activities to indicate a continuing effort or intent to use the mark.

29

(Pl.'s Bona Fide Use Reply Br. 4.)  However, PIM submits into evidence testimonies and records showing that PIM has: conducted multiple meetings with its regular supplier regarding future production using the SWISSKISS mark; explored alternative suppliers for products using the SWISSKISS mark; begun discussions with several potential customers; developed a series of packaging formats utilizing the mark; showed prototypes of products incorporating the mark at various trade shows through 2008; listed the mark in the Candy Buyer's Directory multiple times; and added the mark to the component of brands appearing on its sample shipping cartons still in use today.  Good faith and intent are central in a bona fide use inquiry.  *See Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987) ("[w]hether a trademark has been 'adopted' is a factual finding whose resolution may include elements of subjective intent").  Once an ongoing program to exploit the mark commercially has been established, "the question of whether a trademark's use in commerce is actually 'bona fide' is almost always one of material fact." *Ritz Hotel, Ltd. v. Shen Mfg. Co.*, 2009 U.S. Dist. LEXIS 22194 at *6 (E.D. Pa. 2009).  In light of the available evidence, a reasonable fact finder could conclude that PIM's ongoing activities to exploit the mark commercially is sufficient to support a finding of bona fide use.

Further, determination of "special circumstances" excusing non-use is predicated on a finding of legitimate bona fide use.  Until the question of whether PIM's sale of SWISSKISS products to Continental constitutes bona fide use in commerce has been determined, this Court declines to reach any conclusions as to PIM's subsequent non-shipment of SWISSKISS products.[8]

---

[8] This Court notes Hershey's argument that PIM's affixation of the SWISSKISS mark on the bars sold to Continental failed to demonstrate an intent to bear the mark in commercial transactions.  (*See* Pl.'s Bona Fide Use Br. 23-24.)  Without going into a detailed analysis of the argument, the Court finds that the cases cited by Hershey

Based on the evidence, this Court concludes that a reasonable jury could return a verdict in PIM's favor.  Questions of fact remain as to whether PIM's actions constitute an actual, commercial sale, and whether PIM's subsequent activities demonstrate sufficient intent to exploit the mark.  Further, once these questions are answered, a jury must still decide whether "special circumstances" exist that would excuse PIM's non-shipment of SWISSKISS products since 2004.  As such, this Court cannot reach any conclusions as to the bona fide use of the SWISSKISS mark by PIM.  Therefore, this Court denies Plaintiffs' Motion for Partial Summary Judgment to cancel PIM's SWISSKISS trademark due to a lack of bona fide use in commerce. *See, e.g.*, *Goldfaden v. Miss World (Jersey) Ltd.*, 2005 WL 1703207, at *8 (D.N.J. 2005); *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 2002 U.S. Dist. LEXIS 4950, at *20 (S.D.N.Y. 2002) (denying summary judgment as to prior use because single shipment of samples created an issue of fact).

## **CONCLUSION**

For the reasons stated above, Hershey's Motion for Partial Summary Judgment on PIM's counterclaim and affirmative defense that the KISSES trademark is generic is **granted** and Hershey's Motion for Partial Summary Judgment on PIM's SWISSKISS trademark registration is **denied**.


<u>s/Susan D. Wigenton, U.S.D.J.</u>

Orig:   Clerk
Cc:     Madeline C.Arleo, U.S.M.J.
        Parties

---

are factually distinguishable from the present case.  Moreover, this Court declines to reach any conclusions until the above issues of material fact have been resolved.