Howard J. Schwartz
WOLFF & SAMPSON
The Offices at Crystal Lake
One Boland Drive
West Orange, NJ  07052
(973) 530-2031

Richard S. Mandel (*pro hac vice*)
Jonathan Z. King (*pro hac vice*)
Eric J. Shimanoff (*pro hac vice*)
COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue of the Americas
New York, NY  10036`
(212) 790-9200

Attorneys for Defendant/Counterclaim
Plaintiff Promotion In Motion, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------------x

THE HERSHEY COMPANY and HERSHEY
CHOCOLATE & CONFECTIONERY
CORPORATION,

        07-CV-1601 (SDW)(MCA)

    Plaintiffs/Counterclaim Defendants,

       v.

PROMOTION IN MOTION, INC.,

    Defendant/Counterclaim Plaintiff.

------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT'S MOTION PURSUANT TO FED. R. CIV. P. 54(b) TO MODIFY
THE COURT'S OCTOBER 4, 2010 ORDER TO DENY PLAINTIFFS' MOTION
FOR  PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S
<u>COUNTERCLAIM AND AFFIRMATIVE DEFENSE BASED ON GENERICNESS</u>**

18166/011/1257929

## **Table of Contents**

Page(s)

ARGUMENT ...................................................................................................................1

I. HERSHEY CANNOT IGNORE UNCONTRADICTED EVIDENCE THAT IT PERMITTED UNLICENSED USE OF "KISSES" FOR DECADES ................................1

II. THERE IS A DISPUTED ISSUE OF FACT AS TO WHETHER "KISSES" WAS GENERIC AS OF ITS ADOPTION BY HERSHEY IN 1907 ............................................4

III. THE NEW EVIDENCE CREATES A TRIABLE ISSUE OF FACT AS TO WHETHER "KISSES" WAS GENERIC IN THE 1950's, 1960's AND 1970's................6

IV. HERSHEY CANNOT RECLAIM KISSES FROM GENERIC STATUS ........................9

CONCLUSION................................................................................................................12

## Table of Authorities

Page(s)

**Cases**

*A.J. Canfield Co. v. Honickman*,
  808 F.2d 291 (3d Cir. 1986)..................................................................................9, 10

*Am. Online, Inc. v. AT&T Corp.*,
  243 F.3d 812 (4th Cir. 2001) ........................................................................................10

*BellSouth Corp. v. White Directory Publishers, Inc.*,
  42 F. Supp. 2d 598 (M.D.N.C. 1999) .........................................................................6, 11

*Benjamin Moore & Co. v. Talon Paint Products, Inc.*,
  917 F. Supp. 331 (D.N.J. 1996) .....................................................................................3

*Bourjois, Inc. v. Hermida Labs., Inc.*,
  106 F.2d 174 (3d Cir. 1939).............................................................................................8

*Brogan v. United N.Y. Sandy Hook Pilots' Ass'n, Inc.*,
  213 F. Supp. 2d 432 (D.N.J. 2002) ................................................................................3

*Continental Airlines, Inc. v. United Airlines, Inc.*,
  53 U.S.P.Q.2d 1385 (T.T.A.B. 1999) ..........................................................................10

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.*,
  625 F. Supp. 571 (D.N.J. 1985) .....................................................................................9

*Gaylord Entertainment Co. v. Gilmore Entertainment Group, LLC*,
  No. 99 Civ. 0699 (M.D. Tenn. Oct. 21, 2002) .............................................................11

*Hamilton v. Leavy*,
  117 F.3d 742 (3d Cir. 1997)...........................................................................................3

*Harley-Davidson, Inc. v. Grottanelli*,
  164 F.3d 806 (2d Cir. 1999)...........................................................................................10

*Hershey Foods Corp. v. Cerreta*,
  195 U.S.P.Q. 246 (T.T.A.B. 1977) ...............................................................................10

*Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.*,
  240 F.3d 251 (4th Cir. 2001) ........................................................................................10

*In re Holmstead, Inc.*,
  2000 TTAB LEXIS 240 (T.T.A.B. Apr. 4, 2000) ......................................................10

