NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE HERSHEY COMPANY and HERSHEY CHOCOLATE & CONFECTIONERY CORPORATION, | Civil Action No. 07-1601 (SDW) (MCA) |
| Plaintiffs/Counterclaim Defendants, | **OPINION** |
| v. | |
| PROMOTION IN MOTION, INC., | November 7, 2011 |
| Defendant/Counterclaim Plaintiff. | |

**WIGENTON**, District Judge.

Before the Court is defendant's, Promotion in Motion ("PIM" or "Defendant"), motion pursuant to Federal Rule of Civil Procedure 54(b) to modify this Court's October 4, 2010 order,[1] which granted plaintiffs', the Hershey Co. and Hershey Chocolate & Confectionery Corp. (collectively "Hershey" or "Plaintiff"), motion for partial summary judgment on PIM's counterclaim and affirmative defense based on genericness ("PIM's Motion").

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78.

For the reasons stated below, this Court **DENIES** PIM's Motion.

---

[1] This Court's October 4, 2010 order will be referred to herein as the "October 4, 2010 Order for Partial Summary Judgment."

1

**BACKGROUND AND PROCEDURAL HISTORY**

This action was brought by Hershey against PIM under the Lanham Act, 15 U.S.C. §§ 1114, 1119, and 1125, seeking preliminary and permanent injunctive relief, cancellation of a registered trademark, profits, damages and other relief relating to PIM's registration and use of the SWISSKISS mark. (Pl.'s Compl. ¶ 1.)  The Court will incorporate the background provided in its opinion dated October 4, 2010 ("October 4, 2011 Opinion") and supplement only to provide the current procedural posture and address additional information.

On February 5, 2010, Hershey filed motions for summary judgment.  This Court granted Hershey's motion for partial summary judgment on PIM's counterclaim and affirmative defense that the KISSES trademark is generic and denied Hershey's motion for partial summary judgment to cancel PIM's SWISSKISS trademark registration in the October 4, 2010 Order for Partial Summary Judgment, for the reasons articulated in the October 4, 2011 Opinion.

On June 22, 2011, a week before the original trial date for this matter, Hershey produced additional documents, including documentation regarding commercial arrangements Hershey had to repackage and distribute Hershey's KISSES.[2]  (Def.'s Br. 1, 5; Pl.'s Opp'n Br. 3.)  On July 8, 2011, PIM filed the motion currently before this Court, PIM's Motion.

**LEGAL STANDARD**

Rule 54(b) of the Federal Rules of Civil Procedure provides that

> any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment adjudicating all the claims* and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added).

---

[2] Hershey had not previously collected or reviewed these documents during fact discovery as they were in an "unexpected" location.  (Pl.'s Opp'n Br. 3.)

A partial summary judgment order is interlocutory in nature and does not terminate the action as to any of the claims or parties. *See Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 5–8 (1980); *Sussex Drug Prods. v. Kanasco, Ltd.*, 920 F.2d 1150, 1153 (3d Cir. 1990); *Benjamin Moore & Co. v. Talon Paints Prods., Inc.*, 917 F. Supp. 331, 337 (D.N.J. 1996), *aff'd*, 111 F.3d 125 (3d Cir. 1997). Thus, it is subject to revision or vacation at any time prior to final judgment. *See* Fed. R. Civ. P. 54(b).

Under Rule 54(b), a partial summary judgment order may be certified as final so as to allow the claim to be appealed while other claims within the case remain unadjudicated. *See Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 742–44 (1976); *Anthuis v. Colt Indus. Operating Corp.*, 971 F.2d 999, 1003 (3d Cir. 1992); *Howmedica Osteonic Corp. v. Zimmer, Inc.*, No. 05-897, 2010 WL 199960 (D.N.J. Jan. 13, 2010). However, absent such certification, partial summary judgment orders remain open to revision at any time prior to the entry of judgment on all claims and rights and liabilities of the parties. *Gallant v. Telebrands Corp.*, 35 F. Supp. 2d 378, 393-94 (D.N.J. 1998); *United States ex rel. Haskins v. Omega Inst., Inc.*, 25 F. Supp. 2d 510, 514-15 (D.N.J. 1998); *see* Fed. R. Civ. P. 54(b).

