NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE HERSHEY COMPANY and HERSHEY CHOCOLATE & CONFECTIONERY COPRORATION, | Civil Action No. 07-cv-1601 (SDW) |
| Plaintiffs/Counterclaim Defendants, | **OPINION** |
| v. | |
| PROMOTION IN MOTION, INC., | January 18, 2013 |
| Defendant/Counterclaim Plaintiff. | |

**WIGENTON**, District Judge.

Before the Court are trademark infringement and trademark dilution claims, and request for cancellation by the plaintiffs, The Hershey Company and Hershey Chocolate & Confectionary Corporation (collectively "Plaintiff" or "Hershey") against defendant Promotion in Motion, Inc. ("Defendant" or "PIM") pursuant to 15 U.S.C. §§ 114(1)(a), 1125(a), (c), and §1119.

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a). Venue is proper under 28 U.S.C. § 1391(b).

A five-day bench trial was held from November 14, 2011 to November 18, 2011. For the reasons stated below, this Court finds that Defendant's product, SWISSKISS, does not infringe or dilute Plaintiff's valid trademark for KISSES. However, this Court also finds that PIM did not have a bona fide use of the SWISSKISS mark.

Based on the testimony and evidence presented at trial, this Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**PROCEDURAL BACKGROUND**

On April 5, 2007, Hershey commenced this action against PIM, alleging that PIM's federal registration and proposed use of the SWISSKISS mark for its chocolate product constitutes trademark infringement, false designation of origin, unfair competition, and further  dilution of Hershey's KISSES mark in violation of the Lanham Act.[1]  (Comp. ¶¶ 1, 27-55.)

On October 4, 2010, this Court granted Hershey's motion for partial summary judgment on PIM's counterclaim and affirmative defense that the KISSES trademark is generic and denied Hershey's motion for partial summary judgment to cancel PIM's SWISSKISS trademark registration ("SJ Opinion").

On June 22, 2011, a week before the original trial date for this matter, Hershey produced additional documents, including documentation regarding commercial arrangements Hershey had to repackage and distribute Hershey's KISSES. On July 8, 2011, PIM filed a motion pursuant to Federal Rule of Civil Procedure 54(b) to modify this Court's October 4, 2010 order.  This Court denied PIM's 54(b) motion.

This Court held a bench trial from November 14, 2011 to November 18, 2011.

**FINDING OF FACTS**

**_Hershey's_**

The Hershey Company is a major manufacturer and seller of chocolate and confectionery candy. (SF[2]-1; SF-2; Trial Tr. 57:10-58:23, Nov. 14, 2011 (Wege[3]).)

---

[1]  Plaintiff had two claims for injunctive relief - for the dilution by blurring under the dilution statute, of the Lanham Act, and for trademark infringement and false designation of origin under the Lanham Act.  (Comp. ¶¶ 27-55.) Plaintiff also brought a claim to cancel PIM's SWISSKISS registration on three grounds:  1) lack of a bona fide use; 2) likelihood of dilution; and 3) likelihood of confusion. (*Id.*)
[2] Final Pretrial Order Stipulated Facts ("SF").

The Hershey Company is a corporation organized and existing under the laws of Delaware, with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania 17033. (Compl. ¶¶ 6-7; DX-27.)  Hershey Chocolate and Confectionary Corporation is a corporation organized and existing under the laws of Delaware, with its principal place of business at 4860 Robb Street, Wheat Ridge, Colorado 80033. (SF-1; SF-2; Compl. ¶¶ 6-7.)

### *Hershey's KISSES*

The KISSES trademark was registered to Hershey on January 2, 2001, with July 1, 1907 as the date of first use. (Trial Tr. 148:11-25, Nov. 14, 2011 (Duquette);[4] PX-81.[5])  Except for a period in the 1940s,[6] KISSES chocolates have been sold continuously since its date of first use. (Trial Tr. 62:12-21, Nov. 14, 2011 (Wege).)  Hershey has and maintains several federal trademark registrations containing the word "KISS" or "KISSES." (SF-3; PX-81 - PX-101; DX-2; Trial Tr. 148:7-150:2, Nov. 14, 2011 (Duquette).) [7]

---

[3] D. Michael Wege is Hershey's Chief Commercial Officer and Senior Vice President in charge of the KISSES brand. (*See* Trial Tr. 57:10-58:23, Nov. 14, 2011 (Wege)).

[4] Lois Duquette, Esq. ("Duquette") is Hershey's in-house attorney charged with trademark enforcement.  (*See* Trial Tr. 146, Nov. 14, 2011 (Duquette).)

[5] Hershey's trial exhibits are designated as "PX-", while PIM's trial exhibits are designated as "DX-."  Citations to this Court's October 4, 2010 summary judgment opinion are designated as "SJ Opinion."

[6] During the 1940s, there was a foil shortage.  (*See* SJ Opinion at 3.)

[7] Hershey's registrations for KISS or KISSES include Reg. No. 2,416,701 for KISSES, registered on January 2, 2001 (with a date of first use of July 1, 1907) for use in connection with "solid chocolate candy, with and without ingredients such as nuts" and several others.  (SJ Opinion at 2-3; Trial Tr. 148:7-150:2, Nov. 14, 2011 (Duquette); PX-81)  Additional Hershey's KISS or KISSES related registrations:

  - WHEN YOU WANT TO SAY ALOHA, SAY IT WITH A KISS, U.S. Registration No. 3,685,216. Registered on Sept. 22, 2009 for use in connection with candy;
  - SAY HAPPY EASTER WITH A KISS!, U.S. Registration No. 3,679,745. Registered on September 8, 2009 for use in connection with candy;
  - SAY IT WITH A KISS, U.S. Registration No. 3,604,137. Registered on April 7, 2009 for use in connection with candy;
  - WHATEVER YOU WANT TO SAY, SAY IT WITH A KISS, U.S. Registration No. 3,493,764. Registered on Aug. 26, 2008 for use in connection with candy;
  - SEALED WITH A KISS, U.S. Registration No. 3,382,925. Registered on Feb. 12, 2008 for use in connection with candy;
  - MERRY KISSES, U.S. Registration No. 3,377,344. Registered on Feb. 5, 2008 for use in connection with candy;
  - SEALED WITH A HERSHEY'S KISS, U.S. Registration No. 3,363,296.

### *PIM*

PIM is a corporation organized and existing under the laws of Delaware and maintains corporate offices in Allendale, New Jersey. (Trial Tr. 118:18-119:7, Nov. 16, 2011 (Rosenberg); DX-27; Compl. ¶ 8.)

In 1979, PIM was founded by Michael Rosenberg ("Rosenberg") while he was a student at American University. (*See* Trial Tr. 103:7-23, Nov. 16, 2011 (Rosenberg).)

---

Registered on Jan. 1, 2008 for use in connection with candy;
- KISS OF THE MONTH, U.S. Registration No. 3,328,351. Registered on Nov. 6, 2007 for use in connection with candy;
- KISS SOMEONE, U.S. Registration No. 3,304,676. Registered on Oct. 2, 2007 for use in connection with candy;
- KIS, U.S. Registration No. 3,261,872 Registered on July 10, 2007 for use in connection with candy, chocolate and confectionery bits for baking;
- KISS ABLES, U.S. Registration No. 3,217,777. Registered on March 13, 2007 for use in connection with candy;
- EVERY DAY DESERVES A KISS, U.S. Registration No. 3,195,247. Registered on Jan 2, 2007 for use in connection with chocolate and candy;
- MINI KISSES, U.S. Registration No. 2,507,281. Registered on November 13, 2001 for use in connection with confectionery bits for baking;
- HUGS & KISSES, U.S. Registration No. 2,321,971. Registered on February 22, 2000 for use in connection with candy;
- GOODNIGHT KISSES, U.S. Registration No. 2,285,652. Registered on October 12, 1999 for use in connection with cocoa mixes, chocolate powder and hot chocolate;
- HUGS 'N KISSES, U.S. Registration No. 1,797,199. Registered on October 5, 1993 for use in connection with candy;
- KISSES KISSES KISSES, U.S. Registration No. 1,396,853. Registered on June 10, 1986 for use in connection with mugs filled with candy;
- A BIG KISS OFF, U.S. Registration No. 1,199,747. Registered on June 29, 1982 for use in connection with candy;
- A KISS ESPECIALLY FOR YOU, U.S. Registration No. 1,177,511. Registered on November 10, 1981 for use in connection with chocolate candy;
- A BIG KISS FOR YOU, U.S. Registration No. 1,074,784. Registered on October 4, 1977 for use in connection with candies including chocolate products;
- DELIGHTFULLY DELICIOUS ONE-OF-A-KIND KISSES, U.S. Registration No. 3,759,102. Registered on March 9, 2010 for use in connection with candy;
- DELIGHTFULLY DELICIOUS LITTLE BUNCHES OF KISSES, U.S. Registration No. 3,851,647. Registered on September 21, 2010 for use in connection with candy;
- KISSES FROM ME!, U.S. Registration No. 3,681,592. Registered on September 8, 2009 for use in connection with candy; and
- Design mark featuring the words "HERSHEY'S," "KISSES," and "A KISS FOR YOU," U.S. Registration No. 4,021,596. Registered on September 6, 2011for use in connection with candy; chocolate.

(SJ Opinion at 3; Trial Tr. 149:6-150:2, Nov. 14, 2011 (Duquette); SF-3; PX-81–PX-101; PX-176–PX-179). Hershey's Proposed Findings of Facts 8-10.

Rosenberg secured a licensing arrangement for PIM with Columbia Pictures and Interbake Foods, and was the manufacturing partner for an ANNIE cookie product that ended up being distributed nationally.  (*See* Trial Tr. 104:3-24, 106:4-107:18, Nov. 16, 2011 (Rosenberg).)

PIM currently sells confectionery products under brand names licensed from other corporations, including the following: a license with American Greetings to use the CARE BEAR characters in connection with a gummy bear candy; SUN MAID chocolate covered raisins; FISHER chocolate covered peanuts; MY COLOR M&M's chocolate candies; and, WELCH'S fruit snacks.  (Trial Tr. 107:21-110:22, 117:1-118:16, Nov. 16, 2011 (Rosenberg).)  Additionally, PIM develops its own proprietary brands and owns recipes for various candy products.  (Trial Tr. 108:5-110:22, 117:1-118:16, Nov. 16, 2011 (Rosenberg).)

In 2006, PIM employed approximately two hundred people.  (SF ¶ 7.)  Currently, PIM employs between 500 and 1000 people, and has two manufacturing facilities in Somerset, New Jersey.  (Trial Tr. 113:20-114:18, 118:18-119:10, Nov. 16, 2011 (Rosenberg).)  PIM is one of the one hundred largest candy manufacturers in the world and its annual gross sales are approximately $200 million.  (Trial Tr. 119:8-10, Nov. 16, 2011 (Rosenberg); Trial Tr. 56:6-57:25, 136:12-137:15, Nov. 17, 2011 (Rosenberg)).

### *PIM's SWISSKISS*

As of 2002, PIM sold chocolate products imported from Maestrani, a Swiss manufacturer, and was using the label SUISSE in connection with these Swiss chocolate products.  (Trial Tr. 121:15-122:23, Nov. 16, 2011 (Rosenberg).)

In 2002, Rosenberg formally selected the name SWISSKISS as a new mark for PIM's Swiss chocolate products.  (Trial Tr. 152:24-153:24, Nov. 16, 2011 (Rosenberg).)  The products were intended to be premium imported Swiss chocolates.  (*See* Trial Tr. 124:4-15, Nov. 16, 2011 (Rosenberg).)

5

Prior to selecting the product name SWISSKISS, Rosenberg was aware that Hershey used the name "KISSES" for its chocolate products and was familiar with Hershey's KISSES products in the marketplace.  (Trial Tr. 72:1-73:5, Nov. 17, 2011 (Rosenberg).)

In August 2002, the United States Patent and Trademark Office ("USPTO") Examining Attorney issued an office action regarding PIM's SWISSKISS application, indicating that the Examining Attorney had found no similar registered marks that would bar registration of the SWISSKISS mark.  (*See* Trial Tr. 153:10-154:24, Nov. 16, 2011 (Rosenberg); DX-2; SF 13.)

In the office action, the Examining Attorney indicated that if the goods to be sold by PIM did not originate from Switzerland, then registration should be refused because the SWISSKISS mark would be deceptive.  (*See* Trial Tr. 154:12-156:2, Nov. 16, 2011 (Rosenberg); DX-2.)  Alternatively, if the goods did originate from Switzerland, registration would also be improper because the mark would be primarily geographically descriptive.  (*See* Trial Tr. 154:12-156:2, Nov. 16, 2011 (Rosenberg); DX-2.)  The office action described the term "Swiss" as geographic.  (Trial Tr. 154:12-156:2, Nov. 16, 2011 (Rosenberg); DX-2.)

On May 8, 2002, in response to the office action, PIM argued that the SWISSKISS mark was "a play on words, with both syllables ending in ISS, that is, providing a rhyming nature to the mark."  (DX-4 at 3; Trial Tr. 125:8-17, Nov. 16, 2011 (Rosenberg).)  Thus, PIM argued that "the one-word mark of the present application provides a novel composite, single term, mark that takes it out of the realm of being geographically descriptive."  (DX-4 at 3; *see also* Trial Tr. 157:4-19, Nov. 16, 2011 (Rosenberg).)

Thereafter, on June 24, 2003, the SWISSKISS mark was published for opposition. (*See* DX-5; PX-22, PX-24.)  Hershey filed for extensions of time to oppose the SWISSKISS mark, but it ultimately did not file an opposition against the SWISSKISS mark.  (Trial Tr. 157:4-158:24, Nov. 16, 2011 (Rosenberg); DX-5.)

Another entity, Chocosuisse, filed opposition against SWISSKISS based on the use of the word "Swiss" in connection with chocolate.  (Trial Tr. 158:9-159:24, Nov. 16, 2011 (Rosenberg).) Chocosuisse was concerned that PIM might use SWISSKISS to promote a chocolate product that was not of Swiss origin.  (Trial Tr. 158:9-159:24, Nov. 16, 2011 (Rosenberg).)  As a result, in August 2003, PIM filed an amendment to its trademark application that changed the description of goods from "chocolate" to "chocolate of Swiss origin" and this resolved the potential conflict. (Trial Tr. 158:9-159:24, Nov. 16, 2011 (Rosenberg); DX-9.)

On February 10, 2004, the USPTO issued a Notice of Allowance regarding PIM's SWISSKISS application.[8]  (Trial Tr. 159:25-160:17, Nov. 16, 2011 (Rosenberg); DX-10; SF-15.)