*In re Illinois Bronze Powder & Paint Co.*,
   188 U.S.P.Q. 459 (T.T.A.B. 1975) ..................................................................................11

*In re Minnetonka Inc.*,
   3 U.S.P.Q.2d 1711 (T.T.A.B. 1987) ................................................................................11

*Kellogg Co. v. National Biscuit Co.*,
   305 U.S. 111 (1938)........................................................................................................10

*Microsoft Corp. v. Lindows.com, Inc.*,
   69 U.S.P.Q.2d 1863 (W.D. Wash. 2004).........................................................................10

*Miller Brewing Co. v. Falstaff Brewing Corp.*,
   655 F.2d 5 (1st Cir. 1981) ..........................................................................................10, 11

*Miller Brewing Co. v. Jos. Schlitz Brewing Co.*,
   605 F.2d 990 (7th Cir. 1979) ..........................................................................................10

*Pilates, Inc. v. Current Concepts, Inc.*,
   120 F. Supp. 2d 286 (S.D.N.Y. 2000)............................................................................5, 6

*Prestonettes, Inc. v. Coty*,
   264 U.S. 359 (1924)..........................................................................................................8

*San Filippo v. Bongiovanni*,
   30 F.3d 424 (3d Cir. 1994)................................................................................................3

*Schwan's IP, LLC v. Kraft Pizza Co.*,
   460 F.3d 971 (8th Cir. 2006) ..........................................................................................10

*Singer Mfg. Co. v. Briley*,
   207 F.2d 519 (5th Cir. 1953) .....................................................................................10, 11

*St. Surin v. Virgin Islands Daily News, Inc.*,
   21 F.3d 1309 (3d Cir. 1994)..............................................................................................3

*Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*,
   601 F.2d 1011 (9th Cir. 1979) ........................................................................................10

### Statutes and Other Authorities

J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2010).........8, 9, 10, 11

Defendant Promotion In Motion, Inc. ("PIM") submits this reply memorandum of law in further support of it motion to modify the Court's October 4, 2010 Order (the "Order") to deny the motion by Plaintiffs The Hershey Company and Hershey Chocolate & Confectionery Corporation (collectively, "Hershey") for partial summary judgment based on genericness.

## ARGUMENT

### I. HERSHEY CANNOT IGNORE UNCONTRADICTED EVIDENCE THAT IT PERMITTED UNLICENSED USE OF "KISSES" FOR DECADES

Because Hershey cannot dispute that the newly produced evidence contains express admissions over decades that the term "kisses" is generic, Hershey is at pains to recast the documents, speculate about their meaning, and impose limitations found nowhere in their content.  First, to explain away its express statements that the term "kisses" was not deemed a trademark requiring any license, Hershey hypothesizes that it sought license agreements only where repackers were using its "*registered* trademarks," as opposed to unregistered terms such as "kisses."  *See* Hershey Br. (Doc. No. 148) at 4, 23 (emphasis in original).  This distinction is pure invention on Hershey's part, is mentioned nowhere in the documents, and is not supported by a shred of evidence.  In fact, as the documents reveal, Hershey decided in 1975 to begin licensing "kisses" for the first time, even though the term was not registered until 2001, so clearly the status of registration had no bearing on its decision about whether or not to demand licenses.  *See also* Duquette Decl. (Doc. No. 149-1) ¶6 ("Hershey has licensed KISSES as a standalone mark (e.g., without HERSHEY'S) since at least 1975").

 Second, Hershey assumes that all the repackaged goods were clearly visible as genuine Hershey's "kisses" bearing the conical shape, foil wrapping and paper plume displaying the HERSHEY'S mark.  *See* Hershey Br. at 4, 16-17.  As proof, Hershey attaches three largely illegible photocopies, one of which appears to show Hershey's trade dress and the other two of

1

which may show foil wrapping but no plume.  *See* Duquette Decl. Ex. 5.  Having otherwise insisted that it knows so little about these documents, *see* Hershey Br. at 3; Duquette Decl. ¶¶5, 10, Hershey cannot speculate about the appearance of the majority of these packages based on three photocopies.  But, as set forth below, even if every package clearly displayed Hershey's trade dress, that fact would not change Hershey's bald admissions that the term was generic and free for use without authorization.