Therefore, unless the order has been certified, upon presentation of "supplemental evidence or new legal theories" the Court may entertain motions to reconsider partial summary judgment orders. *United States ex rel. Haskins*, 25 F. Supp. 2d at 515.

**DISCUSSION**

As previously discussed in this Court's October 4, 2010 Opinion, mark registration provides the registrant with "prima facie evidence of . . . the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein." 15 U.S.C. §1115(a). "If a

party has a federal trademark registration, it constitutes a strong presumption that the term is not generic or descriptive." *Interstate Net Bank v. NetBank, Inc.*, 221 F. Supp. 2d 513, 517-18 (D.N.J. 2002) (citing 15 U.S.C. § 1115(a)). This presumption of validity has a burden-shifting effect, and the party challenging a registered mark must produce sufficient evidence to establish that the mark is generic, and thus not protectable as a trademark. *Interstate Net Bank*, 221 F. Supp. 2d at 518 (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)); *see also Barnes Grp. Inc. v. Connell Ltd.*, 793 F. Supp. 1277, 1297 (D. Del. 1992). Following the rebuttal of this presumption, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

As articulated by the Third Circuit in *E.T. Browne Drug Co. v. Cococare Products*, the test for genericness focuses on whether "the primary significance of a term in the minds of the consuming public" is the name of a type of product (*i.e.*, genus), rather than of a source or producer of that product. 538 F.3d 185, 192 (3d Cir. 2008). If the term refers to the product, then it is generic; however, if "it refers to one source or producer of that product, the term is not generic (*i.e.*, it is descriptive, suggestive, or arbitrary or fanciful)." *Id*.

### I.   Documents Produced June 2011

PIM claims that "these new documents show that, while Hershey required such repackers to execute license agreements to use the HERSHEY trademark, Hershey expressly stated on repeated occasion that no license or permission was needed to use only the term 'kisses,' which Hershey did not consider one of its trademarks." (Def.'s Br. 5.) PIM argues that "the evidence is not cumulative because it fills evidentiary gaps that the Court held warranted summary judgment in Hershey's favor." (*Id.* at 9.)

4

For example, PIM points to a memorandum, which indicates that where repackers did not use "Hershey's" labels, they could use "kisses" or "chocolate kisses" without a licensing agreement. (*Id.* at 6-7.) A May 11, 1976 memorandum written by Hershey's Sales Service Coordinator contains the following statement:

> You will notice that in 1975 *for the first time* we are considering the word "KISSES" as one of our trademarks and if this repacker is using this word, they will now be required to complete the License Agreement attached to the General Bulletin . . . .

(*Id.* at 5 (emphasis in brief); Mandel Decl., Ex. 2.)

The new evidence does not create a genuine issue of material fact regarding the validity of Hershey's trademark. Although PIM argues that the public associated "kisses" with multiple sources as a result of Hershey's "decision to disavow any rights in 'kisses'" and permit repackers unlicensed use of the "kisses" designation, the evidence and facts not in dispute in this matter work against that theory. (*See id.* at 8-9.) To demonstrate the primary significance of a term, "[e]vidence of the public's understanding of the term [] may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications." *Berner*, 987 F.2d 975, 982 (3d Cir. 1993) (internal quotation marks and citation omitted). For example, "[c]onsumer surveys have become almost *de rigueur* in litigation over genericness. Judges . . . often expect to receive evidentiary assistance by surveys in resolving generic disputes." *Id.* at 982-83 (emphasis added).