PIM created a logo and design with the SUISSE logo at the top, surrounded by the words "Chocolat Suisse," and the red and white cross of the Swiss flag on top.  (*See* Trial Tr. 168:14-24, Nov. 16, 2011 (Rosenberg); DX-15.)  The red and white colors of Switzerland were also used for the font of the SWISSKISS name.  (Trial Tr. 168:14-24, Nov. 16, 2011 (Rosenberg); DX-15.) The SWISSKISS name was printed with a blue background and had the Swiss flag symbol on top. (Trial Tr. 168:14-24, Nov. 16, 2011 (Rosenberg); DX-15.)  The mountain design was intended to represent the Swiss Alps, and appears in the background behind an image of  chocolate.  (Trial Tr. 168:14-24, Nov. 16, 2011 (Rosenberg); DX-15.)

In 2004, PIM listed SWISSKISS in the 2004 Candy Buyer's Directory.[9] (Trial Tr. 172:14-174:4, Nov. 16, 2011 (Rosenberg); DX-34.)

Continental Concession Supplies, Inc. ("Continental") is a wholesale distributor of confectionery and snack products.  (Trial Tr. 174:11-18, Nov. 16, 2011 (Rosenberg).)

---

[8] PIM understood that it had a total of three years from the issuance of the Notice of Allowance within which to commence use of the SWISSKISS mark and thereby obtain a registration.  (*See* Trial Tr. 159:25-160:17, Nov. 16, 2011 (Rosenberg); DX-10.)
[9] PIM listed SWISSKISS in the directory for 2006, 2008, and 2010 as well. (Trial Tr. 172:14-174:4, Nov. 16, 2011 (Rosenberg); DX-34; Trial Tr. 26:20-25, Nov. 17, 2011 (Rosenberg).)

In 2004, Rosenberg informed Continental's president, Aaron Slonim, that PIM would introduce the SWISSKISS product and asked whether Continental would want to try the product. (*See* Trial Tr. 175:5-176:17, Nov. 16, 2011 (Rosenberg).)   After Rosenberg's discussion with Slonim, Jeffrey Scudillo, PIM's Vice President of Special Markets communicated with Adam Gottlieb, Continental's Executive Vice President of Sales and Procurement, to propose a sale to order the SWISSKISS product.  (*See* Trial Tr. 175:2-176:17, Nov. 16, 2011 (Rosenberg); Scudillo Dep.; Slonim Dep.)   The invoice order date for these products to Continental is listed as June 24, 2004. (*See* DX-17.)  Although it would have been the practice of Continental to sell these acquired products in their outlet store, no concrete evidence of sales to customers was provided.  (*See* Trial Tr. 119:9-120:9, Nov. 17, 2011 (Rosenberg).)

On June 27, 2004, after an initial sale and shipment of fifty cases of SWISSKISS product to Continental, PIM filed a Statement of Use of the SWISSKISS application.[10] (Trial Tr. 11:17-12:8, Nov. 17, 2011 (Rosenberg); DX-19, DX-23.)  On September 28, 2004, the registration for SWISSKISS (U.S. Reg. No. 2,889,705) was issued.  (Trial Tr. 11:17-12:8, Nov. 17, 2011 (Rosenberg); DX-19, DX-23; SF-16, SF-17.)

On January 22, 2005, after discussions with Maestrani and potential buyers, PIM communicated to Maestrani that Wal-mart indicated that they will place an order of the SWISSKISS product.  (Trial Tr. 17:21-18:12, Nov. 17, 2011 (Rosenberg); DX-24.)

On February 14, 2005, PIM received a cease and desist letter from Hershey's outside counsel ("February 14, 2005 Cease and Desist Letter").  (Trial Tr. 18:16-19:14, Nov. 17, 2011 (Rosenberg); DX-25.)  On February 16, 2005, PIM notified Maestrani of the February 14, 2005 Cease and Desist Letter.  (Trial Tr. 20:16-23:6, Nov. 17, 2011 (Rosenberg).)

---

[10] The fifty cases of SWISSKISS sent to Continental were 12-count for a total of 1200 bars of chocolate at a cost of $1,020.00 (which was eventually paid, but credited back to Continental).  (Trial Tr. 177:1-13, 181:2-182:6, Nov. 16, 2011 (Rosenberg).)  It is unknown if Continental ever sold the SWISSKISS product to actual customers.  (Trial Tr. 119:9-120:9, Nov. 17, 2011 (Rosenberg).)

On April 12, 2005, Hershey filed a cancellation petition against PIM with the Trademark Trial and Appeal Board ("TTAB").  (Trial Tr. 19:3-20:14, 37:18-38:8, Nov. 17, 2011 (Rosenberg); DX-27; SF-18.)  On April 5, 2007, Hershey commenced this action before this Court.  (*See* Compl.)[11]

PIM continued to list SWISSKISS as one of its brands in the Candy Buyers Directory.  (Trial Tr. 25:14-27:7, Nov. 17, 2011 (Rosenberg); DX-34 - DX-36.)  PIM has maintained its registration for the SWISSKISS mark in the USPTO.[12]  (Trial Tr. 23:20-25:8, Nov. 17, 2011 (Rosenberg); DX-364 - DX-265.)

Following Hershey's initiation of litigation, PIM did not to make additional sales of SWISSKISS chocolates and decided not to continue until the legal issues with the SWISSKISS mark were resolved.  (*See* Trial Tr. 19:3-20:14, 37:18-38:8, Nov. 17, 2011 (Rosenberg); DX-27.)

### *SURVEY EVIDENCE*

Both Hershey and PIM presented market research surveys at trial.  (*See* PX-124; PX-134; DX-226; Trial Tr. 145:12-163:6, Nov. 17, 2011 (Mantis); Trial Tr. 4:11-29:10, Nov. 18, 2011 (Simonson)).  Hershey had two surveys, one for confusion and one for dilution.  At trial, there was testimony from Simonson and Mantis regarding survey review and performance for the Defendant.

#### *Steckel*

Dr. Joel Steckel ("Steckel") was retained by Plaintiff's counsel to provide expert testimony in this matter to help assess whether SWISSKISS would likely cause consumers to be confused as to the source of the product or affiliate it in some way with the KISSES marks.  (*See* PX-124

---

[11] The TTAB cancellation proceeding was suspended due to the pending federal litigation.  (*See* DX-364 at 6.)
[12] On March 24, 2011, PIM filed a declaration of excusable nonuse with the USPTO.  (Trial Tr. 24:9-10, Nov. 17, 2011 (Rosenberg); DX-364; DX-365.)

(Steckel revised expert report).)   His stimuli were index cards and he found a confusion rate of 29.5%. (*See* Trial Tr. 14:12-15:1 Nov. 16, 2011 (Steckel); PX-124 at 5.)

*Mantis*

George Mantis ("Mantis") replicated Steckel's likelihood of confusion study.  When he re-executed the Steckel survey, Mantis changed the stimuli to the package of SWISSKISS sent to Continental and used the same screening methods that Steckel employed.  (*See* Trial Tr. 70:6-22 Nov. 16, 2011 (Steckel).)   Mantis found confusion rates of 3.2% and 4%.  (Trial Tr.  161:21-162:17, Nov. 17, 2011 (Mantis).)

*Mazis*

Dr. Michael Mazis ("Mazis") was retained by Plaintiff's counsel to provide expert testimony in this matter assessing whether Hershey's KISSES marks were likely diluted by PIM's SWISSKISS mark.   (*See* PX-134 (Mazis report for Hershey), PX-137 (SWISSKISS and SWISSWISH cards used in survey), PX-138 (interviewer instructions), PX-139 (survey validation), PX-140 (product screener survey information), PX-141 (product survey main questionnaires), and PX-142 (product survey data).)  Based on his study, Mazis concluded that over a third of the respondents associated SWISSKISS with the KISSES marks.  (Trial Tr. 98:16-99:5, Nov. 15, 2011 (Mazis).)

*Simonson*

PIM's expert Dr. Itamar Simonson ("Simonson") was retained to evaluate expert reports on the likelihood of confusion (Steckel) and association study (Mazis) performed at the request of Hershey.   (*See* DX-215.)   At trial, Simonson testified and specifically reviewed the studies preformed by Mazis and Steckel.  He found that both studies were not reliable. (*See generally* Trial Tr. Nov. 18, 2011 (Simonson).

10

**EVIDENTIARY ADMISSIONS**

Before addressing the merits of the case, the Court will address the evidentiary objections made by the parties.  Plaintiff objects to the admission of the following of Defendant's Trial Exhibits: DX-46, "History of the Hershey Kiss"; DX-50, advertisements printed in Confectioners' Journal between 1903 and 1915; DX-62, records relating to U.S. trademark registrations containing the word "kiss" or "kisses"; DX-63, records relating to trademark applications and registrations containing the word "kiss" or "kisses" to describe the goods; DX-171, excerpt from The Dictionary of American Food and Drink by John Mariani from other cases, published in 1983; DX-260 through DX-263, expert reports and deposition transcripts of Mazis; DX-282 through DX-291, excerpts from dictionaries containing definitions to the word "kiss"; DX-343, records relating to trademark registrations containing the word "kiss" or "kisses" in English or other languages; DX-366, memoranda from the 1950s through the 1970s written by Hershey's employees related to the repackaging of Hershey's KISSES products; DX-367 through DX-369 and DX-371, images of labels used for repacking Hershey's KISSES from the 1950s through 1970s.  PIM objects to the admission of PX-31, an email to "Mr. Rosenberg" dated October 27, 2008.  For the reasons provided below, the Court will permit Plaintiff's and Defendant's evidentiary submissions with the exception of DX-46 and PX-31.

<u>Objections Based on Relevance</u>

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The court enjoys "wide latitude" in admitting such evidence into the record. *See United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988).  "[E]vidence is irrelevant only when it has *no tendency* to prove a consequential fact."   *Gibson v. Mayor & Council of City of*

*Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004) (internal citations and quotations omitted)(emphasis added).

Hershey argues that these exhibits relating to the "alleged historical use of the word 'kiss' or 'kisses' by third parties" are inadmissible because the "strength of the mark is evaluated at the time of the litigation, *not* in the past." (Hershey's Proposed Findings of Fact 101-02.) This Court has already discussed how dictionaries can be useful to determine consumer perception when scrutinized. (*See* SJ Opinion at 21-23.) Furthermore, there are other aspects to determining likelihood of confusion besides the strength of the mark. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001) (listing *Lapp* factors). This evidence of dictionaries, trade journals, and other trademarks has a tendency to speak to the descriptive qualities of the mark among the other *Lapp* factors. This Court finds that DX-50, DX-62, DX-63, DX-171, DX-282 through DX-291, DX-343, DX-366 through DX-369, and DX-371 are relevant, and therefore are admitted into evidence.

DX-46, "History of the Hershey Kiss," was prepared by a third party. The document is a reflection of the perceptions of Whitenacks, the author. It is not probative as it has no tendency to show likelihood of confusion or dilution. Therefore DX-46 will be excluded.

_Objections Based on Hearsay_

Hershey objects to DX-171 and DX-260 through DX-263 on the ground of hearsay. Hearsay is a statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801. Hearsay is not admissible, unless the statement that is hearsay falls under an enumerated exception. Fed R. Evid. 802 & 804.

DX-171 is not inadmissible hearsay since it is not offered for the truth of the matter asserted, or that the definition of "kisses" is that contained in the dictionary. The dictionary

definition is significant in that it exists, and not for the truth of the matter.  As DX-171 is not inadmissible hearsay, it is admitted into evidence.

DX-260 through DX-263 are expert reports and deposition transcripts of Mazis from other cases.  "[A] witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."  Fed. R. Evid. 613(b).  Mazis was a witness in this case and both parties had the opportunity to inquire about his prior statements on November 15, 2011.

PIM objects to Hershey's PX-31, an email from a third party to PIM's President.  PX-31 is hearsay pursuant to Fed. R. Evid. 801.  The declarant, Stephen Lesser, was not a party or witness in this case.  The email falls squarely within the rule against hearsay.  *See e.g. White v. Brown*, 408 F. App'x 595 (3d Cir. 2010).  Furthermore, these statements do not fall under any applicable hearsay exception.  *See* Fed. R. Evid. 803-04 (listing the exceptions to the rule against hearsay); *Crawford v. Washington*, 541 U.S. 36, 40 (stating that "evidence must either fall within a firmly rooted hearsay exception or bear particularized guarantees of trustworthiness") (internal citations and quotations omitted).  Therefore, PX-31 will be excluded.

**CONCLUSIONS OF LAW**

I.   <u>Trademark Infringement and Unfair Competition Claims</u>

The Lanham Act provides a national system for registration of trademarks used in interstate commerce and grants a registered trademark holder the exclusive right to determine the use of its mark by others.  *See* 15 U.S.C. § 1127.  Trademark infringement claims under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and federal unfair competition claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), are considered under the same standard. *See Advance Magazine Publrs. Inc. v. Vogue Int'l*, 123 F. Supp. 2d 790, 795 (D.N.J. 2000) (citing *A&H Sportswear, Inc.*

13

*v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 201-11 (3d Cir. 2000)). Trademark infringement is established when the plaintiff proves that it owns the mark, that its mark is valid and legally protectable, and that the defendant's use of the mark to identify its goods or services is likely to create confusion. *Commerce Nat'l Ins. Servs. Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).  Thus, a claim for trademark infringement or unfair competition under the Lanham Trademark Act, is established by demonstrating that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) (citing *Opticians Ass'n of Am.*, 920 F.2d at 192.)

In the instant matter, on summary judgment, this Court determined that the KISSES marks at issue are valid and legally protectable and there is no dispute that Plaintiff owns these marks. (*See generally* SJ Opinion.)  Thus, this Court now considers whether Defendant's use of the marks is likely to create confusion.

"Likelihood of confusion is a factual question, [ ] but legal principles govern what evidence may, or must, be considered by the District Court in reaching that conclusion, and also what standards apply to its determination."  *A & H Sportswear, Inc.*, 237 F.3d at 210.

Likelihood of confusion exists "when the consumers viewing the defendant's mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Commerce Nat'l*, 214 F.3d at 438-39 (internal citations omitted); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 279.  The court evaluates whether consumers would assume the product is associated with the source of a different product identified by a similar mark under the factors set forth by the

Third Circuit in *Interpace Corp. v. Lapp, Inc.*, known as the "*Lapp* Factors." 721 F.2d 460, 463

(3d Cir. 1983). These factors include:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
>
> (5) the intent of the defendant in adopting the mark;
>
> (6) the evidence of actual confusion;
>
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of consumers because of the similarity of functions; and
>
> (10) other factors suggesting that the consuming public might expect the prior owner to manufacture product in the defendant's market, or that he is likely to expand into that market.

*Id.* These factors are to be applied as a balancing test, where no one factor is determinative. *See*

*Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 182 (3d Cir. 2010) (citing *Checkpoint*

*Sys.*, 269 F.3d at 280). The *Lapp* test requires a "qualitative inquiry [where] [n]ot all factors will

be relevant in all cases; further, the different factors may properly be accorded different weights

depending on the particular factual setting. A district court should utilize the factors that seem

appropriate to a given situation." *A&H Sportswear, Inc.*, 237 F.3d at 215. "*Lapp* factors are not to

be mechanically tallied, but rather that they are tools to guide a qualitative decision." *Id.* at 216.