Finally, after speculating broadly about the documents, Hershey then turns around and protests that there is no evidence of the extent of sales or advertising of the repackaged goods, *see* Hershey Br. at 4, 20, or whether the authors of the documents were "knowledgeable or authorized to speak authoritatively" regarding Hershey's trademark rights.  *Id.* at 23.  The argument fails for several reasons.  On their face, the 1500 pages of documents show an uninterrupted, long term practice of private labeling of "kisses" without license by numerous third parties.  *See* PIM Moving Br. (Doc. No. 148) at 4-9.  Hershey has never produced a single license agreement for "kisses" before 1975, even though it demanded licenses for other marks without exception.  Thus, the only evidence of record is that Hershey routinely permitted third party customers to use "kiss" generically and without license, while demanding licenses for other marks used in exactly the same way.  Whether the authors of the documents were "authorized to speak authoritatively" on legal matters is beside the point, because these salespeople had responsibility for implementing Hershey's licensing policy and thus controlled how the mark was used commercially and exposed to consumers.

Moreover, Hershey is ill-situated to criticize this evidence as incomplete.  Although PIM sought precisely these kinds of documents in discovery, Hershey failed to produce them until one week before the previously scheduled trial date and long after PIM would have had any chance

2

to take follow up discovery. Given these circumstances and the governing summary judgment standard, any inferences regarding the scope of these generic uses and their impact on consumer perception should be drawn in PIM's favor. *See Brogan v. United N.Y. Sandy Hook Pilots' Ass'n, Inc.*, 213 F. Supp. 2d 432, 435 (D.N.J. 2002) (citing *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997)). The Court may thus infer that Hershey's repackaging practice was sufficiently widespread to create an issue of fact on genericness.[1]

Alternatively, to the extent the Court believes that further information regarding the scope of Hershey's repackaging practices is relevant to disposition of the motion, PIM would then ask for an opportunity to take further discovery pursuant to Fed. R. Civ. P. 56(d). Given Hershey's production of the documents on the eve of trial and its exclusive control over the relevant information, any other result would be inequitable. *See St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1313-15 (3d Cir. 1994) (summary judgment improper where party raised Rule 56(d) objection due to lack of discovery on issue); *San Filippo v. Bongiovanni*, 30 F.3d 424, 432-33 (3d Cir. 1994) (Rule 56(d) motion should be granted as "matter of course" "where relevant information sought is in the hands of the [party moving for summary judgment]").

---

[1] *Benjamin Moore & Co. v. Talon Paint Products, Inc.*, 917 F. Supp. 331 (D.N.J. 1996), cited at pages 3 and 20 of Hershey's brief, does not support its position. That Court held that evidence of private labeling was insufficient to overturn a prior finding of likelihood of confusion in light of defendant's intentional and wholesale copying of plaintiff's trade dress. Moreover, there was a *full record*, including testimony from witnesses with personal knowledge, that plaintiff's private labeling practice was extremely limited in scope and time. No such record exists here. Where all inferences concerning the scope of Hershey's generic use must be drawn in PIM's favor, reliance on *Benjamin Moore* is thus inappropriate. 917 F. Supp. at 334-36.

3

## II. THERE IS A DISPUTED ISSUE OF FACT AS TO WHETHER "KISSES" WAS GENERIC AS OF ITS ADOPTION BY HERSHEY IN 1907

The newly produced documents contain Hershey's own express admission that it was not until 1975 – seven decades after the introduction of Hershey's Kisses – that Hershey was "*for the first time . . . considering the word 'KISSES' as one of [Hershey's] trademarks*" requiring a license. *See* Mandel Decl. (Doc. No. 147) Ex. 2 (emphasis added). That admission standing alone creates an issue of fact as to whether "kisses" was generic as of 1907. If Hershey did not treat the term "kisses" as a trademark in its own commercial arrangements until the 1970's, a reasonable factfinder could certainly conclude that it was not a trademark back in 1907.