As discussed in the October 4, 2011 Opinion, this Court determined that the relevant genus is solid chocolate and held that there was "no genuine issue of material fact, and no reasonable fact finder could conclude that KISSES was generic in 1907 as applied to solid chocolate candy." (*See* October 4, 2011 Opinion 12-15, 17.) PIM asserts that the new documents provide circumstantial evidence indicating that Hershey itself did not consider the

5

word "kisses" one of its trademarks until 1975, and thus could not have considered "kisses" to be a trademark for its solid chocolate. (Def.'s Br. 12; *see also* Mandel Decl., Ex. 2.) Further, PIM claims "this evidence does not stand alone, but casts new light on the record previously before the Court." (Def.'s Br. 12.) The new documents were considered, but do not alter the Court's ultimate decision in the October 4, 2010 Order for Partial Summary Judgment.

The new evidence that was presented does not address what the "relevant consuming public" would have thought regarding "kisses." Permitting repackers to use the "kisses" designation without licensing in certain instances does not change the consuming public's association with Hershey's KISSES as "solid chocolate candy, with and without ingredients such as nuts." (Oct. 4, 2011 Opinion 2.) Here, the perception of the relevant consuming public is demonstrated in numerous ways, including the consumer surveys in the record.

## II.   Relevant Consuming Public

"The critical question is whether the mark is descriptive to the prospective purchasers of the product." *Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 982 (3d Cir. 1993) (internal citations omitted). Moreover, "the primary significance test must be utilized to determine a term's genericness. Only if a term's meaning to the relevant consuming public is discovered can regulation of that term properly influence purchasing decisions and comport with relevant precedent." *Id.* (noting that "direct consumer evidence, *e.g.*, consumer surveys and testimony is preferable to indirect forms of evidence.")

In the instant case, over seventy percent of the respondents surveyed for Hershey in each of the three surveys identified KISSES as a brand. (Oct. 4, 2011 Opinion 19.) This Court previously found that the *Teflon* surveys in this matter were validly conducted, provided "strong

probative evidence of consumer perception" and weighed heavily against PIM's duty to overcome the presumption of validity of the KISSES registered mark. (*Id.* at 21.)

PIM asserts that "no survey can revive a once-generic term," but largely disregards the fact that the evidence in the record does not show KISSES was ever a generic term for solid chocolate candy. (Def.'s Reply 10; *see generally* Oct. 4 2010 Opinion 18-19, 23-24.) The new documents show some of Hershey's internal and repackaging practices, but not generic use or information on public perception. As this Court has previously stated, "[t]he focus of the inquiry is on whether the mark owner's generic use was directed toward the relevant consuming population." (Oct. 4, 2010 Opinion 24.) As discussed herein, the new evidence does not alter the Court's finding that the relevant consuming public's perception of KISSES was that the term was not generic.

### III. Public Domain

In arguing that Hershey understood KISSES to be generic, PIM relies on cases including *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598 (M.D.N.C. 1999) and *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286 (S.D.N.Y. 2000). Both cases are distinguishable from the instant matter. In *BellSouth Corp.*, the plaintiff sued a competing telephone directory publisher for infringing on its purported trademark rights in the "walking fingers" logo. 42 F. Supp. 2d 598. White Directory provided uncontradicted evidence that "AT & T expressly disavowed any trademark interest it might have had in the 'walking fingers' when it developed the symbol." *Id.* at 606. "White Directory prevail[ed] because it ha[d] demonstrated that AT & T, after developing the 'walking fingers' immediately disclaimed any interest it might have had in the logo and encouraged all in the industry to display it as the symbol of the yellow pages." *Id.* at 610. Further, "BellSouth [had] not presented a single piece

of evidence which suggest[ed] otherwise." *Id.* As discussed herein and in this Court's October 4, 2011 Opinion, this is not the case with Hershey and its use of "kisses."[3]