These *Lapp* factors apply whether or not the parties' products directly compete. *Id.* at 214, 215. The Third Circuit has stated that "the *Lapp* factors should be used both for competing and for noncompeting goods. As for those factors that specifically refer to noncompeting goods, we believe that, rather than force courts first to inquire as to whether or not the goods are directly competitive simply for the purpose of determining if those factors apply—and, presumably, applying *Lapp* factors to make this initial determination—factors (7), (9), and (10) of the *Lapp* test must be adapted to make them applicable whether the products directly compete or not." *Id.* at 213. Further, "the court often need not apply each and every factor . . . At all events, the factors are meant to be tools, not hurdles." *Id.* at 214.

Here, for our purposes the parties are considered competitors largely in the chocolate market.[13]

**A.** The degree of similarity between the owner's mark and the alleged infringing mark (*Lapp* factor one):

The similarity of marks is a factor that has been described as "[t]he single most important factor in determining [the] likelihood of confusion. . . ." *A&H Sportswear*, 237 F.3d at 216. Appropriate consideration of similarity is not side-by-side comparison, but "whether the labels create the same overall impression when viewed separately." *Kos Pharms, Inc., v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004). An "[o]verall impression is created by the sight, sound, and meaning of the mark." *Sabinsa Corp.*, 609 F.3d at 183 (citing *A&H Sportswear*, 237 F.3d at 217). Where goods directly compete for the same consumer, "the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Kos Pharms, Inc.,* 369 F.3d at 713 (internal citation omitted).

---

[13] Hershey and PIM are both part of the confectionery candy industry. Hershey's witness Wege testified that Hershey competes with chocolate candies and non-chocolate (although less directly). (Trial Tr. 120:19-122:20, Nov. 14, 2011 (Wege).) Premium chocolate is a category of the market on which PIM's SWISSKISS focuses. PIM's position is that their competitors are really other premium chocolate brands, while still identifying companies like Nestle as a competitor. (Trial Tr. 28:22-29:5, 52:15-18, Nov. 16, 2011 (Rosenberg).)

In *PB Brands, L.L.C. v. Patel Shah Indian Grocery*, the Third Circuit considered the similarity of marks between three names: (a) "Patel Brothers;" (b) "Patel Cash & Carry," and (c) "Patel Shah Indian Groceries." 331 F. App'x 975, 980 (3d Cir. 2009).  The *PB Brands* court concluded no similarity existed between these marks because they "differ in sight, sound, and length." *Id.*  For example, the court found that "each name contains a different number of words and syllables, and all three names end with different sounds."  *Id.*  The court further observed "the strongest sound in Patel Brothers is 'Brothers' distinguishing it from Patel Shah."  *Id.*  Thus, the degree of similarity between the owner's mark and the alleged infringing mark was not great enough to create confusion.  *Id.*

In the instant matter, clearly the word "kiss" is part of SWISSKISS.  However, there are several other distinguishing elements.  For example, even Wege, Hershey's Chief Commercial Officer and Senior Vice President, recognized the product shape, packaging design, color, font, and graphics of KISSES and SWISSKISS are significantly different.  (*See* Trial Tr. 110:13-111:25, 141:12-142:14, Nov. 14, 2011 (Wege).)  Differences in presentation such as logos, graphics, packaging, and trade dress can eliminate the likelihood of confusion, even where marks share similar words or elements.  *See, e.g., A&H Sportswear*, 237 F.3d at 217 (finding no confusing similarity between THE MIRACLE BRA and MIRACLESUIT); *InterState Net Bank v. NETB@NK, Inc.*, 348 F. Supp. 2d 340, 354-55 (D.N.J. 2004) (finding no confusing similarity between NETBANK and INTERSTATE NET BANK where the parties used different fonts and "the marks are visibly different and distinct").  "[T]he fact that names sound similar does not mean that they are likely to cause confusion because the sounds of product names do not exist in a vacuum." *Noasha LLC v. Nordic Group of Cos. Ltd.*, 630 F. Supp. 2d 544, 553 (E.D. Pa. 2009) (denying preliminary injunction because no confusing similarity between WARBALL and WARBLES where "the trade dress of the two products and their marks are very different").

Hershey's KISSES brand is often associated with the product's conical shape, plume, and silver foil wrapping. (Trial Tr. 60:17-22, Nov. 14, 2011 (Wege).)   The candies have a well recognized paper plume (with "KISSES" printed on about a third of those distributed; other plumes may have related terms).   (Trial Tr. 60:17-22; 87:17-20, Nov. 14, 2011 (Wege).)  Hershey produces them in a variety of sizes, but bite size is the most common.   (Trial Tr. 60:17-22, Nov. 14, 2011 (Wege).)   Notably, KISSES are also produced in different color foil.   (*See* Trial Tr. 65:18-68:24, Nov. 14, 2011 (Wege).)   As Hershey representatives have acknowledged, these characteristics help consumers identify and distinguish Hershey's KISSES from other products. (*See* Trial Tr. 71:21-73:5, Nov. 15, 2011 (Duquette); Trial Tr. 110:13-111:8, Nov. 14, 2011 (Wege).)

PIM has used, and claims it intends to continue using, a different color scheme, shape, and Swiss theme for its SWISSKISS product.  PIM has incorporated the red and white cross symbol of a Swiss flag, a mountain setting against a blue background, with the brand name presented in red lettering outlined in white, and will not use the iconic conical shape.  (*See* Trial Tr. 168:14-171:20 Nov. 16, 2011 (Rosenberg); DX-15.)   These distinctions between the parties' products significantly reduce any potential for confusion.  *See, e.g., A&H Sportswear*, 237 F.3d at 217; *InterState Net Bank*, 348 F. Supp. 2d at 354-55; *CIT Group, Inc. v. Citicorp*, 20 F. Supp. 2d 775, 787 (D.N.J. 1998).  Defendant's exhibit 15 depicts the logo on the SWISSKISS product that PIM distributed to Continental, which is what they "have gone with and that [they] will be going with." (Trial Tr. 169:3-4, Nov. 16, 2011 (Rosenberg); DX-15.)  The logos for the SWISSKISS and KISSES marks are visibly very different and clearly distinct.  They do not create the same overall impression when viewed separately.  *See PB Brands,* 331 F. App'x at 980.

18

PIM's mark begins with the word, "SWISS," which is a significant and distinguishing element of the mark.[14]  *See, e.g.*, *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 796 (6th Cir. 2004) (POWERZONE and AUTOZONE were not confusingly similar where first syllable was dominant); *Citigroup Inc. v. Capital City Bank Group, Inc.*, 94 U.S.P.Q.2d 1645, 1664 (T.T.A.B. 2010) (finding no confusion between CITIBANK and CAPITAL CITY BANK, and noting that "Capital City" was dominant due to "its location as the beginning of applicant's marks").

Further, the letter "S" that begins PIM's SWISSKISS mark helps to create a very different sound from the letter "K" of Hershey's KISSES mark.  *See, e.g., ComponentOne, L.L.C. v. ComponentArt, Inc.*, 2008 U.S. Dist. LEXIS 87066, at *28-29 (W.D. Pa. Oct. 27, 2008) (discussing dominating sounds and distinguishing marks).

The Third Circuit has noted that "the weight to be given [to] each word is a judgment call, best suited to the fact-finder." *A&H Sportswear*, 237 F.3d at 218.  In the instant matter, the term "Swiss" comes in the beginning of the mark and could be considered the dominant part of the mark.  "Swiss" is in part a geographic reference in PIM's SWISSKISS mark that conveys a connotation distinguishable from the image of KISSES as an American quality candy produced by Hershey. The use of additional terms to add connotations has been used to distinguish other phrases with the word "kiss" from Hershey's KISSES mark.  *See, e.g.*, *Hershey Foods Corporation v. Cerreta*, 195 U.S.P.Q. 246, 256 (T.T.A.B. 1977) ("applicant's composite marks 'SEALED WITH A KISS' and 'A BIG KISS FOR YOU' with their overall connotation and

---

[14]  Additionally, the inclusion of the SUISSE house mark and its visual formatting works against any potential confusion.  *See, e.g., McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 361 (3d Cir. 2007) (house mark dispels confusion); *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 475 (3d Cir. 2005) (CHASE house mark precluded finding of confusing similarity); *A&H Sportswear*, 237 F.3d at 218 (house mark "renders the marks dissimilar").  As Defendant points out, the HERSHEY name has appeared on the packaging of every Hershey's KISSES product, identifying Hershey as the source of its product, whereas PIM's SUISSE and CHOCOLAT SUISSE convey the Swiss origin of the product for PIM.  However, Hershey offered evidence that in some instances KISSES have been advertised without the Hershey's name (*i.e.* in commercials).  (*See* Trial Tr. 77:18-79:17, Nov. 14 2011 (Wege).)

double entendre are so readily distinguishable from any use of 'KISSES' made by [Hershey] that confusion as to source of the goods sold thereunder is not reasonably likely to occur").

Understandably, Hershey's concern is that PIM has registered the SWISSKISS mark for chocolate of Swiss origin, and that it is not specific as to any particular trade dress or product form. The only restriction is that it be chocolate that comes from Switzerland. (*See generally* Trial Tr. 165:14-166:12, Nov. 14, 2011 Duquette).) While it is possible that other descriptive phrases before KISSES would be too similar or raise other issues with the KISSES mark, this Court does not see that as deeming the SWISSKISS product infringing.

Thus, on balance this Court finds that this factor does weigh in PIM's favor.

**B.**  The strength of the owner's mark (*Lapp* factor two):

To determine the strength of a mark, courts look to: (a) the mark's inherent distinctiveness or conceptual strength, and (b) evidence of the mark's commercial strength in terms of marketplace recognition. *See A&H Sportswear*, 237 F.3d at 221.

A mark's conceptual strength is measured along the continuum of: (a) generic, (b) descriptive, (c) suggestive, and (d) arbitrary or fanciful marks. *Id.* A descriptive mark is inherently weak. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002); *see, e.g.*, *New York Style Bagel Chip Co. v. That's Entertainment, Inc.*, 1992 U.S. Dist. LEXIS 3368, at *40 (E.D. Pa. Mar. 9, 1992) ("'New York Style' is geographically descriptive and is therefore, inherently weak"). Further, "[a]lthough a trademark may be 'strong and worthy of full protection' because it is valid and incontestable, that does not necessarily mean that its strength is particularly relevant to the ultimate issue of whether confusion is likely to occur." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002) (internal citation omitted). Indeed, "[e]ven where a trademark is incontestable and 'worthy of full protection,' the significance of its presumed

20

strength will depend upon its recognition among members of the public." *Id*. (internal citation omitted).

When a company files an application to register something as a trademark under Section 2(f), 15 U.S.C. § 1052(f), based on acquired distinctiveness for a descriptive term, the company concedes the trademark is descriptive. *Outdoor Kids, Inc. v. Parris Mfg. Co., Inc.*, 385 F. App'x 992, 994 (Fed. Cir. 2010). "By . . . seeking and obtaining registration under 15 U.S.C. § 1052(f), [plaintiff] admitted that the OUTDOOR KIDS mark is not an inherently distinctive mark and that the words are merely descriptive of its goods." *Id*. Hence, the court stated that the mark was weak. *Id*. at 994-95. Further, widespread use of the owner's terms, by third parties in the industry, is strong evidence that the term is descriptive. *Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 858 (3d. Cir. 1992) (recognizing that "[f]requent use of a term by sellers of similar products or services tends to indicate that the term is descriptive"). Moreover, third parties' trademark registrations that contain the owner's term, in the mark or description of goods, is further evidence of the term's descriptiveness. *See id*.; *Nartron Corp v. STMicroelectronics, Inc.*, 305 F.3d 397, 407 (6th Cir. 2002); *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1564-65 n.1 (Fed. Cir. 1987).

Additionally, longstanding descriptive use of the owner's term in media, newspapers, magazines, trade journals, recipes, product listings, etc. is evidence of descriptiveness. *See Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 982 (3d Cir. 1993); *In re Omaha Nat.'l Corp.*, 819 F.2d 1117, 1118-19 (Fed. Cir. 1987). Further, a dictionary definition, which defines the owner's term in descriptive manners, may provide further proof that a term is descriptive. *See In re Stereotaxis, Inc.*, 429 F.3d 1039, 1042-43 (Fed. Cir. 2005) (deeming STEREOTAXIS as descriptive for medical goods and services due to dictionary definitions describing the word as a type of surgery); *Colonial Elec. & Plumbing Supply of Hammonton, L.L.C. v. Colonial Elec.*

*Supply, Ltd.*, 2007 U.S. Dist. LEXIS 94417, at *9-10 (D.N.J. Dec. 27, 2007) ("based on these dictionary definitions, it is clear that 'electric supply' is simply a descriptive term").

Finally, the owner's use of his term in a descriptive sense is "particularly relevant" evidence that the term is inherently descriptive. *ConAgra, Inc. v. George A. Hormel & Co.*, 784 F. Supp. 700, 708 (D. Neb. 1992) *aff'd sub nom. ConAgra, Inc. v. George A. Hormel, & Co.*, 990 F.2d 368 (8th Cir. 1993) (HEALTHY CHOICE publicized its brand by talking "in terms of their low fat, sodium and cholesterol contents" and asking consumers to "make the healthy choice"); *Sunbeam Corp. v. Battle Creek Equip. Co.*, 216 U.S.P.Q. 1101, 1103 (T.T.A.B. 1982).

To determine the strength of a mark, courts also look at the evidence of the mark's commercial strength in terms of marketplace recognition. *See A&H Sportswear*, 237 F.3d at 221. Money spent on advertising to increase public recognition of a good will tend to support the owner's ownership of the term. *See id.* at 224. However, third party use of the owner's term weakens the commercial strength of the term. *See id.* at 223-24; *Citizens Fin. Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 123 (3d Cir. 2004). Further, in *A&H Sportswear*, the Third Circuit specifically analyzed a Fifth Circuit decision holding the term "sun," in a bank name, to be weak because it was used by twenty-five other competing financial institutions and 4,400 state businesses. *A&H Sportswear, Inc.*, 237 F.3d at 223; *Sun Banks of Florida, Inc. v. Sun Fed. Savings & Loan Assoc.*, 651 F.2d 311, 316-17 (5th Cir.1981).

Additionally, a product's popularity does not translate into trademark strength. *See Cerreta*, 195 U.S.P.Q. at 254. Large sales could be attributable to a unique combination of distinctive elements that constitute the brand's identity. *See E.T. Browne Drug Co. v. Cococare Products, Inc.*, 538 F.3d 185, 200 (3d Cir. 2008) (refusing to find that plaintiff's "Cocoa Butter Formula" mark had acquired distinctiveness, despite large sales, since product was always marketed in connection with plaintiff's "Palmer's" house mark).