Hershey seeks to avoid such a result by pointing to a small handful of registration and enforcement efforts prior to the 1970's. However, that evidence hardly eliminates all factual dispute concerning the trademark status of "kisses" in 1907. That Hershey *unsuccessfully* sought to register "kisses" in 1921 – fourteen years *after* the product was introduced – does not somehow compel the conclusion that the term was a trademark in 1907. Indeed, the fact that no trademark protection was sought in 1907 or in the decade and a half that followed, coupled with the Trademark Office's rejection of Hershey's registration attempts in both the 1920's and 1970's, evidences that "kisses" was not a trademark when adopted. Moreover, Hershey's fifty year delay in returning to the USPTO hardly reflects a clear perception that "kisses" was a trademark, especially when measured against Hershey's tireless efforts to register its many other marks (e.g., HERSHEY and HERSHEY-ETS) and its countless other admissions that "kisses" was a generic term. *See* PIM Moving Br. at 17-18.

The record of Hershey's purported enforcement efforts points to the same conclusion. While Hershey exaggerates about "numerous" examples of pre-1975 enforcement efforts (Hershey Br. at 15), it points only to *four* isolated claims asserted in a nearly seventy year time

4

span. *See* Duquette Decl. Ex. 7 (asserting claims against Cook, Pandora's Box, Budget Pak and K.G. Bakers). Such sporadic enforcement efforts (the earliest of which occurred some four decades after Hershey's first use) cannot disprove the generic status of "kisses" as a matter of law, *see, e.g., Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 292 (S.D.N.Y. 2000) (finding "Pilates" to be generic even though evidence showed that plaintiff's predecessor had "sent some cease and desist letters and settled a trademark infringement lawsuit relating to the PILATES mark"), especially where there is far greater evidence showing Hershey's policy for decades not to enforce rights against third party "kiss" marks.

For example, in a 1970's lawsuit alleging infringement of the trade dress features of Hershey's "kisses," Hershey lodged no objection to defendant's use of two "kiss" marks and even used the term "kisses" generically throughout its complaint in identifying the type of goods sold by both parties. *See* PIM Supp. 56.1 (Doc. No. 80) ¶¶ 24-29. Hershey's principal outside trademark attorney issued demand letters during that same time frame objecting solely to the trade dress features of third party chocolate "kisses" products. *See id.* ¶¶ 30-33. Indeed, as late as 1993, Hershey opposed a third party trademark application on the grounds that "the combination of ALMOND KISSES is only a *generic term* for a bite-size piece of candy containing almonds or pieces of almonds." *See id.* ¶¶ 34-37 (emphasis added).

In the face of such evidence – including judicial admissions that "kisses" was generic – Hershey's reliance on four limited claim letters does not warrant judgment in Hershey's favor as a matter of law. The record reflects that Hershey did *not* (1) seek registration when "kisses" was initially adopted; (2) challenge the Trademark Office's conclusion that "kisses" was unprotectable in the 1920s or make any other effort to register the term for some 50 years; (3) generally pursue potential infringers using "kisses" on chocolate products; or (4) seek a single

18166/011/1257929

license for the term "kisses" until 1975. Viewing this record as a whole, a reasonable factfinder could certainly credit Hershey's statement that 1975 was the "first time" Hershey considered "kiss" a trademark and thus find that the term was generic as of its adoption in 1907.

### III. THE NEW EVIDENCE CREATES A TRIABLE ISSUE OF FACT AS TO WHETHER "KISSES" WAS GENERIC IN THE 1950's, 1960's AND 1970's

With regard to the decades that preceded 1975, Hershey's arguments that the new evidence does not create an issue of fact are largely legal non-sequiturs. It first reiterates that there is "no dispute" that the repackaged goods were always clearly visible as Hershey's "kisses" bearing Hershey's trade dress, foil wrapping and plume. *See* Hershey Br. at 16-17. As noted above, Hershey's evidentiary basis for that assumption is questionable, particularly where it provides only three illegible examples and otherwise professes to know so little about these documents. Regardless, Hershey simply ignores the key import of this evidence. Hershey unambiguously stated that "kisses" was not a trademark and that no license was required to use the term. That admission standing alone creates an issue of fact regarding the genericness of "kisses" in the years leading up to Hershey's change of policy in 1975. And, when combined with Hershey's other admissions and actions reflecting a similar mindset, *see* Section II, *supra,* this new evidence warrants vacating the Court's prior summary judgment ruling.[2]