Unlike in the instant matter, BellSouth had a long history of encouraging third-party directory publishers to use the logo. *Id.* at 601 ("Thus the logo came to be used not only by advertisers appearing in Bell directories, but also by those appearing in directories of independent telephone companies and independent publishers not affiliated with telephone companies.") AT & T "not only 'acquiesced' in but also 'approved' and 'encouraged' the logo's use by affiliated telephone directories and unrelated third party publishers."[4] (Def.'s Br. 14.) As a result, the "walking fingers" logo was "proliferated" throughout the industry. *BellSouth*, 42 F. Supp. 2d at 610. Moreover, "AT & T and its operating companies not only represented to each other and to all in the industry that the mark was in the public domain, but also acted in a manner consistent with that understanding of the symbol's status before the public at large." *Id.* Other notable evidence presented also belied BellSouth's argument that "walking fingers" was a brand identifier. *See id.* For these reasons, the *BellSouth* court held that the "walking fingers" logo had entered the public domain, and that it had been in the public domain for over thirty years. *Id*.

PIM claims that, similar to BellSouth, in this case Hershey disavowed or disclaimed its rights to KISSES by encouraging unlicensed use of the term by third parties. In doing so, PIM argues that Hershey believed KISSES to be generic, and that KISSES was circulated among the public as a generic descriptor of a product type available from multiple sources in such a way as to place KISSES in the public domain. However, the new documents do not raise genuine issues

---

[3] Neither BellSouth nor its predecessors registered the logo "walking fingers." BellSouth sought protection under section 43(a) of the Lanham Act. *See generally BellSouth Corp.*, 42 F. Supp. 2d 598.
[4] There are references in the *BellSouth* case to AT & T because AT & T was divested of the Bell companies in 1984. The later-formed BellSouth filed against White Directory for the use of the "walking fingers" logo in BellSouth territory. A previous 1995 decision in the Federal Circuit held that the "walking fingers" logo was generic in non-BellSouth territory. *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565 (Fed. Cir. 1995).

of material fact regarding Hershey's public perspective, or more importantly, the relevant consuming public's perception of Hershey's KISSES.

Unlike in *BellSouth*, PIM has not presented evidence to demonstrate that Hershey encouraged the use of KISSES on anything other than genuine Hershey's KISSES products. (Pl.'s Opp'n Br. 24.) In *BellSouth*, the plaintiff already believed the walking fingers logo had entered the public domain and thus the company made a conscious decision not to register the mark. In the instant matter, Hershey sought to register "kisses" on more than one occasion. (Pl.'s Opp'n Br. 13-14.) Here, there is no "immediate[] disclaime[r][,]" but rather well-documented efforts to protect a mark, and thus, this Court does not find that Hershey let KISSES enter the public domain. *Id.* at 610; (*see also* Duquette Decl., Ex. 7.).

Additionally, PIM relies on the *Pilates* case, which is also distinguishable from the instant matter. 120 F. Supp. 2d 286. In *Pilates*, the owner of the registered trademark PILATES sued an alleged infringer of the mark. *Id.* The court held that despite the plaintiff's "efforts to police its marks and promote the Pilates method" the mark had become generic as it relates to service and equipment marks. *Id.* at 306. Unlike in *Pilates,* where the mark was only subsequently policed by the successor of the mark through cease and desist letters, Hershey has presented evidence that it has actively enforced its mark against third-party sellers of chocolate products as far back as the 1940s. *Id.* at 298; (Pl.'s Opp'n Br. 15, 24; Duquette Decl., Ex. 7.).

In further support of its public domain argument, PIM reiterates that private labeling allowed confusion as to the source of the product. (Def.'s Br. 19.) PIM claims that by making the "kisses" product available to other brands, Hershey allowed "kisses" to become a reference to product type rather than product source. (*Id.*) The Court has found little support for PIM's

9

argument, but will address the private labeling and the issue of consumer confusion in the following section.