The term "kiss" was used to describe small pieces of candy, and pre-1907 even small bits of chocolate candy.  (*See* SJ Opinion.)  In 1977, Hershey's KISSES mark was held weak due to significant third party "use of marks in the candy field containing the term 'KISS' or 'KISSES.'" *Hershey Foods Corp. v. Cerreta*, 195 U.S.P.Q. 246, 253-54 (T.T.A.B. 1977).   However, a company's success in enforcing its term against some third parties is not dispositive of the strength of the term. *See Application of Wella Corp.*, 565 F.2d 143, 144 n.2 (C.C.P.A. 1977).

PIM asserts that "KISSES is descriptive, a fact Hershey conceded when it filed its initial application in 1996 to register KISSES under Section 2(f), 15 U.S.C § 1052(f), based on acquired distinctiveness for a descriptive term." (*See* PIM's Proposed Findings of Fact at 68.)

In 2001, the TTAB ruled that KISSES has acquired distinctiveness and could be trademarked.  (*See* Trial Tr. 148:2-149:24, Nov. 14, 2011 (Duquette); PX-81.)   Hershey also acquired several related marks.  (*See* Trial Tr. 148:2-149:24, Nov. 14, 2011 (Duquette); PX-81-101, PX-176-179.)   However, in the 1920s and 1970s Hershey's efforts to register the KISSES mark were unsuccessful.  (*See* Trial Tr. 62:19-63:15, Nov. 15, 2011 (Duquette).)[15]

The Cerrata dispute of the 1970s involved "a big kiss for you" and "a kiss especially for you," with chocolate sold in a conical shape.  (*See* Trial Tr. 40:17-41:19, Nov. 15, 2011 (Duquette); PX-106.)  This was prior to Hershey registering the KISSES mark in 2001.  (*See* Trial Tr. 40:17-41:19, Nov. 15, 2011 (Duquette); PX-106.)   The Cerreta dispute did not end in Hershey's favor; however, Cerreta has since settled and assigned those marks to Hershey in 2002. (PX-147.)

On summary judgment and during trial PIM argued that Hershey's KISSES mark is inherently weak and has been diluted by third party use.  Specifically, PIM argued that because

---

[15]  Hershey was able to register the mark in 2001. (*See* Trial Tr. 65:13-18, Nov. 15, 2011 (Duquette); DX-279; DX-280; DX-281.)

"kisses" is descriptive it is inherently weak. (*See* SJ Opinion; *see also* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy") § 11:69; *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 965-67 (Fed. Cir. 2007). Further, PIM argued that KISSES on its own has relatively little commercial strength when divorced from other elements of the Hershey's KISSES brand. *See Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 123 (3d Cir. 2004); *A&H Sportswear*, 237 F.3d at 223-24. *See also CareFirst*, 434 F.3d at 270; *PB Brands v. Patel Shah Indian Grocery*, 2008 U.S. Dist. LEXIS 50356, at *23-24 (D.N.J. June 27, 2008); *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, 2006 U.S. Dist. LEXIS 16672, at *22-23 (D.N.J. Apr. 4, 2006).

PIM argued vigorously that consumers recognize the Hershey product not simply as KISSES, but as Hershey's KISSES. (Trial Tr. 46:1-8, Nov. 14, 2011 (Def.'s Counsel).) Hershey's witness, Wege, even testified that the Hershey name had been on every KISSES bag of which he was aware. (Trial Tr. 113:7-19, Nov. 14, 2011 (Wege).) Further, Hershey's own document indicating the key brands for licensing listed Hershey's and Hershey's KISSES, but not KISSES. (*See* DX-215.) In fact, Hershey has, on occasion, disclaimed rights to KISSES on some of its registrations or used the term descriptively. (*See* Trial Tr. 62:19-65:3, Nov. 15, 2011 (Duquette).) However, Hershey has presented significant evidence of KISSES being used without the Hershey's tag accompanying it in advertising, and even a 2007 U.S. postal stamp on the hundred year anniversary of the product. (Trial Tr. 88:21-89:23; 91:9-92:2, Nov. 14, 2011 (Wege); PX-111.) Further, Hershey's appears on bags of KISSES with the term "KISSES" being notably larger. (Trial Tr. 76:9-77:12, Nov. 14, 2011 (Wege).)

Several other candies with the word "kiss" or "kisses" are included in the SJ Opinion and/or discussed in Rosenberg's testimony at trial and referenced exhibits. (*See e.g.*, Trial Tr. 143:18-149:20, Nov. 16, 2011 (Rosenberg).) Evidence of other "kisses" candies (chocolate and

24

non-chocolate)[16] was presented including the following: Madelaine's Love and Kisses,[17] a chocolate product, that, as well as other products, co-existed for many years; Sun Sweet's registration for French Kisses (chocolate covered prunes); Baci candies promoted as Italian or chocolate kisses;[18] Barton Almond Kisses;[19]  Necco Mary Jane Peanut Butter Kisses; Lammes Peppermint Kisses; Kiss Blarny, Hagensborg's Kiss Me, Champagne Kiss by Jacque Tores.[20] (*See* Declaration Nart-Anong Chinda; DX-125; DX-126, Dx-164; DX-165; DX-190; DX-197; DX-355; DX-363.)[21]  Sarris also made a product called Sweet Kiss.  (*See* Trial Tr. 31:14-32:16, Nov. 15, 2011 (Duquette).)  Bayard sold a chocolate product called "coconut kisses."[22]  (*See* Trial Tr. 57:6-58:8, Nov. 15, 2011 (Duquette).)  There was also a candy, Karmakisses (the producer of which settled with Hershey and amended their USPTO application).  (*See* Trial Tr. 61:13-18, Nov. 15, 2011 (Duquette); DX-106.)   Notably, KISSES with almonds co-exists with the Barton's Almond Kisses.  (*See* Trial Tr. 27:15-31:12, Nov. 15, 2011 (Duquette).)

---

[16] The distinction between chocolate-flavored candies and chocolate candies was raised, but the evidence presented did not specifically show it is distinguishable to the average consumer or of significant consequence to the analysis of the market for confectionery products in terms of confusion.

[17] As noted at trial, "Love and Kisses" is very similar to "Hugs and Kisses", which Hershey has used for a product. However, Plaintiff's counsel pointed out that when the CEO of Madelaine Chocolates was deposed, he stated that sales of the Loves and Kisses product were less than $150,000 and not in national retail stores.   (*See* Trial Tr. 39:4-40:15, 40:23-41:7, Nov. 17, 2011 (Rosenberg).)  Madelaine Chocolates total annual sales are $33 million. (*See* Trial Tr. 40:23-41:7, Nov. 17, 2011 (Rosenberg).)

[18] Baci's candy, promoted as Italian kisses, was introduced in 1922.  "Baci" is Italian for the word kiss.  Perugina, a company that is owned by Nestle, manufactures Baci.  (*See* Trial Tr. 141:8-16, Nov. 17, 2011 (Rosenberg).)  Hershey deposed a Nestle representative who indicated the term "kiss" was used as a reference to a romantic kiss.  (*See* Trial Tr. 49:17-20, Nov. 17, 2011 (Rosenberg).)

[19] Examples of advertisements are shown as early as 1949 of Barton's Almond Kisses, a chocolate liquor candy.  (*See* Trial Tr. 21:10-27:14,  Nov. 15, 2011 (Duquette).)  Hershey and Barton reached an agreement that Barton could register the almond kisses with the proviso that the product list the Barton's or Boyer's brand.  (*See* Trial Tr. 27:15-30:5, Nov. 15, 2011 (Duquette).)

[20] A seasonal product around Valentine's day.  (*See* Trial Tr. 17:19-19:13, Nov. 15, 2011 (Duquette).)

[21] Hershey's did not branch into other flavors, such as milk chocolate with almonds, until the 1990s.  (Trial Tr. 111:10-19, Nov. 14, 2011 (Wege).)

[22] Hershey learned of Bayard's use in 1989 and did not object up to at least 2009. (*See* Trial Tr. 57:6-58:8, Nov. 15, 2011 (Duquette).)  The company has since agreed to change its product name. (*See* Trial Tr. 58:1-11, Nov. 15, 2011 (Duquette).)

Hershey's position is that it typically protects the KISSES marks against uses of the word "kiss" or "kisses" in connection with chocolate candies, not all candy products.[23] (Trial Tr. 154:1-11, Nov. 14, 2011 (Duquette)). [24]  For this litigation, the main focus is on the chocolate products, but the existence of non-chocolate products with "kisses" in their mark is additional context and relevant information on the pervasiveness and use of the term in the confectionary industry.

This Court does find that the strength of the KISSES marks weigh in Hershey's favor. While this Court finds that Hershey does have a solid mark for KISSES, the strength of its mark alone does not determine the confusion analysis.[25]

**C.**   The price of the goods and other factors indicative of the care and attention
     expected of consumers when making a purchase (*Lapp* factor three):

"'When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion.' Thus, '[t]he greater the care and attention, the less the likelihood of confusion.'"  *PB Brands, LLC*, 331 F. App'x at 982 (internal citations omitted).  That is, although products are from the same industry, differences in focus and genre reduce the potential for confusion.  *See, e.g.*, *Sunenblick v. Harrell*, 895 F. Supp. 616, 620 (S.D.N.Y. 1995) *aff'd*, 101 F.3d 684 (2d Cir. 1996) (no likelihood of confusion between producers of musical recordings both using UPTOWN label because plaintiff distributed to audiences that were distinct from those who were target of defendant's music).

---

[23] Hershey's representative Wege, noted that upon learning of PIM's SWISSKISS, he "was very concerned when it was brought to my attention that a company with distribution capabilities similar to our own was looking to launch the KISSES mark into the chocolate category." (Trial Tr. 93:11-94:16, Nov. 14, 2011 (Wege).)  Although this sentiment is understandable given Hershey's investment in KISSES, the size alone of the competitor does not mean that PIM should be prohibited from using a mark remarkably similar to the type of marks that Hershey has allowed others to use and not policed in the past.  Clearly Hershey does not have to show it litigated every instance where the term "kisses" is used with candy, but other companies of notable size own many of the other examples of candies, including chocolate flavored candies, that KISSES have co-existed with over the years.

[24] There was also a company website chocolate-kisses.com, which Hershey had not taken steps against at the time of trial.  (*See* Trial Tr. 37:14-18, Nov. 15, 2011 (Duquette); DX-204)

[25] See discussion of Hershey's KISSES marks in SJ Opinion.

26

When a good is priced at a different price point than another similar good, consumers generally exercise heightened care and the likelihood of confusion diminishes. *See, e.g., Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1511 (2d Cir. 1997) (difference in price point supported finding of no likelihood of confusion)*; Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.,* No. 03-2420, 2006 WL 1153354 at *8 (S.D.N.Y. May 1, 2006) (noting that although parties' products were sometimes sold in the same stores (*e.g.* Wal-mart), there was no confusion where there was a significant price difference ($3.99 compared to $12 - $18 for Plaintiff's products).)  "It is widely accepted as true that consumers are less likely to be confused about the origin of specific goods or services if such goods are expensive because the amount of care and attention expended by consumers increases proportionately as the price of the desired goods or services increases." *Harlem Wizards Entm't Basketball, Inc. v. NBA Properties, Inc.,* 952 F. Supp. 1084, 1097 (D.N.J. 1997) (internal citations omitted) (noting that plaintiff, a show basketball team, sold tickets between $5-8, while NBA tickets are "significantly more expensive."); *But see Recot, Inc. v. Becton,* 214 F.3d 1322, 1329 (Fed. Cir. 2000)  ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care.")

In the instant matter, notable differences in the price of goods will impact the degree of care a consumer displays towards purchasing the chocolates.  At trial, Rosenberg distinguished premium from non-premium chocolate and provided that SWISSKISS was designed to be a premium chocolate.  (Trial Tr. 122:10-123:22, Nov. 16, 2011 (Rosenberg); Trial Tr. 35:12-21, Nov. 17, 2011 (Rosenberg).)    Rosenberg estimated that the gusseted bag of SWISSKISS that PIM currently intends to market would probably retail between $3.99 and $5.99.[26]  (Trial Tr.

---

[26] In 2009, Rosenberg estimated that the price point would be $2.50 to $4.00. (Trial Tr. 67:1-15, Nov. 17, 2011 (Rosenberg).)

35:12-21, Nov. 17, 2011 (Rosenberg).)   This is distinctly higher than the price of Hershey's KISSES on a weighted basis; however, the most popular bag of KISSES normally retails for around $3.00 to $4.00.   (Trial Tr. 87:4-20, Nov. 14, 2011 (Wege).)   The evidence reflects that PIM's SWISSKISS product will be sold at a higher price point than HERSHEY'S KISSES on a weighted basis, which would diminish the likelihood of confusion.   However, as Hershey argues some SWISSKISS product packages may be within the same price range as the KISSES product, and displayed in the same retail stores.   Part of the price issue before us is a matter of weight versus retail package pricing.   Rosenberg estimated that SWISSKISS would be about two to three times as expensive by weight, but also said he considered using a twist-wrapping because it "[eats] up a lot of volume in the package" and thus results in "a better perceived value with the consumer." (*See* Trial Tr. 13:13-14:10, 35:12-21, Nov. 17, 2011 (Rosenberg)).  This works against the concept that price would be a distinguishing factor for consumers because the packaging price point in retail stores would be closer even if the weight was less.   Given that the products at issue are grocery items, and relatively low-priced, the risk of likelihood of confusion is increased. *Recot, Inc. v. Becton*, 214 F.3d at 1329

In addition to the price distinction, premium chocolates also tend to be distinguished from the non-premium chocolate items in their placement within stores.   For example, premium chocolates are generally placed in a separate section apart from other chocolate items.   (Trial Tr. 123:15-124:15, Nov. 16, 2011 (Rosenberg); Trial Tr. 35:12-21 Nov. 17, 2011 (Rosenberg); Trial Tr. 126:17-127:5, 133:2-134:10, Nov. 15, 2011 (Mazis).)  This would help customers differentiate the products.

On balance, based on the law and evidence, the price of the goods and other factors indicative of the care customers would give when selecting the product weigh slightly in favor of Plaintiff.

**D.** <u>Evidence of actual confusion and the length of time the defendant has used the mark without evidence of actual confusion (*Lapp* factors four and six):</u>

Evidence of actual confusion is highly probative of likelihood of confusion. *Harlem Wizards Entm't Basketball, Inc.,* 952 F. Supp. at 1098 (citation omitted). To show such confusion, a plaintiff may rely on "actual incidents of confusion between the marks, consumer survey results and expert testimony." *Id.* at 1098.