---

[2] Hershey distinguishes *BellSouth* and *Pilates* on the grounds that the plaintiffs in those cases more aggressively disavowed rights in the terms deemed generic. Apart from the fact that those cases found the marks at issue generic as a matter of law or after trial, whereas PIM need only establish an issue of fact to defeat Hershey's summary judgment motion, Hershey seriously understates its own disavowals, which included: (1) a publicly distributed listing describing the term as generic; (2) pleadings and demand letters using the term generically or even opposing its registration by a third party as "unsuitable for trademark protection"; and (3) a policy permitting unlicensed use of the term and stating clearly that it was not considered a trademark until 1975. Surely such admissions create issues of fact, especially where there is already a sharp factual dispute (not present in *BellSouth* and *Pilates*) as to whether "kisses" was already generic as of the time of its adoption in 1907.

6

Moreover, by implementing this policy, Hershey permitted consumers to see the term used as a generic product identifier for the type of candy contained in the package. As noted in PIM's moving papers, when used alone by repackers, "kisses" was routinely treated as a generic term displayed similarly to "chocolate treats" and other generic identifications. *See* PIM Moving Br. at 18-19; Mandel Decl. Ex. 10. Regardless of whether consumers could recognize the chocolate in the bag as Hershey's product, they would still see a separate reference at the top of the package to "kisses" as the generic type of candy inside. The mere fact that consumers may have understood that those specific "kisses" were manufactured by Hershey does not diminish the generic nature of the term, just as a bag containing clearly labeled Hershey's chocolate bars or M&Ms would not imbue the phrases "chocolate bars" or "chocolate coated candy" appearing on a header card with trademark status.

In an effort to sanitize the repackers' generic uses of "kisses," Hershey likens a small handful of labels displaying its HERSHEY-ETS mark to "kisses" labels by the same repackers. *See* Hershey Br. at 21; Duquette Decl. Ex. 4. (It apparently found no parallel uses of the HERSHEY mark). However, unlike with respect to "kisses," Hershey required license agreements for the HERSHEY-ETS mark and insisted that the mark be accompanied by the registration symbol "®" and the statement that the term is a "trademark of the Hershey Chocolate Corporation." *See* Reply Declaration of Richard. S. Mandel, dated August 11, 2011, Ex. A.

All but a few of the examples provided by Hershey abided by this requirement, stating clearly on the label that HERSHEY-ETS was a Hershey trademark. *See, e.g.,* Duquette Decl. Ex. 4 (Family Treats, Warner's, Linda Scott, Bard/s Dairyland, Krauszer's Quality, High's, Carl's Candies, and Eillien's -- all showing registration symbol and stating "trademark of Hershey"). The express identification of HERSHEY-ETS as a Hershey trademark proximate to the

7

registration symbol bears no similarity to the many naked uses of "kisses" as a product identifier, with no reference to ownership or registration by any corporation. That Hershey failed to enforce the requirements of its license agreement for HERSHEY-ETS against a few remaining repackers, *see, e.g., id.* (South Park Candies and Ever-So-Fresh), is irrelevant to its total abdication of any claim of right to "kisses" in the first place. And, Hershey's cherry-picked comparisons to references to the composite mark "*Hershey's* Kisses," with the registration symbol underneath the term "Hershey" and physically separate from "kisses," *see, e.g., id.* (Warner's Hershey's Kisses, Linda Scott Hershey's Kisses) drive the point home that "kisses" itself was not a trademarked term.