This Court held that "Hershey's KISSES mark was not generic within the relevant genus at the time of first use." (Oct. 4, 2011 Opinion 18.) Since the cases PIM cites can be distinguished from the instant matter, and due to the lack of genuine issues of material facts in dispute, this Court finds that PIM has not demonstrated that "kisses" entered the public domain.

## IV.   Private Labeling and Repackaging

PIM claims that the new evidence creates issues as to material facts pertaining to Hershey's use of "kisses" that warrants modification of the October 4, 2010 Order for Partial Summary Judgment. PIM's arguments primarily focus on Hershey's private labeling and repackaging practices through the years. While directing the Court's attention to newly produced documents, PIM asserts perceived conflicts between Hershey's private labeling and trademark rights, due to Hershey's alleged licensing practices and Hershey's own understanding of its ownership rights in "kisses." Each of these issues is addressed below.

   A.   *Private Labeling*

Over the years, Hershey allowed the repackaging of its goods under other private labels. (Mandel Decl. ¶ 2.) PIM claims that permitting repackaging "undermines public perception that the term designates a single source of origin" and thereby dilutes trademark rights. (Def.'s Br. 11.) Further, PIM claims that the new documents "illustrate how solid chocolate 'kisses' were sold to the public under various private-label brands, creating the impression that 'kisses' was a generic description of a type of candy that derives from multiple sources." (Def.'s Br. 2.) However, PIM fails to present relevant persuasive case law to demonstrate that private labeling

in and of itself, without more, destroys trademark rights.[5] As in other instances in this district, this Court "fails to see how use of private labels would dilute the distinctiveness of plaintiff's trade dress or its marketplace recognition." *Benjamin Moore & Co. v. Talon Paints Prods., Inc.*, 917 F. Supp. 331, 335-36 (D.N.J. 1996), *aff'd*, 111 F.3d 125 (3d Cir. 1997) (citing *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1204 (Fed. Cir. 1994) (private labeling does not mean proponent cannot prove that the consuming public identified its trade dress)).

Based on the record before this Court, Hershey's repackaging practices have not caused consumer confusion as to the source of the KISSES products. (Pl.'s Opp'n Br. 17-18.) First, most of the privately-labeled products explicitly stated that the chocolates were packaged or repackaged. (*See, e.g.*, Mandel Decl., Ex. 9 at KISS0212288, KISS0212343, KISS0212350; Duquette Decl., Ex. 4 KISS0212201, KISS0212376, KISS0212378, KISS0212382, KISS0212432.) Several of the product packages also stated that the products are genuine KISSES chocolates manufactured by Hershey, and provided the name and addresses of the repackers. This clear identification of the product's source is contrary to PIM's confusion-based argument.

---

[5] PIM relies on *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 216 (3d Cir. 1995), *cert. denied*, 516 U.S. 808 (1995) to support its reasoning that private labeling is deleterious to continuing trademark rights. (Pl.'s Br. 19.) However, *Versa* does not suggest that private label use of a word mark supports a de facto finding of genericism; and further, the case focuses on trade dress. PIM also presents various other cases that are distinguishable and non-binding on this Court. *See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) (stating that sales of a mark to a third-party *could* warrant a finding of weakened trade dress, and holding the mark in question was weak when evidence of third-party sales was combined with "low level of commercial success and small advertising budget relative to market competitors at the relevant time" (emphasis added)); *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 364-65, 370 (S.D.N.Y. 2003) (finding that third-party use of product design and plaintiff's "failure to police infringing third-party uses" for decades rendered mark generic and unprotectable, while noting plaintiff's extensive repackaging and private-labeling practices); *Deltona Transformer Corp. v. Wal-Mart Stores, Inc.*, 115 F. Supp. 2d 1361, 1367 (M.D. Fla. 1999) (denying a preliminary injunction while considering private labeler's generic use of a word mark as one of several factors to determine the mark was merely descriptive and had not acquired secondary meaning); *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 977 F. Supp. 264, 267-68 (S.D.N.Y. 1997), *aff'd without op.*, 152 F.3d 948 (Fed. Cir. 1998) (canceling Aerogroup's registration in a "waffle" shoe sole where Aerogroup engaged in "extensive private [labeling] of its shoes," shoe lacked inherit distinctiveness, and where private labelers sometimes advertised the waffle sole as their own).