"[S]urvey evidence is circumstantial, not direct, evidence of the likelihood of confusion." 6 McCarthy § 32:184 (4th ed. 2012). Consumer surveys testing for actual confusion can constitute strong evidence regarding a likelihood of confusion to the extent the surveys accurately replicate market conditions. *See Charles Jacquin Et Cie, Inc. v. Destileria Seralles, Inc.*, 921 F.2d 467, 475-76 (3d Cir. 1990); *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp 2d 335, 373 (D.N.J. 2002); *Harlem Wizards Entm't Basketball, Inc.*, 952 F. Supp at 1098. Generally, for a survey to be accepted it must gauge the views of a large number of people in a fair way. *See id.*; *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 422 (D.N.J. 2011). Indeed, "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 405 (D.N.J. 2011) (quoting 6 McCarthy § 32:163 (4th ed. 2011)). Consequently, results of a survey that do not adequately test how a consumer would react to a trademark are "neither reliable nor probative." *Id.*

Further, surveys based on word association tests divorced from marketplace context, are not probative as to the issue of likelihood of confusion in the real-world marketplace since they fail to simulate "the real world setting in which instances of actual confusion would occur."[27] *See, e.g.*, *Componentone, L.L.C. v. Componentart, Inc.*, No. 05-1122, 2008 WL 4790661 at 21, 24-25

---

[27] Although several of the cases cited as examples of this proposition are not binding, they are informative.

(W.D. Pa. Oct. 27, 2008) (survey that "presented the parties' marks on a plain background in large block letters followed by descriptions of the companies" was "completely divergent from the conditions that potential purchasers encounter in the parties' marketplace" and thus could not "serve as a meaningful measure of . . . confusion"); *Playtex Prods., Inc. v. Georgia-Pacific Corp*., 390 F.3d 158, 168 (2d Cir. 2004) (excluding dilution survey that "did not use any Georgia-Pacific packaging [or house marks], but rather used index cards"); *Visa Int'l Service Ass'n v. Eastern Fin. Fed. Credit Union*, 24 U.S.P.Q.2d 1365, 1368 (9th Cir. 1992) (survey flawed where "Visa did not use an actual MoneyPlus card in its survey"); *Juicy Couture, Inc. v. L'Oreal USA, Inc*., 2006 U.S. Dist. LEXIS 20787, at *78 (S.D.N.Y. Apr. 19, 2006) (confusion survey held to have "no value" where the "survey did not replicate the marketplace conditions in which consumers encounter Lancome's products"); *Pilot Corp. of America v. Fisher-Price, Inc*., 344 F. Supp. 2d 349, 358 (D. Conn. 2004) (rejecting confusion survey that showed logos "in isolation" rather than actual products; "That two logos may be confusing when viewed in isolation does not show that their use on two separate products is also confusing"); *National Distillers Prods. Co., LLC v. Refreshment Brands, Inc*., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) (noting that using a mark on card rather than on a bottle as it would appear in marketplace caused "methodological errors that prevented [the survey] from replicating actual market conditions").

For a court to rely on a survey, the survey must gauge the views of a large number of people. *Harlem Wizards Entm't Basketball, Inc.,* 952 F. Supp. at 1098; *Fancaster, Inc.*, 832 F. Supp. 2d at 422. Evidence of a small number of instances where actual confusion occurred can be dismissed as "inconsequential or *de minimis.*" *Fancaster, Inc.*, 832 F. Supp. 2d at 422 (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 366 (3d Cir. 2007)). Similarly, surveys showing confusion rates of less than 10% are strong evidence that confusion is not likely. *See, e.g.*, *Pharmacia*, 201 F. Supp. 2d at 373 (1.5%); *Harlem Wizards*, 952 F. Supp. at

30

1090-92 (3-5%); *Tyco Indus., Inc. v. Lego Sys., Inc.*, 5 U.S.P.Q.2d 1023, 1045 (D.N.J. 1987),

aff'd, 853 F.2d 921 (3d Cir. 1988) (6%); *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d

263, 268 (4th Cir. 2006) (2%); *Visa*, 24 U.S.P.Q.2d at 1368 (6.7%); *Juicy Couture*, 2006 U.S.

Dist. LEXIS 20787, at *83 (2%).

Evidence of actual confusion can be difficult to find.  *See Fancaster, Inc.*, 832 F. Supp. 2d

at 421; *Sabinsa Corp.*, 609 F.3d at 187.  Because of this, "[A]ctual confusion is not necessary to

demonstrate a likelihood of success."  *Sabinsa Corp.*, 609 F.3d at 187.  However, "[a] party's

failure to come forward with 'any competent evidence of actual confusion . . . weighs significantly

against a finding of likelihood of confusion.'"  *Fancaster, Inc.*, 832 F. Supp. 2d at 421 (quoting

*Chase Manhattan Bank, USA N.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d 239, 249–50 (D. Del.

2004)).

The "most relevant evidence of actual confusion is the testimony of a reasonably prudent

purchaser who was in fact confused by defendant's trademark." *Id.* (internal quotation and citation

omitted).[28]  However, evidence of a small number of instances where actual confusion occurred

can be dismissed as "inconsequential or *de minimis*."  *Id.* at 422 (citation omitted); *see also*

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 366 (3d Cir. 2007) ("a

district court may weigh the sixth *Lapp* factor in favor of a defendant when it concludes that the

evidence of actual confusion was isolated and idiosyncratic" (quotations and citations omitted)).

"Moreover, [i]f a defendant's product has been sold for an appreciable period of time without

evidence of actual confusion, one can infer that continued marketing will not lead to consumer

confusion in the future. The longer the challenged product has been in use, the stronger this

---

[28] For example, in *Fancaster, Inc.*, defendant was only able to show one instance, where a consumer was confused about whether FANCAST was related to Comcast, in three years of plaintiff's product life.  *Id.* at 421-22.  The *Fancaster, Inc.* court stated that one instance of actual confusion in three years did not justify the belief that the two products were confusing. *Id.* at 422.

inference will be." *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 498 (W.D. Pa. 2011); *Checkpoint Sys.*, 269 F.3d at 280.

In the instant matter, first Hershey points out that the "actual confusion" evidence relied upon is survey evidence because there is no evidence of actual sales of the SWISSKISS products (as will be discussed in further detail in the section on bona fide use in this Opinion). Next, as discussed below, the parties rely on the survey results obtained by their experts.

*Steckel and Mantis Surveys*

Plaintiff's counsel retained Steckel as an expert and he performed a survey to measure the likelihood of confusion with SWISSKISS. (*See* PX-124 (Steckel revised expert report).) In Steckel's survey, 463 interviews were completed in 14 shopping malls.[29] (*See* Trial Tr. 24:21-25:1 Nov. 16, 2011 (Steckel); PX-124 at 6.) Based on his survey, Steckel opined that 29.5% of premium chocolate buyers would believe that the SWISSKISS chocolate product was a Hershey product, authorized by Hershey, or put out by a company with an affiliation or connection to Hershey. (*See* Trial Tr. 14:12-15:1 Nov. 16, 2011 (Steckel); PX-124 at 5; PX-133 (data).) For the survey, Steckel placed the SWISSKISS mark on a plain white card in capital letters with the description "Chocolate of Swiss Origin." (Trial Tr. 10:23-11:12, Nov. 16, 2011 (Steckel); PX-124C.) He used "SWISSWISH" as a control because it sounded similar, has positive connotations, several common letters, and the same number of letters.[30] (*See* Trial Tr. 17:4-24, Nov. 16, 2011 (Steckel).)

Where a survey respondent provided two brands in an answer (*i.e.* Hershey's or Nestle) the response was considered ambiguous and Steckel did not count them as confused; however, where the respondent thought the brand was affiliated with another brand (*i.e.* Hershey affiliated with

---

[29] The universe for the survey is premium chocolate purchasers. (*See* Trial Tr. 48:19-25, Nov. 18, 2011 (Simonson).)

[30] Steckel testified that he considered, but would not use a brand like Swiss Miss because it is a real brand and would not control for noise and other factors, but rather would test knowledge. (Trial Tr. 18:1-21, Nov. 16, 2011 (Steckel).)

Nestle) Steckel counted respondent as confused. (Trial Tr. 31:19-33:9, Nov. 16, 2011 (Steckel).) Steckel testified that "the non-trademark reasons for the confusion were all taken care of by the control." (Trial Tr. 32:19-33:9 Nov. 16, 2011 (Steckel).) Steckel also did not code answers as confused based on responses to why questions.[31]

Although Steckel normally would have used a stimuli reflective of what would appear in the market place, he choose not to in this case and instead used plain white cards. (Trial Tr. 10:23-11:12, 11:13-14:11, Nov. 16, 2011 (Steckel).) Steckel provided the following general reasons regarding his choice not to use a stimuli close to what would appear in the market: 1) he considered the core of the claim in this matter as one for cancellation, so he wanted to test the mark as registered; 2) lack of evidence that Rosenberg would market or merchandise the product as it was shipped to Continental; and, 3) there was information about the product he was able to present, such as brand name. (Trial Tr. 11:13-14:11, Nov. 16, 2011 (Steckel).)

Additionally, Steckel testified that he would not have used a digital representation of the proposed SWISSKISS product package that was produced, as he did not have evidence that Rosenberg or PIM marketed the product in that form. (Trial Tr. 12:24-14:11, Nov. 16, 2011 (Steckel).) In the past, Steckel has criticized other confusion surveys for not replicating the market, but felt that was not an issue here because there was no confirmed market place context. (Trial Tr. 13:13-14:11, Nov. 16, 2011 (Steckel).) Also, often his criticism was with regard to affirmative misrepresentation of market place context. (Trial Tr. 13:19-14:11, Nov. 16, 2011 (Steckel).) Steckel claimed that based on these reasons he chose a neutral stimuli. (Trial Tr. 14:2-

---

[31] Notably, however, Mazis used answers to "why questions" to filter and Steckel did not consider that unreasonable. (*See* Trial Tr. 85:6-14, Nov. 16, 2011 (Steckel).) Mantis also followed up with "why questions" because responses unrelated to the name would not provide sufficient information about whether the name is causing confusion. (*See* Trial Tr. 158:1-163:6, Nov. 17, 2011 (Mantis).) As for what Mantis considered "unrelated responses," he stated the following: "for example, a respondent may say Hershey because it's the only chocolate company I know, or Hershey because it's the leading or the biggest chocolate company, without any reference to what you're testifying." (Trial Tr. 161:19-24, Nov. 17, 2011 (Mantis).)

11, Nov. 16, 2011 (Steckel).)   For the survey, Steckel listed about nine brands of chocolate, including premium and non-premium brands. (Trial Tr. 20:3-12, Nov. 16, 2011 (Steckel).)  The validation rate was approximately two thirds, and that is reflected in the revised report Steckel submitted.[32]  (Trial Tr. 26:4-21, Nov. 16, 2011 (Steckel).)

This Court does not find Steckel's survey results persuasive.  Much of Steckel's criticism of other confusion surveys applies to his own on SWISSKISS.  By all accounts, including Steckel's, the real world market context would influence consumers and impact the likelihood of confusion.  (*See* Trial Tr. 36:16-43:20,  Nov. 16, 2011 (Steckel).)  Steckel also testified that he did not review any of the SWISSKISS prototype packages prior to running his survey.  (*See* Trial Tr.63:2-4, Nov. 16, 2011 (Steckel).)[33]  While this Court accepts that SWISSKISS is not readily available in the market place context, for the purposes of the survey the use of white and black cards, when there was a product, logos and known color scheme that was shipped to a distributor, is problematic.  The prevailing view is that "the closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has."  McCarthy § 32:163.

In fact, Defendant's expert Mantis concluded that Steckel's methodology of displaying the SWISSKISS mark on an index card with the designation of "chocolate of Swiss origin" underneath, was "devoid of any context, therefore not suitable for measuring confusion in the market place." [34]  (*See* Trial Tr. 147:19-148:6, Nov. 17, 2011 (Mantis).)  Mantis recommended

---

[32] Steckel's original report erroneously indicated a 100% validation rate.  (Trial Tr. 26:4-21, Nov. 16, 2011 (Steckel).)

[33] Rosenberg testified that PIM is ready to introduce the version depicted in exhibit DX-44. (Trial Tr. 30:24-31:1, Nov. 17, 2011 (Rosenberg).)  However, in 2009, Rosenberg testified that he did not know what the SWISSKISS product or package would look like.  (Trial Tr. 79:23-80:3, Nov. 17, 2011 (Rosenberg).)

[34] Mantis also claimed that while he had used index cards with marks in matters before the TTAB, he had not in court for the following reason, "The Trademark Trial and Appeal Board is concerned with the elements shown on the registration or application, regardless of how the mark may be used on a product or perception of consumers in the market place."  (Trial Tr.  150:11-24, Nov. 17, 2011 (Mantis).)  However, he felt using a stimulus in the likelihood of confusion survey, namely a card in an infringement action in court, would be "inappropriate" because "[i]t would be devoid of any type of indicia of origin which consumers would use to distinguish one brand from another." (Trial Tr. 150:11-24, Nov. 17, 2011 (Mantis).)  Particularly as the cancellation claim in this matter is not in isolation, but accompanied with an infringement claim.  (Trial Tr. 166:20-21, Nov. 17, 2011 (Mantis).)

using the actual SWISSKISS product as the stimuli and replicated Steckel's study, changing the stimuli itself.[35]  (*See* Trial Tr. 147:19-148:17, Nov. 17, 2011 (Mantis).)  Mantis re-executed the Steckel survey, but changed the stimuli to be the package PIM sold to Continental and used the same screening methods that Steckel employed.  (*See* Trial Tr. 70:6-22, Nov. 16, 2011 (Steckel).)  Mantis replicated the study with 430 participants at nine different locations in nine different cities.  (Trial Tr. 150:11-24, Nov. 17, 2011 (Mantis).)  He even used the same SWISSWISH item as a control, but placed it on the product rather than on a card.  (*See* Trial Tr.  149:7-13, 154:2-15, Nov. 17, 2011 (Mantis); DX-228.)

Mantis' results demonstrated confusion rates of about 3.2% using his methodology and "why responses," but 4% when he applied Steckel's methodology of including as a confused respondent any mention of Hershey.[36]  (Trial Tr. 161:21-162:17, Nov. 17, 2011 (Mantis).)  Thus, it would be accurate to contrast at least Mantis' 4% confusion rate to the 29.5% that Steckel detected.[37]  (*See* Trial Tr.  14:12-15:1, 69:14-70:22, Nov. 16, 2011 (Steckel).)  When asked why he believes the difference in rate occurred, Mantis stated: "[w]hen you use an actual product with contextual cues . . . with indicia of origin, that is the basic difference between showing an actual product and just the name in isolation." Trial Tr.  162:21-163:3, Nov. 17, 2011 (Mantis).)  He concluded that when the SWISSKISS name is used on an actual product, the confusion is *de minimus*.  (Trial Tr.  163:3-6, Nov. 17, 2011 (Mantis).)  Generally, rates of less than 15% have

---

[35] Mantis also added the statement "in a moment I'm going to show you a product . . . Please look at this product as you would if you were thinking about buying it. Take as much time as you want, and let me know when you're ready to continue." (Trial Tr. 154:2-15, Nov. 17, 2011 (Mantis).)  Mantis adds this to his studies as a way "to replicate the market place condition under which people can respond." (Trial Tr. 154:2-157:12, Nov. 17, 2011 (Mantis).)