   Hershey misses the point again by relying on *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924). The principle of that case is that third parties do not infringe when using the original producer's trademark on repackaged goods, as long as the repackers include a clear disclaimer that they have no connection to the trademark owner and do not make overly prominent use of plaintiff's mark. *See* J.T. McCarthy, *McCarthy On Trademarks And Unfair Competition* (4th ed. 2010) (hereinafter "McCarthy") §25:35 (describing case and the required "COTY disclosure"). *See also Bourjois, Inc. v. Hermida Labs., Inc.*, 106 F.2d 174, 175 (3d Cir. 1939) (repacker infringed by failing clearly to state that it was "not connected with" trademark owner, as required by *Prestonettes*). Its oblique footnote notwithstanding, *see* Hershey Br. at 19 n. 5, Hershey plainly recognized the need to require licenses from its repackers, whose prominent use of marks like HERSHEY and HERSHEY-ETS without any disclaimers transcended the type of use permitted by *Prestonettes*. Conspicuously, however, Hershey imposed no requirement of a license as to "kisses," because it did not consider the term a mark. In any event, the issue is not whether the repackers meet the *Prestonettes* standard for infringement, but rather that Hershey

8

(1) expressly stated to its customers that "kisses" was not a trademark requiring any license, as was required for HERSHEY or HERSHEY-ETS, and (2) willingly suffered generic use of the term as a product identifier on what appear to be decades of third party packaging.

That Hershey claims to have exercised quality control over repacked products and "routinely inspected . . . the packaging and finished products themselves," *see* Hershey Br. at 19, is similarly beside the point. PIM has never argued that Hershey has abandoned its mark by failing to exercise adequate quality control over a licensee. *See generally McCarthy* § 17.6. Rather, the key point is that Hershey never saw fit to obtain licenses for "kisses" in the first place, because by its own express admission, reflected in decades of behavior, it did not consider the term to be a mark. Consistent with that view, while Hershey may have been concerned about the quality of the repackaged chocolate products themselves (which some consumers might ultimately recognize as Hershey's) and may have been vigilant in monitoring uses of HERSHEY and HERSHEY-ETS to ensure that packaging and trade dress met its standards, it simply gave no care and exercised no control as to how its customers used the generic term "kisses." The reason is obvious – Hershey never believed it had rights in what was a generic term, free for third parties to use.

## IV. HERSHEY CANNOT RECLAIM KISSES FROM GENERIC STATUS

Since "kisses" was either born generic or became generic through Hershey's express disavowal of rights in the term, under clear Third Circuit precedent, it can *never* function as a trademark. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986) (generic term "is *never* protectable") (emphasis added); *see also Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 580 (D.N.J. 1985) ("generic term cannot become a trademark *under any*

9

*circumstances*") (emphasis added).³ As this Court held on summary judgment, "words used generically *in the past* cannot be infused with trademark significance through survey evidence." SJ Opinion at 18 (emphasis added). At best, such survey evidence can only show *de facto* secondary meaning, which is insufficient to imbue a generic term with trademark significance. *Id*. (citing *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 822 (4th Cir. 2001)). *See also Canfield*, 808 F.2d at 297; *Hershey Foods Corp. v. Cerreta*, 195 U.S.P.Q. 246, 256 (T.T.A.B. 1977) ("fact that a segment of the respondents associate the term 'KISSES' with [Hershey] is understandable in that [Hershey] is the largest distributor and seller of chocolate 'KISSES,' but this alone cannot establish purchaser recognition thereof as a trademark").

*Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953) does not support Hershey's theory of reclaiming "kisses from the public domain through survey evidence.⁴ *Singer* represents the *only* case where a Court found that a once generic term had become a trademark over time. It is at odds with Third Circuit precedent and contrary to the majority view and the law of this case that a generic term can *never* function as a trademark.⁵

---

³ The law of other Circuits and the T.T.A.B. is in accord. *See, e.g., Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006); *Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.*, 240 F.3d 251, 255 (4th Cir. 2001); *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 811-12 (2d Cir. 1999); *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 7-8 (1st Cir. 1981); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979); *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014-1015 (9th Cir. 1979); *Continental Airlines, Inc. v. United Airlines, Inc.*, 53 U.S.P.Q.2d 1385, 1395 (T.T.A.B. 1999). *See also Microsoft Corp. v. Lindows.com, Inc.*, 69 U.S.P.Q.2d 1863, 1864 (W.D. Wash. 2004).

⁴ Hershey's reliance on *dicta* from the seventy year old decision in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938), which has been criticized by Professor McCarthy as "opaque" and "far from clear," *McCarthy* § 12:47, and has been expressly rejected by the First Circuit as "unsound" and an "error," *see Miller Brewing*, 655 F.2d at 8 n.2, 9, is similarly unavailing. *See also* PIM's SJ Opp. Br. (Doc. No. 78) at 8.