Secondly, several of the products retained their signature trade dress—conical, foil-wrapped, plume-bearing KISSES chocolates, which served as a strong indicator of source.[6] (Pl.'s Opp'n Br. 26.) Many repackagers also purchased licenses to place "HERSHEY" on the product label, in addition to the repacker's house brand. (*Id.* at 16.) When consumers viewed the product, they would have "readily identified Hershey as the source of the product." (*Id.* at 17.)

Thirdly, Hershey exercised "oversight and quality control" over the repackaged products. (*Id.* at 19.) PIM attempts to distinguish Hershey's "quality control" argument by claiming that oversight and control only pertain to trademark abandonment, which would not apply as PIM does not claim that Hershey abandoned its trademark. (Def.'s Reply 9.) PIM claims that Hershey, instead, "simply gave no care and exercised no control as to how its [licensees] used the generic term 'kisses.'" (*Id.*) However, Hershey's quality control practices speak to both Hershey's belief that KISSES was a protectable mark and to the ultimate issue of consumer perception as to brand and source identification. Hershey has presented evidence of over 125 "Plant Inspection Reports" indicating oversight and control efforts. (Duquette Decl. ¶ 10, Ex. 6.) This routine monitoring and inspection of KISSES repacking facilities was meant to ensure the integrity of the repackaged products—a guarantee of quality that was held out to consumers. Hershey's actions indicate care and protection of KISSES.

PIM also argues that allowing third parties to display "kisses" on product labels in "block, unstylized letters" gave the public the impression that "kisses" was meant to be used as a generic description of the product. (Def.'s Br. 18; Def.'s Reply 7.) However, as the October 4, 2011 Opinion noted previously, "a trademark owner is not required to take action against every

---

[6] It is important that the consuming public identifies the trade dress, "consisting of its container shape and material, with a single, though anonymous, product source." *Benjamin Moore & Co. v. Talon Paints Prods., Inc.,* 917 F. Supp. 331, 335-36 (D.N.J. 1996).

infringing or *de minimis* use of its mark." (Oct. 4, 2011 Opinion 25-26.) Furthermore, Hershey has provided evidence that "kisses" was often displayed in the same typeface as "Hershey's" on private labels. (Pl.'s Opp'n Br. 21.) Thus, even though "kisses" was being displayed in block letters, these block letters mimicked the block letters used to designate "Hershey" or "Hershey-Ets" products. The use of distinct lettering goes to further support the argument that third-party usage of "kisses" failed to create consumer confusion. Thus, this Court finds the evidence of private labeling presented fails to create a genuine issue of material fact to require modification of the October 4, 2010 Order for Partial Summary Judgment.

  B. *Licensing of KISSES*

Hershey argues that the statements of its sales staff from decades ago essentially indicate internal confusion regarding when a license was needed for registered or unregistered trademarks. As noted, even when Hershey permitted unlicensed use of "kisses" by repackers, Hershey implemented quality control. Further, there is no indication that the repackers' sales of KISSES impacted consumer perception.

PIM points out that over the years, Hershey has allowed licensing of "HERSHEY," but it was not until 1975 that it began licensing "kisses" to repackagers. (*See* Duquette Decl. ¶ 6.) According to PIM, this licensing policy demonstrated that between 1907 and 1975, Hershey made a considered policy decision that "kisses" was not a term in which Hershey could or would claim any trademark rights. (Def.'s Br. 5, 8, 10.) Based on this evidence, PIM claims that Hershey meant to use "kisses" generically.