[36] Steckel coded every respondent as "confused" even if that respondent cited reasons unrelated to the similarity of the marks.  (See Trial Tr. 31:9-32:35, 84:16-23, Nov. 16, 2011 (Steckel).)  This impacts the reliability of his survey.  *See, e.g.*, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 596-598 (S.D.N.Y. 2007) (rejecting survey results that tagged those who provided reasons other than similarity of protected trademark and trade dress as confused respondents).

[37] Mantis noted that a significantly greater proportion of individuals in both the test and the control group mentioned other products in their survey responses.  (Trial Tr. 160:23-161:4, Nov. 17, 2011 (Mantis).)

been considered evidence of no confusion. (*See* Trial Tr. 70:23-71:5, Nov. 16, 2011 (Steckel); *see also* 6 McCarthy § 32:188 (4th ed. 2012).

Even Plaintiff's expert Steckel acknowledged that it was possible for PIM to sell a product named SWISSKISS that will not cause confusion or cause only de minimus confusion depending on how it is packaged. (*See* Trial Tr. 69:2-10, Nov. 16, 2011 (Steckel).) This highlights how important performing surveys close to the real world context would have been in this instance to see, if as packaged as PIM distributed, what level of confusion would have been detected by the study.

PIM's expert Dr. Simonson was retained to evaluate the expert reports of Mazis, Steckel, Dr. Ford, and Dr. Joachimsthaler completed on behalf of Hershey. (*See* DX-215.) Simonson opined that the surveys performed by Mazis and Steckel were flawed for several reasons. The first main flaw Simonson noted was the use of block letter product names on index cards. (DX-215 at 5.) Simonson testified that any of the SWISSKISS prototypes would have been better to use as a stimuli than an index card. (Trial Tr. 51:9-21, Nov. 18, 2011 (Simonson).)

Thus, as a result of the elements discussed, this Court does not give Steckel's survey results much evidentiary weight in its analysis, but acknowledges that it can be an acceptable form for reviewing confusion in other circumstances. Based on the above discussion, this factor weighs in PIM's favor.

**E.** The intent of defendant in adopting the mark (*Lapp* factor five):

A "defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *A&H Sportswear*, 237 F.3d at 226. Bad faith is shown only where a defendant had "the deliberate intent to palm off or exploit the good will of the senior user's mark." *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 416 (D.N.J. 2008). Differences in logo marks could

establish that no intent to confuse existed. *See, e.g.*, *Pocono Int'l Raceway, Inc. v. Pocono Mt. Speedway, Inc.*, 171 F.Supp 2d 427, 436 (M.D. Pa. 2001) ("In light of our conclusion that there is little similarity between plaintiff's 708 mark and defendant's logo mark, we find no evidence of intent to confuse"). For instance, in *Prince Mfg., Inc. v. Bard Int'l Associates, Inc.*, although Bard International Associates, Inc. ("Bard") mentioned Prince Manufacturing in an advertisement for Bard tennis racquets, the court stated that Bard did not intend to confuse the marks because they place a prominent "B" on their tennis racquets and tried to distinguish their tennis racquets from others. *See* No. 88-3816, 1988 WL 142407 at *6 (D.N.J. Dec. 22, 1988).

Good faith could be established when a company picks a name based on matching the image it intended to portray. *E.S. Originals Inc. v. Stride Rite Corp.,* 656 F.Supp. 484, 490 (S.D.N.Y.1987) ("knowledge of prior use alone does not in itself constitute a showing of bad faith"); *see also A&H Sportswear, Inc.*, 237 F.3d at 226 (good faith established where "Victoria's Secret Stores assumed that its original trademark search had uncovered no confusingly similar registrations.").

Moreover, selection of a mark that has a descriptive meaning and that is commonly used in the industry can establish good faith. *See MedAvante, Inc. v. ProxyMed, Inc.*, 2006 U.S. Dist. LEXIS 74614, at *32 (D.N.J. Oct. 12, 2006) (numerous third party uses weighed against finding of intent to confuse); *J&J Snack Foods, Corp. v. Nestle USA, Inc.*, 149 F. Supp 2d 136, 156 (D.N.J. 2001) (good faith noted where "Nestle appears to use their 'Just Break - & Bake' instruction as a descriptor" for product).

In the instant matter, PIM's Rosenberg liked the SWISSKISS name, in part because he thought the rhyming combination would be more memorable to consumers for marketing. (Trial Tr. 125:8-22, Nov. 16, 2011 (Rosenberg).) The "SWISS" portion of the product name was to promote that the product was imported from Switzerland. (Trial Tr. 125:23-126:9, Nov. 16, 2011

(Rosenberg).)   The "KISS" portion of the name represented a double meaning, a romantic connotation and a term Rosenberg knew in the confectionary industry to be for different kinds of candy products.  (*See* Trial Tr. 125:6-149:19, Nov. 16, 2011 (Rosenberg); *see, e.g.*, DX-60, DX-61, DX-326, DX-328, DX-329, DX-339, DX-341.)

There are clear distinctions between the parties' logos, graphics, packaging and product configuration, including the prominent use by PIM of the SUISSE mark and Swiss mountains and theme.[38]  It does not appear that PIM had an intention of benefiting from Hershey's goodwill.  *See, e.g.*, *Pocono Int'l Raceway, Inc. v. Pocono Mt. Speedway, Inc.*, 171 F. Supp. 2d 427, 436 (M.D. Pa. 2001) (finding no evidence of intent to confuse); *Prince Mfg. Inc. v. Bard Int'l Assocs.*, Inc., 1988 U.S. Dist. LEXIS 15031, at *17-18 (D.N.J. Dec. 22, 1988).  In addition, there are anticipated differences in premium marketing and product placement.

At trial, Rosenberg asserted that when he selected SWISSKISS as a product name, he did not intend to draw a connection to the Hershey's KISSES product.  (Trial Tr. 149:21-152:13, Nov. 16, 2011 (Rosenberg).)  Further, he indicated that such an association would not have helped PIM's marketing plan that focused on a premium Swiss chocolate product and not an inexpensive domestic product, which he considered Hershey's KISSES.  (Trial Tr. 149:21-152:13 Nov. 16, 2011 (Rosenberg).)  No proof to the contrary was presented at trial.  This Court finds Rosenberg's reasons for selection of the SWISSKISS mark to be reasonable and credible.

**F.**  Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media (*Lapp* factor seven):[39]

"Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or

---

[38] DX-7 shows the SWISSKISS product with a cellophane bag containing suisse bars of chocolate attached to a cardboard header with the SWISSKISS logo.  (*See* DX-7.)

[39] In case analyses, *Lapp* factor seven is often grouped with factors eight and/or nine, so the discussion of these three factors is interrelated.  *See, e.g., Sabinsa*, 609 F. 3d at 188-89.

sponsorship." *Checkpoint Sys.*, 269 F.3d at 286.  The inquiry is "whether the goods are similar enough that a customer would assume they were offered by the same source." *Id.*; *see also Fisons Horticulture v. Vigoro Indus.*, 30 F.3d 466, 481 (3d Cir. 1994) ("The question is whether the consumer might therefore reasonably conclude that one company would offer both of these related products.")

Products may be in the same general industry or category, but still be distinct enough to not risk confusion if they "operate in distinct niches." *Checkpoint Sys.*, 269 F.3d at 288.  For example, in *Checkpoint Sys.*, the parties both operated in corporate security, but there was no chance of confusion where one specialized in physical security and the other in electronic information.  *Id.* at 287.  "[T]here [was] no overlap in the places these parties market[ed] their products [which] diminish[ed] the chance that someone who is a specialist in network security [would] even come across an advertisement for plaintiff, and vice versa." *Id.*; *see also InterState Net Bank v. NETB@NK, Inc.*, 348 F. Supp. 2d at 354-55.

KISSES have principally been sold at retail outlets including stores like Target, Walgreens, CVS, K-Mart, Wal-mart etc.  (Trial Tr. Nov. 14, 2011 (Wege) 72:10-76:8.)  KISSES are generally advertised on television, in magazine, point of sale, by circulars etc.  (*See e.g.,* Trial Tr. 72:10-76:8, Nov. 14, 2011 (Wege).)  The KISSES and SWISSKISS products will have similar channels of trade and will probably be marketed through the same types of media.  Overall, the KISSES and SWISSKISS products will likely have similar marketing channels, but the products do not create the same overall impression.  Word-of-mouth advertising is an important component of confectionary sales.  (*See* Trial Tr. 92:7-93:5, Nov. 14, 2011 (Wege).)  Also, SWISSKISS is a premium chocolate, and premium chocolates often in a separate section of a retail store for display.  (*See* Trial Tr. 134:4-10, Nov. 15, 2011 (Mazis).)

On balance, this factor weighs slightly in Hershey's favor.

**G.** The extent to which the targets of the parties' sales efforts are the same (*Lapp* factor eight) and the relationship of the goods in the minds of consumers because of similarity of functions (Lapp factor nine)[40]

"[W]hen parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." *Fancaster, Inc.*, 832 F. Supp. 2d at 420 (quoting *Checkpoint,* 269 F.3d at 289). A product's traits can show that it is not necessarily marketed to the same audience as another similar product. *See Harlem Wizards Entm't Basketball*, 952 F. Supp. at 1096. ("as a show basketball team, plaintiff competes with other show and comedy basketball teams for customers and not with the NBA. For example, plaintiff frequently refers to the Harlem Globetrotters in its advertisements and promotional material because it is seeking to reach that more famous team's audience").

Courts consider whether the marks are "similar enough that a consumer could assume they were offered by the same source." *Fancaster, Inc.*, 832 F. Supp. 2d at 420 (quoting *Kos,* 369 F.3d at 723). "This factor focuses on the nature of the *products* themselves, asking whether it would be reasonable for consumers to associate them or see them as related." *Id*. (quoting *Kos*, 369 F.3d at 723). "Relatedness involves assessing 'the near-identity of the products or their similarity of function.'" *Id*. (quoting *Kos*, 369 F.3d at 723). In *Fancaster*, no relatedness was found because Fancaster.com focused on short sports clips containing the Fancaster mark while Fancast.com focused on full-length premium network television content. *Id*. Although overlap between the products may exist, a court must look at the specifics of a product because "'[g]oods may fall under the same general product category but operate in distinct niches. When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that

---

[40] These two factors (factors eight and nine) can be analyzed together. *See A&H Sportswear*, 237 F.3d at 215 ("A comparison of these factor lists reveals that the ostensibly missing *Lapp* factors appear to be incorporated into the District Court's test. *Lapp* factor (9), 'the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors' and *Lapp* factor (8), 'the extent to which the targets of the parties' sales efforts are the same,' are subsumed in the court's factor (3), which considers the 'similarity of the products and the degree to which they directly compete with each other.'")

consumers are not likely to assume the products originate from the same mark.'"  *Id.* (quoting *Checkpoint Sys.,* 269 F.3d at 287–88).

While both parties' products are chocolate, PIM points to the distinction between American-made chocolate and premium Swiss chocolate.  (Trial Tr. 150:9-22, Nov. 16, 2011 (Rosenberg).)  PIM argues that this difference reduces the potential for confusion, particularly where such products tend to be sold in their own separate dedicated sections of retail outlets.  (*See* Trial Tr. 134:4-10, Nov. 15, 2011 (Mazis).)  This Court finds that this argument has some merit. *See, e.g., Sunenblick v. Harrell*, 895 F. Supp. 616, 629 (S.D.N.Y. 1995), aff'd, 101 F.3d 684 (2d Cir. 1996) (no likelihood of confusion between producers of musical recordings distributed to distinct audiences).

PIM argues that the commercial impressions of SWISSKISS are dissimilar from KISSES so that there is no likelihood of confusion.  Further, PIM asserts that SWISSKISS is used to describe "chocolate of Swiss origin" premium chocolate. (PX-25; SF-17.)  This Court finds that the SWISSKISS product is distinguishable by the level of quality it hopes consumers perceive; however, arguably the products fight for the same "stomach share." (Trial Tr. 122:1-11, Nov. 14, 2011 (Wege).)  KISSES are sold in national retail stores, as are PIM products.  PIM also distributes its products through various national distributors and wholesalers, and would launch SWISSKISS products to be sold via these avenues.   (Trial Tr. 60:5-63:4, Nov. 17, 2011 (Rosenberg).)

Additionally, Rosenberg has considered various formats for SWISSKISS products including having the chocolate in bars, gift packs, baking chips, logs, sticks, bite size, cubes or even as an organic chocolate product.  (Trial Tr. 73:15-74:8, 77:7-25, 78:6-11, Nov. 17, 2011 (Rosenberg).)  Some options would likely appeal to the same market as KISSES.

Overall, this factor weighs slightly in favor of Hershey's, but potentially would be distinguished by consumers on this basis.

**H.** Other factors (*Lapp* factor ten)

Finally, *Lapp* factor ten is "other factors suggesting the consuming public might expect the prior owner to manufacture product in the defendant's market or that he is likely to expand into that market." *Interpace Corp. Lapp, Inc.*, 721 F.2d at 463.  When consumers are aware that multiple competitors exist then this factor is not weighed heavily in a confusion analysis.  *See J&J Snack Foods, Corp.*, 149 F. Supp 2d at 156.  The similarity of the goods and their competitive relationship was also accounted for in several of the other factors discussed herein.  Thus, this Court will continue with the final balancing of the factors.

*OVERVIEW OF LAPP FACTOR ANALYSIS AND CONCLUSION*

After reviewing all of the relevant factors, this Court finds that the main factor clearly weighing in Hershey's favor is the strength of its KISSES mark, and while the target consumers and advertising are similar there are differences in premium chocolate status and placement, and more importantly overall commercial impression distinguish SWISSKISS.  As noted by survey evidence, in a market context, there is not a significant likelihood that consumers would be confused as to whether SWISSKISS was produced by Hershey's or part of the KISSES brand.

After reviewing the evidence before this Court, including but not limited to, testimony and survey evidence, and balancing the relevant factors discussed above, this Court does not find that PIM's SWISSKISS mark infringes on Hershey's KISSES mark.  While both sides articulately presented their arguments, the key is that PIM's SWISSKISS product is not likely to be confused with Hershey's KISSES.

On balance, a review of all of the factors supports this Court's finding that PIM's SWISSKISS mark does not infringe on Hershey's mark.   Further, for similar reasons, the SWISSKISS mark does not constitute unfair competition or false designation.

II.   <u>Trademark Dilution</u>

Trademark dilution is distinguishable from trademark infringement and mark confusion. Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of competition between the owner of the famous mark and other parties or the likelihood of confusion, mistake, or deception." *American Cyanamid Co. v. Nutraceutical Corp.*, 54 F.Supp. 2d 379, 390 (D.N.J. 1999).  Dilution may result from either "uses that blur the distinctiveness of [a famous] mark or [that] tarnish or disparage it." *Id.* at 390.