⁵ As discussed in detail in PIM's SJ Opp. Br. at 9 n.5, Hershey cannot rely on the T.T.A.B.'s *non-citable ex parte* decision, *In re Holmstead, Inc.*, 2000 TTAB LEXIS 240 (T.T.A.B. Apr. 4, 2000), which permitted Hershey's registration of the term "kisses" at issue in this case. Although the "softsoap" and "opry" decisions cited by Hershey suggested that secondary

10

Moreover, at best, *Singer* represents a "rare" and "extraordinary" circumstance where there has been a "radical change in consumer perception" such that the term at issue has become devoid of *any* generic meaning, leaving not even a minority of consumers with an understanding of the generic meaning. *McCarthy* §§ 12:30, 12:47. Thus, in *Miller Brewing*, the First Circuit rejected Miller's argument that, under *Singer*, it had recaptured the term "Lite" from the public domain where survey evidence showed that consumers identified Miller as the dominant source of beer bearing the term. 655 F.2d at 8 n.2, 9. Because "[t]here was no evidence that . . . 'LITE' ha[d] *ceased* to have in current usage among consumers of beer the generic meaning, 'beer of low caloric content,'" the Court found that *Singer* did not apply. *Id*. at 9 (emphasis added). *Accord BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 613 (M.D.N.C. 1999) ("Because BellSouth has failed to adduce any evidence supporting reclamation beyond evidence of consumer association of the 'walking fingers' with BellSouth, its reliance on the *Singer* doctrine must fail"). Hershey's own survey, showing that 30% of respondents identify "kiss" as a *generic* term, proves that the generic usage of "kiss" has not become entirely obsolete and that a significant percentage of consumers still perceive the term to be generic. Thus, even if applicable, *Singer* would not justify wresting "kisses" from decades of generic usage.

---

meaning of a generic term *may* be relevant in certain circumstances, none of these decisions actually held that such secondary meaning had transformed the generic term at issue into a trademark. The term "softsoap" was eventually granted registration not because of any purported change over time to its generic significance, as Hershey implies, but rather because it was deemed *never* to have been generic for the relevant genus of household liquid soap. *See In re Minnetonka Inc.*, 3 U.S.P.Q.2d 1711, 1712-13 (T.T.A.B. 1987). *See also McCarthy* § 12:30 (*Minnetonka* is *not* example of generic term later obtaining trademark status). Nor did the Court in *Gaylord Entertainment Co. v. Gilmore Entertainment Group, LLC*, No. 99 Civ. 0699 (M.D. Tenn. Oct. 21, 2002), make any judicial determination as to the trademark significance of the term "opry." The language Hershey cites appears in a *consent judgment* resulting from a settlement between the parties and does not carry any precedential effect. *See In re Illinois Bronze Powder & Paint Co.*, 188 U.S.P.Q. 459, 462-63 (T.T.A.B. 1975) (consent decree is not evidence of trademark significance).

## CONCLUSION

For the foregoing reasons, as well as those set forth in PIM's moving papers, the Court should modify the Order to the extent it granted summary judgment to Hershey on the issue of genericness, deny Hershey's motion for partial summary judgment on that issue, and permit the issue to proceed to trial.

Dated: West Orange, New Jersey  　　　　　　　　　　Respectfully submitted,
　　　　August 12, 2011

　　　　　　　　　　　　　　　　　　　　　　　　　　WOLFF & SAMPSON

Richard S. Mandel (*pro hac vice*)
Jonathan Z. King (*pro hac vice*)　　　　　　　　　　By:   s/ Howard J. Schwartz
Eric J. Shimanoff (*pro hac vice*)　　　　　　　　　　　　　Howard J. Schwartz
COWAN, LIEBOWITZ & LATMAN, P.C.　　　　　The Offices at Crystal Lake
1133 Avenue of the Americas　　　　　　　　　　　One Boland Drive
New York, NY 10036　　　　　　　　　　　　　　West Orange, NJ 07052
(212) 790-9200　　　　　　　　　　　　　　　　　(973) 530-2031

18166/011/1257929