Hershey purports that, at best, the May 11, 1976 memorandum came from salespeople who mistakenly believed that the authority to license "kisses" required a registered trademark in the term. (Pl.'s Opp'n Br. 23.) However, PIM counters that this could not have been the reason

13

why "kisses" was not licensed until 1975 because the trademark was not registered until 2001. (Def.'s Reply 1.) PIM further asserts that whether salespeople were authorized to speak on legal matters is irrelevant because Hershey's licensing policy "controlled how the mark was used commercially and exposed to consumers." (Def.'s Reply 2.)

The evidence presented demonstrates that Hershey intended to use KISSES as a mark prior to 1975. Hershey's attempts to register KISSES in 1921 and again in 1973 supports Hershey's position that it never intended the term to be used generically. (Pl.'s Opp'n Br. 13-14.) As discussed above, Hershey's quality control mechanisms for repackaging further supports that Hershey intended to protect its mark. Also, it should be noted that PIM has failed to put forth evidence that the sale or advertising of the repackaged goods was so "copious" in comparison to Hershey's widespread and continuous sales of KISSES. *Benjamin Moore*, 917 F. Supp. at 336; (*see also* Pl.'s Opp'n Br. 20.).

The Court does not find that further discovery regarding the scope of Hershey's repacking practices is necessary at this time, as it would not alter the results of the primary significance test (*i.e.* the perception of the relevant consuming public). Thus, there will be no need for further discovery pursuant to Federal Rule of Civil Procedure 56(d). The licensing evidence presented fails to provide a new material issue of fact that would require a modification of the October 4, 2010 Order for Partial Summary Judgment.

**V.     Recapture**

Hershey asserts that even if the term "kisses" had lapsed into genericism at some point Hershey had "recaptured" the mark. (Pl.'s Opp'n Br. 27-29.) Hershey argues that the ability to recapture a mark from genericism was recognized in *Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953). Hershey relies on the *Singer* case to rebut PIM's argument that a term, once generic,

could never become a protectable trademark again.[7] (Pl.'s Opp'n Br. 28.) Hershey also relies upon *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111 (1938). In *Kellogg*, "shredded wheat" had been the general description of a patented product. The Supreme Court stated that "secondary meaning" required a showing that the "primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* at 118. However, this Court finds the *Kellogg* case distinguishable from the instant matter on the issue of recapture because the court in *Kellogg* did not directly address pulling a term back from generic use.[8]

Overall, the cases cited by the parties on the issue of recapture are informative, but largely distinguishable or not binding.[9] Further, neither party has fully developed arguments regarding recapture. This Court focuses its determination on the relevant consuming public standard, and has stated that the relevant consuming public identifies the primary significance of KISSES as a brand. Thus, this Court will not address the recapture issue further at this time.

**CONCLUSION**

Although the new evidence does provide some additional information regarding Hershey's practices decades ago, it does not render the mark generic. Moreover, a reasonable fact finder could not find that Hershey's KISSES mark is generic today. Thus, as previously determined by this Court, "[i]n light of the strong presumption in favor of finding Hershey's federally registered mark as valid and protectable, the limited and indirect evidence presented by PIM, and Hershey's multiple *Teflon* surveys offering direct evidence of the primary significance

---

[7] The *Singer* court stated that by "constant and exclusive use of the name 'Singer'" and in "advertising . . . continuously and widely," the manufacturer was able to recapture "Singer" from the public domain. *Id.* at 522 n.3.
[8] *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986) is also relied on by PIM in opposing the recapture argument. Again, the issue of recapture was not specifically before the Court in that case. In the *Canfield* case, the Court found that evidence of secondary meaning will not be relevant if a mark is generic.
[9] The *Kellogg* case, which the parties also cite, notably focuses on the perception of the consuming public.

15

of KISSES as a brand to consumers, this Court concludes that a reasonable fact finder could not find the KISSES mark generic." (Oct. 4, 2011 Opinion 26.)

For the foregoing reasons, this Court **DENIES** PIM's Motion.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
cc:     Judge Arleo
        Parties