Under the Trademark Dilution Revision Act of 2006 ("TDRA"), "dilution by blurring" is a correlation occurring from a similarity "between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."   15 U.S.C. § 1125(c)(2)(B).  For a successful dilution claim under the TDRA, a claimant must (1) demonstrate that the mark is sufficiently famous and distinctive as to warrant protection, and (2) that the "association arising from the similarity between a mark or trade name and a famous mark . . . impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B)

First, "[t]he key requirement is that the mark be famous, which the section defines as 'widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.'" *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007) (quoting 15 U.S.C. § 1125(c)(2)(A)).   This standard only protects marks that are distinctive enough to be known throughout the country. *See Green*, 486 F. 3d at 105.

If a mark is sufficiently famous as to merit protection, then a court may consider the following factors to establish dilution by blurring:

> (i) The degree of similarity between the mark or trade name and the famous mark.
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
> (iv) The degree of recognition of the famous mark.
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B). This list of factors that courts may consider is not exhaustive. These factors will be addressed below.

A. <u>Degree of similarity between marks</u>

Before the enactment of the TDRA in 2006, for a successful dilution claim, the marks needed to "be 'identical' or 'nearly identical' or 'substantially similar.'" *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 744 (W.D. Ky. 2008), aff'd, 605 F.3d 382 (6th Cir. 2010). Some courts have held that the TDRA does not appear to eliminate this requirement. *Id.* This is a high standard, and courts have rejected dilution claims where marks are not similar enough. *See e.g.*, *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832-833 (8th Cir. Minn. 1999) (holding Lean 'N Tasty does not dilute the mark Lean Cuisine as "common use of the descriptive word 'lean' does not make the marks similar"); *Mead Data Cent., Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1029-030 (2d Cir. N.Y. 1989) (finding that Lexis is not substantially similar to Lexus). In these jurisdictions, marks must be nearly identical for a successful dilution claim. *See Visa Int'l*, 610 F.3d at 1091-92 (EVISA and EVISA.COM dilute VISA); *Nike*, 84 U.S.P.Q.2d at 1828 (NIKEPAL diluted NIKE); *McNeil Consumer Brands*, 116 F. Supp. 2d at 609 (TEMPANOL diluted TYLENOL). In fact, prior to the TDRA of 2006, the Third Circuit in 2000 in *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157 (3d Cir. 2000), held that LAS

VEGAS SPORTING NEWS was sufficiently similar to THE SPORTING NEWS as to cause dilution; the geographic distinction was not sufficient, but the case dealt with a niche market and is distinguishable from the present matter.

The Third Circuit has not specifically addressed whether the "near identical standard" still applies post-TDRA.  However, other circuits have held that the passage of the TDRA in 2006 lowered the similarity standard.   *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010); *see also* Anne Gilson Lalonde, Gilson on Trademarks § 9.03(2)(f) (2010).  Under this more lenient standard, "the similarity between the famous mark and the allegedly blurring mark need not be 'substantial' in order for the dilution by blurring claim to succeed."  *Tiffany (NJ) Inc.*, 600 F.3d at 111 n.18.   Instead, the court "asks whether the applicant's mark will immediately remind consumers of the famous mark and cause them to associate the two."   Glison on Trademarks § 9.03(2)(f); *see e.g.*, *Nike, Inc. v. Maher*, 2011 TTAB LEXIS 234, 10-12 (TTAB 2011) (finding JUST DO IT and JUST JESU IT are sufficiently similar).

Regardless of which standard is applied, "similarity is an integral element in the definition of blurring. . . ."  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 108 (2d Cir. 2009) (finding that the district court erred to the extent it focused on the absence of "substantial similarity").[41]  Further, similarity for blurring purposes should be analyzed in the context of actual marketplace conditions.  *See Id.* at 106-08; *see also Gen. Motors Co. v. Urban Gorilla, LLC*, 2:06-CV-00133, 2010 WL 5395065 (D. Utah Dec. 27, 2010) (noting that even after the TDRA, the similarity "factor remains among the most critical in the blurring analysis").

In the instant matter, this Court notes that upon review of SWISSKISS under the higher "nearly identical" standard or a more lenient standard, after review of all of the dilution factors,

---

[41] In *Starbucks*, the Second Circuit held that the district court did not err in determining that for the purposes of dilution, the plaintiff's STARBUCKS marks were only "minimally similar" to the defendant's CHARBUCKS marks "as they are presented to consumers," despite similar "sound and spelling."  588 F.3d at 106.

trademark dilution would not be found in the instant matter.  As discussed above the products are not "nearly identical."  Among other differences, the marks begin with different letters, with SWISSKISS having "Swiss" in the beginning related to the connotation of chocolates of Swiss origin.  It also lends a distinct sound to the name.

Further, according to the survey evidence discussed in more detail below, SWISSKISS does not remind  a sufficient amount of consumers (or potential consumers) of the KISSES mark or cause them to associate the two marks to warrant dilution protection.

Clearly there is some similarity between words used in the KISSES and SWISSKISS marks.  However, this Court does not find that the similarity is sufficient to cause dilution.  On balance this Court finds that this factor weighs in PIM's favor.

   B.   Degree of inherent or acquired distinctiveness of the famous mark

For a likelihood of blurring to occur, a mark must be distinctive.  "The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark."  *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978).  A mark can achieve protection if the mark is shown to have secondary meaning.  *See Times Mirror Magazines, Inc.*, 212 F.3d at 165, 167 ("a mark that is 'merely descriptive' shall not be entitled to federal registration . . . . unless the mark acquires secondary meaning.")  Generic marks are those that are "ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their products by name. . . Thus, no one can claim the exclusive right to use the mark 'CAR' for a car."  *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 745 (W.D. Ky. 2008) (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 250-16 (2d Cir. N.Y. 1999).

This Court has already held that the KISSES mark is not generic.  *See* SJ Opinion at 26.  Hershey also has trademark registrations regarding the wrapping and shape of the KISSES

products.  (Trial Tr. 65: 19-2517-18, Nov. 15, 2011 (Duquette).)  The KISSES marks have acquired distinctiveness.  Therefore, this factor weighs in Hershey's favor.

      C.  <u>Extent owner of the famous mark is engaging in substantially exclusive use of the mark</u>

      To satisfy this factor, the mark must be "substantially exclusive" to the claimant, though absolute exclusivity is not required.  "A mark that is merely one of several identical or very similar marks is already 'diluted' in fact.  In such a case, the junior user's actions can hardly be said to be likely to cause any significant further 'dilution' of such a mark."  McCarthy § 24:119.  In addition, active efforts by the mark holder to advertise their mark and police unauthorized use of the mark, are significant to whether the mark is substantially exclusive to the owner.  *See Gen. Motors Co. v. Urban Gorilla, LLC*, 2:06-CV-00133, 2010 WL 5395065 (D. Utah Dec. 27, 2010).

      On summary judgment this Court noted that "PIM failed to address evidence of current use by a third party that is more than *de minimis*."  SJ Opinion at 26.  This does not mean that such use is not relevant to the dilution analysis.  There is evidence of dictionaries referring to "kisses" as small pieces or bits of candy or confectionary. (*See* SJ Opinion 4.)  Hershey acknowledges that the term kisses has frequently been used with taffy and hard candy products in the confectionary industry.  (*See generally* Trial Tr. Nov. 15, 2011 (Duquette).)  Hershey does not claim exclusive rights to use the term "kiss" or "kisses" with all types of candy, just chocolates.  (Trial Tr. 5:8-17, Nov. 15, 2011 (Duquette).)

      Where there are several identical or very similar marks, a new junior mark that may have some similarities to the senior mark is unlikely to cause any significant further dilution.  McCarthy § 24:119; *see also Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 367 (S.D.N.Y. 2003).   Existing uses of the KISSES mark lessen the likelihood of dilution in this instance. *See, e.g., Pharmacia*, 201 F. Supp. 2d at 379.

      Several other existing products use the term "kisses" or "kiss" for candy, some even for

chocolate flavored candy.  Hershey has taken steps to broaden its enforcement efforts for the KISSES mark to include generally solid chocolates, but this was not Hershey's previous position. (Trial Tr. Nov. 15, 2011 37:14-38:10 (Duquette).)  Prior to registering the mark in 2001, Hershey focused on protecting the KISSES mark against only conical shaped chocolates.  (Trial Tr. Nov. 15, 2011 37:14-38:10 (Duquette).)   However, for decades prior to that, Cerreta and other companies sold chocolate flavored candies with the terms "kiss" or "kisses."  As discussed, since 2001, other companies have continued to use terms like "kisses" and "kiss" with candies, including chocolate flavored ones.

The somewhat inconsistent exclusivity of the use of the KISSES mark detracts from Hershey's argument for protection from dilution under this factor.  The term "kisses" refers to small bits of candy of various types, and does not specifically exclude chocolates from the descriptive reference.  Hershey has developed and acquired distinctiveness for its KISSES mark, but has not had substantially exclusive use of the term for most of its existence.  In fact, it appears its best efforts to do so have been since this litigation was commenced.  Thus, this factor weighs in PIM's favor.

    D.  Degree of recognition of the famous mark

As noted in the SJ Opinion and supported by survey evidence, Hershey's KISSES mark is highly recognizable.[42]   As counsel for Plaintiff said at trial, "Hershey's famous KISSES marks have an iconic brand image."  (Trial Tr. 24:25-25:1, Nov. 14, 2011 (Pl's counsel)).

KISSES is a highly recognized mark.  The mark has acquired distinctiveness, as set forth before the USPTO.  (DX-281.)  This factor weighs in Hershey's favor, however this Court appropriately considers the other factors as well.

---

[42] Survey evidence supporting this point is discussed within the SJ Opinion and was reviewed at trial.  For additional discussion see elaboration herein and in the SJ Opinion.

E.   Whether the user of the mark intended to create an association with the famous mark

Where "[t]here is no evidence that [the] applicant intended to create an association with opposer's . . . mark[] . . . this dilution factor favors [the]  applicant." *Citigroup Inc. v. Capital City Bank Group, Inc.*, 2010 TTAB LEXIS 40 (TTAB 2010); *see also*, *Nike*, 2007 U.S. Dist. LEXIS 66686 at *24 (finding junior mark user was aware of NIKE mark before adoption of NIKEPAL, and evidence that there was no intent of association was not credible).

As previously discussed, based on the evidence provided, PIM did not intend to draw a connection to the Hershey's KISSES product when SWISSKISS was selected as a product name. (Trial Tr. 149:21-152:13, Nov. 16, 2011 (Rosenberg).)  The Court weighs this factor in favor of PIM.

F.   Any actual association between the mark or trade name and the famous mark

To determine whether customers associate the junior mark with the famous mark, survey evidence may be relevant.  *See e.g.*, *Starbucks Corp*, 588 F.3d at 109.  However, evidence of customer association by itself is insufficient for a showing of dilution.  *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, LLC, 507 F.3d 252, 264-265 (4th Cir. 2007).  The association must harm the distinctiveness or reputation of the famous mark in some way.  *Id.* at 265.  Further, as discussed above, the survey should replicate actual conditions in which consumer confusion occurs. *See Pharmacia*, 201 F. Supp. 2d at 373.

*Mazis*

Mazis performed an association survey designed to be relevant for the likelihood of association, which is relevant to dilution under the Lanham Act, but does not reach that ultimate issue.  (Trial Tr. 102:5-14, Nov. 15, 2011 (Mazis).)  Mazis interviewed 400 chocolate candy

49

purchasers for his survey,[43] of which approximately 268 were premium chocolate candy purchasers.  (*See* Trial Tr. 83:14-24, Nov. 15, 2011 (Mazis); PX-134 at 4.)  The survey was performed at twelve shopping malls around the country and data collection was outsourced.[44] (*See* Trial Tr. 85:19-86:10, Nov. 15, 2011 (Mazis); PX-134, PX-135, PX-137- PX142.)

Mazis acknowledged that he had two options for examples to show those surveyed: 1) a card with SWISSKISS on it with an identifier of chocolate of Swiss origin or 2) the SWISSKISS product PIM shipped to Continental.  (*See* Trial Tr. 86:20-87:23, Nov. 15, 2011 (Mazis).)  Mazis testified that normally he would have selected the product that was already in existence, but here he felt that since Rosenberg indicated uncertainty about what the SWISSKISS product would ultimately look like he choose the first option, a white card.  (*See* Trial Tr. 87:12-25, Nov. 15, 2011 (Mazis).)  Further, based on viewing the SWISSKISS product that was sent to Continental Mazis stated "to me, it doesn't look like a real product at least not anything that I had seen before. So I kind of wondered: Is this something that actually would be sold at the retail level?"  (*See* Trial Tr. 88:22-25, Nov. 15, 2011 (Mazis); PX-7, PX-27.)  Ultimately Mazis used white cards with black ink, no color (even though the colors of the SWISSKISS mark were available), with SWISSKISS in all capital letters and no packaging. (Trial Tr. 135:8-136:24, Nov. 15, 2011 (Mazis).)

Mazis concluded that over a third of the respondents to the survey made an association between SWISSKISS and the KISSES marks (*e.g.* Hershey's KISSES, KISSES or Hershey's). (Trial Tr. 98:16-99:5, Nov. 15, 2011 (Mazis).)  However, Mazis noted that if the SWISSKISS name was on a product package, the association could go higher or lower.  (Trial Tr. 99:3-5, Nov. 15, 2011 (Mazis).)   The test was not designed to, nor did it, reflect whether other candy brands

---

[43] Mazis used a control cell of approximately 200 about half of whom saw the phrase "Swisskiss" as part of the survey.  (Trial Tr. 92:21-93:7, Nov. 15, 2011 (Mazis).)
[44] The survey did not involve retail stores, where product placement may influence consumers' ability to distinguish brands.

with the terms "kiss" or "kisses" that were in the market had already diluted Hershey's KISSES mark. (Trial Tr. 104:16-105:17, Nov. 15, 2011 (Mazis).)

Mazis' selection of a white card as opposed to an actual sample of the product when one was readily available is problematic for this Court. The Court accepts Mazis' reasoning that the product SWISSKISS sent to Continental was not clearly established as the version Rosenberg planned for PIM to distribute as plausible, but not reasonable given the circumstances. Mazis' reasoning does not justify doing the survey with white cards and black lettering when other samples or similar mock ups were available. It makes the validity of the Mazis survey questionable, particularly since not only did PIM's expert testify they would not have done so, but Mazis even admitted that normally he would not have done so. (*See* Trial Tr. 86:20-87:23, Nov. 15, 2011 (Mazis).) If Mazis was not confident about using the SWISSKISS product sent out to Continental, PIM also had prototypes used at trade shows etc, and the logo produced in discovery that could have been utilized.[45] (*See* Trial Tr. 119:1-3, Nov. 15, 2011 (Mazis).)

In the past, Mazis himself had criticized other surveys for not using reasonably proximate market conditions. (Trial Tr. 105:23-106:23, 107:12-114:17, Nov. 15, 2011 (Mazis).) Specifically, Mazis previously pointed out deficiencies in using cards instead of actual promotional and product information because contextual cues may influence how consumers distinguish and interpret brand information. (Trial Tr. 114:4-17, Nov. 15, 2011 (Mazis).) Mazis had even criticized a study that used only a logo on a card when an actual product package was available. (Trial Tr. 119:16-121:10, Nov. 15, 2011 (Mazis).) Mazis agreed that the manufacturer's name on the product and other features can help consumers distinguish products. (Trial Tr. 120:1-121:10, Nov. 15, 2011 (Mazis).)

---

[45] Exhibit PX-27 is a SWISSKISS mock up/example with green background that still has the red and white SWISSKISS logo. There were other mock ups. (*See generally* Trial Tr., Nov. 17, 2011 (Rosenberg).)

Defendant's expert, Simonson, also testified that he found Mazis' study unreliable and irrelevant.  (Trial Tr. 8:10-13, Nov. 18, 2011 (Simonson).)  Simonson's main critique of Mazis' study was the card stimuli selected and the lack of market place conditions or context.  (*See generally* Trial Tr. Nov. 18, 2011 (Simonson).)  Simonson made pointed arguments for why Mazis (and Steckel) should have used the "best available information" for a stimuli (or in the alternative told Hershey's counsel they could not perform a reliable survey based on the information they had).  (Trial Tr. 13:11-15:9, Nov. 18, 2011 (Simonson).)

Contextual cues can make a big difference to consumers on whether there is a likelihood of association.  Even with that, the association rate of one third is not as high as in other cases reviewed, and it included coding for those surveyed who mentioned multiple brands as long as Hershey's or KISSES was among them.[46]  (*See* Trial Tr. 142:19-151:17, Nov. 15, 2011 (Mazis).)  Based on Mazis' testimony, and the other testimony and evidence provided, this Court does not find Mazis' survey to be reliable for a dilution study on the likelihood of association of SWISSKISS with KISSES or Hershey's KISSES.

After review of the evidence and factors for dilution analysis, this Court finds that dilution of the KISSES mark by the SWISSKISS mark has not been established.  *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 379 (the court should apply anti-dilution "laws with care and common sense lest they damage the competitive system they are designed to enhance") (internal citation omitted).

### III.  Bona Fide Use and Cancellation of Trademark

Pursuant to 15 U.S.C.A. § 1119, the power of the court over registration is as follows:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in

---

[46] *See, e.g., Nike, Inc. v. Nikepal Int'l, Inc.*, 84 U.S.P.Q.2d 1820, 1825 (E.D. Cal. Sept. 18, 2007) ("87%, associated Nikepal with Nike").

> whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C.A. § 1119; *see also* 15 U.S.C. § 1051(d).

### Whether PIM Made "Bona Fide Use" of the SWISSKISS Mark

Under the circumstances presented, there was not a bona fide use of the SWISSKISS mark by Defendant.

Pursuant to 15 U.S.C. § 1127,

> "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--
>
> (1) on goods when--
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

The Lanham Act permits registration of a trademark when "the mark is in use in commerce." 15 U.S.C. § 1051(a)(3)(C). "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

First, the mark must be adopted by being "placed in any manner on the goods or their containers." 15 U.S.C. § 1127. However, "[m]ere adoption of a mark without bona fide use, in an attempt to reserve it for the future, does not create trade-mark rights . . . Ownership of a mark requires both appropriation and use in trade." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001) (internal citations and quotation marks omitted).

After adoption, the second requirement a mark must satisfy for bona fide use, is that the goods must be "sold or transported in commerce." 15 U.S.C. § 1127. "[T]he purpose of the [Act] was to eliminate 'token use' as a basis for registration, and that the new, stricter standard contemplates instead commercial use of the type common to the particular industry in question." *Paramount Pictures Corp. v. White*, 31 U.S.P.Q.2D (BNA) 1768, 1774 (TTAB 1994). Whether use in commerce is sufficient is a fact specific inquiry. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. Fla. 2001) (internal citations omitted). While token use is not sufficient, we previously noted that use does not need to be extensive to qualify. (*See* SJ Opinion at 28 (citing *Protech Diamond Tools, Inc. v. Liao*, 2009 U.S. Dist. LEXIS 53382, at *12 (N.D. Cal. 2009).) The analysis must take into account the unique circumstances and market. *See Lucent Info. Mgmt. v. Lucent Techs., Inc.*, 186 F.3d 311, 317 (3d Cir. 1999).[47]

"The Third Circuit has held that the volume of sales must be more than *de minimis*." *Universal Nutrition Corp. v. Carbolite Foods, Inc.*, 325 F. Supp. 2d 526, 534 (citing *Lucent*, 186 F.3d at 317); *see also Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1400 (3d Cir. 1985). For example, in *Lucent Info. Mgmt.*, one single sale of a computer modem for $323.50

---

[47] The Third Circuit has used a four-factor test to establish "whether the market penetration of a trademark in an area is sufficient to warrant protection." *Universal Nutrition Corp. v. Carbolite Foods, Inc.*, 325 F. Supp. 2d 526, 533 (D.N.J. 2004) (internal citations omitted). The four factors considered are: "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Id.* (quoting *Lucent Info. Mgmt., Inc.*, 186 F.3d at 317).

was not sufficient to constitute bona fide use for a software and hardware company.  *Id.* at 313, 317.  In *Lucent Info. Mgmt.*, there was only a single shipment and the volume was small.  *Id.*

However, use can be *de minimis* even where there is more than one shipment if the volume is not significant enough.  *See Universal Nutrition Corp.*, 325 F. Supp. at 533-534.  In *Universal*, two shipments containing 2,400 chocolate bars for approximately $4,800 were sent to distributors. *Universal Nutrition Corp.*, 325 F. Supp. 2d at 533-34.  The court found these two shipments four weeks prior to the date the competitor filed intent-to-use trademark registration, were not sufficient to satisfy the bona fide use requirement.  *Id.*  Similarly, in *Natural Footwear*, there were multiple sales, but volume was considered *de minimus* to warrant a nationwide injunction where gross sales did not exceed $5,000 over fifty customers in any state "in at least two of the three years for which sales data [was] available."  *Natural Footwear, Ltd.*, 760 F.2d at 1400.

Although to date the Third Circuit has not found bona fide use where there has been only one sale or shipment, other courts have acknowledged that under certain circumstances, one sale or shipment may satisfy bona fide use:

> [W]here a mark has been placed on goods, a single sale or shipment may be sufficient to support an application to register the mark, *providing that* this shipment or sale has *the color of a bona fide transaction and is accompanied or followed* by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade.

*Chance*, 242 F.3d at 1157 (citing *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1472-74 (Fed. Cir. 1987)) (emphasis added).

It may also be possible to establish sufficient use in commerce without actual sales. *CCBN.com, Inc. v. C-call.com, Inc.*, 73 F. Supp. 2d 106, 110 (D. Mass. 1999).  However, where there are no sales, pre-sale use must be extensive.  *See id.* ("A party can establish 'use in commerce' by demonstrating 'test-market use' of the mark."); *see also Brookfield*

*Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ("trademark rights can vest even before any goods or services are actually sold if 'the totality of one's prior actions, taken together, can establish a right to use the trade-mark").   However, promotional activities alone will not be sufficient for bona fide use.   For example, the Ninth Circuit found that a promotional "mailing of the 35,000 post cards, which generated 128 responses to its 800 number and no sales, cannot be considered a first use under the law."   *Chance*, 242 F.3d at 1160.

In the instant matter, Plaintiff argued that PIM's distribution of the SWISSKISS product should "be viewed as a mere token use, done for the purposes of securing a trademark registration."   (Trial Tr. 9:21-22, Nov. 14, 2011 (Pl.'s Counsel).)   Efforts to secure a source of supply of the Swiss chocolate and follow up with Continental regarding its one shipment of goods was questionable, but ultimately it is the lack of evidence of sales to customers that is most problematic for this Court.

The one shipment to Continental does not appear to be a sale or use in commerce in the ordinary course of business in a traditional sense, but testimony has indicated that the sale and credit back (although a year later in this instance) was not unusual for PIM with a new product like SWISSKISS.   This Court reviews the transaction while acknowledging that what would suffice as a purchase or sale may be industry specific.   In this case, this Court considers what is appropriate or normal in the confectionery industry.   However, even still this transaction is at best as *de minimus*.

PIM argues that a buyer at Wal-mart indicated they were interested in buying SWISSKISS products in 2005, but a few weeks later PIM received a demand letter with a draft cancellation petition from Hershey that demanded PIM cease all use of the SWISSKISS marks.   PIM claims it then made a business decision to hold off on further sales until it clearly established its rights to use the brand.   (*See generally* Trial Tr. 11:17-20:11 Nov. 17, 2011 (Rosenberg).)      Rosenberg

56

also indicated that construction issues and delays impacted efforts to distribute SWISSKISS. (Trial Tr. 114:3-115:25, Nov. 16, 2011 (Rosenberg).)   All of these reasons explain to some extent why there was no mass production of the SWISSKISS product.  However, other than the fifty cases sent to Continental, on June 24, 2004, no other SWISSKISS packages were ever manufactured.[48]  (Trial Tr. 113:13-21, Nov. 17, 2011 (Rosenberg).)

Although it appears that PIM continued on some level to develop ideas for the SWISSKISS product, including packaging and looking at suppliers and distributors,[49] PIM has not been able to provide concrete evidence that its SWISSKISS product ever reached actual customers at any point in all these years.  In this instance, there is not even evidence of directed marketing for sales to the general public.  PIM did list SWISSKISS in the 2004 Candy Buyer's Directory, other directories, and on cartons sent to distributors which are more of a representation to the confectionery industry (distributors, etc.) that the candy was created, rather than the targeted consumers.  (Trial Tr. 134:21-136:6, Nov. 17, 2011 (Rosenberg).)  Further, it appears that none of the directories include a useful description of the SWISSKISS product for marketing purposes. (Trial Tr. 135:4-136:6, Nov. 17, 2011 (Rosenberg).)   This Court does not find that these minor uses or listings qualify as bona fide uses, and that they are in fact *de minimus*.

Rosenberg testified that PIM did not produce commercial quantities of the SWISSKISS product.  (Trial Tr. 87:3-14, Nov. 17, 2011 (Rosenberg).)  The fifty cases sent to Continental in June 2004 were 12-count for a total of 1200 bars of chocolate for a "price" of $1,020.00.  (Trial Tr. 177:1-13, 181:2-182:6, Nov. 16, 2011 (Rosenberg).)  The amount paid by Continental was not paid until April or May 2005 *after* PIM contacted Continental in April 2005 for payment.  (Trial

---

[48] Currently, PIM is not selling the Suisse chocolate bars that were sold at least from 2004-2009.  (Trial Tr. 114:21-115:9, Nov. 17, 2011 (Rosenberg).)

[49] PIM also included SWISSKISS on its brands list on shipping cartons to ship complimentary samples of its various products to retailers, wholesalers, distributors, and sales personnel, and allegedly to even customers. (Trial Tr. 25:21-26:10,  Nov. 17, 2011 (Rosenberg); DX-36.)  It does not include any description of the product or pricing information, but has a line under SWISSKISS, that reads "Finest Swiss Chocolates."  (DX-36.)

Tr. 122:19-22, 124:14-24, 125:5-10, Nov. 17, 2011 (Rosenberg).)   The amount paid by

Continental was credited back to Continental approximately two weeks later.  (Trial Tr. 177:1-13,

180:2-181:6, Nov. 16, 2011 (Rosenberg); Trial Tr. 124:14-24, 125:5-10, Nov. 17, 2011

(Rosenberg).)  Even accepting that this transaction was to promote business and test the product,

what happened to the SWISSKISS products after Continental received them is unknown.  Further,

Rosenberg's testimony provided the following:

> Q: I take it as you sit here today, under oath, you can't
> testify that in fact Continental sells -- may sell to any
> retailer of the SwissKiss product?
> A: I don't think we ever, it was ever clear exactly what they
> did with the product. I think it's our belief that it ended up
> in their retail store.
> Q: I'm not asking you about your belief. I'm asking you, do
> you have any information that you can testify to, under oath,
> that Continental Concession made a sale to any retailer?
> A: No, I do not.
> Q: And while you say it's your belie[f] it went into their
> retail store, you -- let me finish, you don't have any actual
> information that it did, do you?
> A: The only information I have is in connection with this
> case, so the answer is no, I do not.
> Q: And you, as you sit here now, you can't testify under oath
> that any consumer in America has ever purchased any product
> under the name or mark "SwissKiss", can you?
> A: I'm not certain if they have or they haven't because, as I
> testified, I'm not sure of what happened to the product we
> shipped to Continental.
> Q: So the answer to my question is, you can't testify that
> such a sale of SwissKiss to any consumer ever occurred? That's
> an accurate statement, isn't it?
> A: I don't know if it did or didn't, I can't say. I don't
> know.

(Trial Tr. 119:9-120:9, Nov. 17, 2011 (Rosenberg).)

The *de minimus* single transaction for SWISSKISS offered as a bona fide use (and its

circumstances), in conjunction with the lack of evidence of sales to consumers and significantly

limited production and marketing, leaves this Court unable to find a bona fide use of the

SWISSKISS product.  In sum, Defendant has not established a bona fide use in commerce of the SWISSKISS product.[50]

**CONCLUSION**

Hershey has not demonstrated a reliable likelihood of confusion to support a claim for trademark infringement or unfair competition.  This Court further finds that PIM's SWISSKISS mark for its product will not dilute the strength of the KISSES mark.  However, PIM has failed to establish bona fide use of the SWISSKISS trademark.

For the reasons stated above, the Court will enter judgment in favor of Defendant regarding claims of trademark infringement and dilution, but judgment is for Plaintiff with regard to the lack of bona fide use and the request for cancellation of Defendant's trademark.  An appropriate Order will accompany this opinion.

<u>s/ Susan D. Wigenton, U.S.D.J.</u>

Orig:        Clerk
cc:          Parties
             Magistrate Judge Arleo

---

[50] This Court does not find bona fide use.  However, even with bona fide use, nonuse of the mark may be excused only due to special circumstances.  *See generally Imperial Tobacco Ltd., Assignee of Imperial Group PLC v. Philip Morris, Inc.*, 899 F.2d 1575 (Fed. Cir. 1990); McCarthy § 17:16; 15 U.S.C. § 1127; 15 U.S.C. § 1058(b).  The cases cited by the parties in which litigation has constituted "special circumstances" generally involved abandonment.  *See, e.g., Penthouse Int'l, Ltd. v. Dyn Elecs., Inc.*, 196 U.S.P.Q. 251, 257 (T.T.A.B. 1977); *see also Rivard v. Linville*, 133 F.3d 1446, 1450 (Fed. Cir. 1998) ("not every business reason excuses nonuse").  Further, several cases cited by the Defendant to support excusable nonuse are distinguishable from the instant matter and/or are not binding.  *See, e.g., Penthouse Int'l, Ltd.*, 196 U.S.P.Q. at 257 (noting that "nonuse of a mark pending the outcome of litigation [or] a party's protest to such use constitutes excusable nonuse," but accepting token use).   In the instant matter, the circumstances of use, lack of follow up, and the timing of the litigation would not be sufficient to support an exception for "special circumstances."